# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

Hebei Mighty Synthetic Rubber and Plastic Co. Ltd.     :
                                                       :
                                    Petitioner,        :
         -vs.-                                         :          ECF Case No.
                                                       :
Global Syn-Turf, Inc.                                  :          **PETITION TO CONFIRM**
                                                       :          **ARBITRATION AWARD**
                                    Respondent.        :
---------------------------------------------------------------- x


Petitioner Hebei Mighty Synthetic Rubber and Plastic Co. Ltd. ("HMSRP"), by and through its attorneys, Mazzola Lindstrom LLP, as and for its Petition to Confirm the Arbitration Award rendered in an underlying arbitration between Petitioner and Respondent, Global Syn-Turf, Inc. ("GST"), hereby alleges as follows:

## PARTIES

1.      HMSRP is a Chinese corporation with its principal offices located at Floor 10, Block B, Rundou Shenghe Plaza, South of Huanghe Ae. & Qilian St. Crossing High Tech Zone, Shijiazhuang City, Hebei 050000, People's Republic of China. HMSR is a manufacturer of synthetic turf.

2.      Global Syn-Turf, Inc. is a California corporation with its principal offices located at 5960 Inglewood Drive, Suite 150, Pleasanton, CA 94588.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction to confirm an arbitral award in favor of a party pursuant to 28 U.S.C. § 1331(a) because this is an action under Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9 to confirm an arbitration award.

4854-1612-1094, v. 2

4. Alternatively, this Petition may be brought under the diversity jurisdiction of this Court, 28 U.S.C. § 1332(a)(2), since there is complete diversity of citizenship between the parties and the amount at issue is greater than $75,000 exclusive of interest and costs.

5. This Court has personal jurisdiction over the parties as the underlying arbitration took place in New York, New York.

6. Venue in this District is proper as the underlying arbitration took place in New York, New York.

## FACTUAL AND PROCEDURAL BACKGROUND

7. On April 15, 2015, HMSRP and GST entered into an Exclusive Agency Agreement ("Agreement") pertaining to the manufacture, marketing, and sale of a particular type of "hollow-blade" synthetic turf, under which GST became the exclusive agent to promote and solicit customer orders for the product. *See*, Declaration of Ruofei Xiang ("Xiang Decl."), Exhibit A.

8. The original Agreement was drafted in Chinese. Both parties had the Agreement certifiably translated into English, and there are no real substantive differences between the two translations.

9. The Agreement contained an arbitration clause providing that:

**11. Arbitration**
Any disputes arising out of or relating to the performance of this agreement shall be settled through friendly negotiation. If the negotiation fails, the case shall then be submitted for arbitration to the American Arbitration Association, and it shall be arbitrated by the rules of this association. The results of the arbitration shall be final and binding upon both parties, and the costs of the arbitration proceeding shall be borne by the unsuccessful party, unless otherwise stipulated by the arbitrators' judgment.
(English translation provided by GST)

**Article 11 Arbitration**
In the course of the performance of this Agreement, all disputes

arising out of or related to this Agreement shall firstly be settled
through friendly negotiation between both Parties. If it is not
resolved, the dispute shall be submitted to the American Arbitration
Commission and the arbitration shall be conducted
in accordance with its arbitration rules. The arbitration fee shall
be borne by the losing Party, unless otherwise specified by the
Arbitration Commission.

(English translation provided HMSRP)

10.     In or about 2017, the parties engaged in various commercial disputes wherein both

parties claimed breach of contract and fraud against the other in connection with the quality and

specifications of the product.

11.     On February 20, 2019, GST commenced arbitration proceedings with the

International Center for Dispute Resolution, an arm of the American Arbitration Association.

12.     On August 27, 2019, the Tribunal consisting of a sole arbitrator issued a Partial

Award confirming the Tribunal's jurisdiction over the dispute and determining the seat of

arbitration to be New York. *See* Xiang Decl., Exhibit B.

13.     After significant discovery, expert reports, and pre-hearing submissions, the

arbitration took place on November 2-5, November 9-10, and December 1, 2020 virtually via

Zoom.

14.     The parties submitted post-hearing summaries of damage evidence and costs on

December 8, 2020 pursuant to the Tribunal's instructions.

15.     The Tribunal closed the hearing officially on March 5, 2021.

16.     Both parties had a full and fair opportunity to present their respective cases.

17.     On May 17, 2021, the arbitrator rendered a Final Award in full adjudication of all

claims submitted to arbitration. *See* Xiang Decl., Exhibit C.

18.     The Final Award awarded HMSRP the following: 1) contractual damages in the

amount of $130,788, 2) costs of arbitration and legal fees in the amount of $312,046.71, and 3)

reimbursement in the amount of $28,378.75 representing portion of said fees and expenses in excess of the apportioned costs incurred by GST.

19.     The Final Award also awarded HMSRP interest at the statutory rate of 9% per annum on all monetary sums awarded above (except for the reimbursement of US$28,378.75, in respect of which interest will run 30 days from the date of payment by HMSRP), from 30 days from the date of the Award until payment is made.

20.     On June 17, 2021, GST submitted a Request for the Clarification and Modification of the Final Award, which was denied by the Tribunal on July 27, 2021. *See* Xiang Decl., Exhibit D.

21.     On August 27, 2021, GST submitted a Request for Clarification of Disposition of Request for Modification. On October 11, 2021, the Tribunal denied the request, and reaffirmed the Final Award. *See* Xiang Decl. Exhibit E.

22.     To date, Respondent has failed and/or refused to honor or satisfy the Final Award.

## CLAIM FOR RELIEF

23.     The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., govern this Award, because the Award arises from a contractual relationship that involves commerce and contains an arbitration provision. 9 U.S.C. § 2.

24.     The Final Award in all respects conforms to the requirements of 9 U.S.C. §9 governing confirmation of arbitration awards.

25.     No prior application for confirmation of the Final Award has previously been made in this or any other Court.

26.     The Federal Arbitration Act provides that upon application by any party to the arbitration agreement for an order confirming the award, "the court *must* grant such an order unless

4

the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. 9 U.S.C. § 9 (emphasis added).

27.     No grounds exist to support vacatur, modification or correction of the Final Award under 9 U.S.C. § 10 or § 11, and no such application has been made.

28.     Therefore, the Award should be confirmed  pursuant to  9 U.S.C. §9.

WHEREFORE, Petitioner Hebei Mighty Synthetic Rubber and Plastic Co. Ltd. respectfully requests Judgment confirming and enforcing the Final Award, fees and costs incurred in the prosecution of this Petition, and that the Court grant the Petitioner such other and further relief as may be just and equitable in the circumstances.

Dated: New York, New York
        December 14,  2021

Respectfully submitted,

MAZZOLA LINDSTROM LLP

___s/Ruofei Xiang___
Ruofei Xiang
1350 Avenue of the Americas, 2FL
New York, NY 10019
Tel: (646) 663-1860
ruofei@mazzolalindstrom.com
*Attorneys for Petitioner*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

Hebei Mighty Synthetic Rubber and Plastic Co. Ltd.   :
  :
                              Petitioner,   :
    -vs.-   :        ECF Case No.
  :
Global Syn-Turf, Inc.   :
  :
                           Respondent.   :
------------------------------------------------------------- x

---

# MEMORANDUM OF LAW IN SUPPORT OF
# PETITION TO CONFIRM ARBITRATION AWARD

---

MAZZOLA LINDSTROM LLP
1350 Avenue of the Americas, 2FL
New York, NY 10019
Tel: (646) 663-1860
*Attorneys for Petitioner*

Petitioner Hebei Mighty Synthetic Rubber and Plastic Co. Ltd. ("HMSRP"), by and through its attorneys, Mazzola Lindstrom LLP, respectfully submits this Memorandum of Law in support of its Petition to Confirm the Arbitration Award rendered in an underlying arbitration between Petitioner and Respondent, Global Syn-Turf, Inc. ("GST"). HMSRP  seeks confirmation of the Final Award and entry of judgment consistent with its terms.

## PRELIMINARY STATEMENT

This is an action arising under the Federal Arbitration Act , 9 U.S.C. § 201, *et seq*. to confirm an arbitral award rendered by the International Center for Dispute Resolution, an arm of the American Arbitration Association. After extensive discovery, an arbitration hearing lasting several days,  and post-hearing submissions, the arbitral tribunal issued a Final Award on May 17, 2021 in favor of HMSRP.

The Final Award awarded HMSRP the following: 1) contractual damages in the amount of $130,788, 2) costs of arbitration and legal fees in the amount of $312,046.71, and 3) reimbursement in the amount of $28,378.75 representing portion of said fees and expenses in excess of the apportioned costs incurred by GST. The Final Award also awarded HMSRP interest at the statutory rate of 9% per annum on all monetary sums awarded above (except for the reimbursement of US$28,378.75, in respect of which interest will run 30 days from the date of payment by HMSRP), from 30 days from the date of the Award until payment is made.

GST has failed and/or refused to pay, and as such HMSRP brings this instant motion for a confirmation and summary enforcement of arbitration award.

2

## FACTUAL AND PROCEDURAL BACKGROUND

HMSRP respectfully refers the Court to the factual and procedural background as set forth in the Petition to Confirm Arbitration Award ("Petition") and accompanying Declaration of Ruofei Xiang ("Xiang Decl."), and supporting exhibits.

## ARGUMENT

## I.   THIS COURT HAS JURISDICTION TO ENFORCE THE AWARD

This Court has subject matter jurisdiction under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") and the implementing provisions of the Federal Arbitration Act (the "FAA"). *See* 9 U.S.C. §201 *et seq.*; 9 U.S.C. §1 *et seq.*; *see also Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp. 1229, 1236 (S.D.N.Y. 1992) (holding that the Convention "is the supreme law of the land…and controls any case in any American court falling within its sphere of application). The Court has original jurisdiction over an action that arises under the Convention. 9 U.S.C. § 203. An action arises under the Convention if it concerns the enforcement of an arbitration agreement or arbitral award under the Convention. 9 U.S.C. § 202. Whether an arbitration agreement is within the scope of the Convention is determined by 9 U.S.C. §202, which states in pertinent part as follows:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether  contractual or not, which is considered as commercial, including a transaction, contract or agreement described in Section 2 of this title, falls under the Convention. 9 U.S.C. § 202.

Applying §202, courts have held that where an agreement to arbitrate involves parties domiciled or having their principal place of business outside the United States, that agreement is governed by the Convention. The U.S. Court of Appeals for the Second Circuit has set forth four basic requirements to invoke federal court jurisdiction: (1) there must be a written agreement; (2)

3

it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial: and (4) it cannot be entirely domestic in scope. *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc*., 198 F.3d 88, 92 (2d Cir. 1999); *Credit Suisse First Boston, LLC v. Padilla,* 326 F. Supp.2d 508, 511 (S.D.N.Y. 2004).

The underlying agreement, the Exclusive Agency Agreement, pursuant to which arbitration was held, meets all four of these elements. It is a written agreement regarding manufacture and sales of synthetic turf, which is obviously commercial in nature. The matter is not entirely between citizens of the United States as HMSRP is a foreign party with a principal place of business in China. Furthermore, performance under the Agreement was in China. *See Bergesen v. Joseph Muller Corp*., 710 F.2d 928, 932 (2d Cir. 1983) (holding that federal courts have jurisdiction under the Convention to confirm an award from a New York arbitration where there were foreign parties and performance was overseas); *Lander Co v. MMP Invs., Inc.*, 107 F.3d 476, 478-79 (7th Cir. 1997) (arbitration fell under the Convention because performance was to be in Poland).

No court was specified in the Agreement with regard to confirmation of the arbitration award. 9 U.S.C. §9 provides that, "If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." The seat of the arbitration was in New York, and the Final Award was rendered in New York.

The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between HMSRP (a citizen of a foreign country) and GST (citizen of California), and the amount in controversy exceeds $75,000.

4

## II.  THIS PETITION SHOULD BE GRANTED ON SUMMARY REVIEW AS SET FORTH BY THE FEDERAL ARBITRATION ACT AND THE NEW YORK CONVENTION.

The standard of review of the arbitrator's decision is extremely narrow, as confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court," thereby allowing a party seeking confirmation to pursue a variety of remedies to enforce the judgment should the losing party to the arbitration not abide by the arbitration award. *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984); *see also D. H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).

Judicial review of arbitral awards is extremely limited. The Second Circuit has held that confirmation under the Convention is limited to a determination of the statutory conditions for confirmation or grounds for refusal to confirm. *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007). Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation. *Willemijn Houstermaatschappij, BV v. Standard Microsystems Corp*., 103 F.3d 9, 12 (2d Cir. 1997).

Upon application of a party to an arbitration award made pursuant to the Convention, a district court shall confirm the award as against any other party to the arbitration, unless the court finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the Convention. 9 U.S.C. § 207. Article V of the Convention delineates the limited and exclusive grounds under which a court may refuse recognition and enforcement of an award, but this must be at the request of the party against whom it is invoked. The party opposing the petition to confirm the award bears the burden of establishing the existence of one of the grounds for refusal to recognize and enforce the award. *Compagnie Noga D'Importation Et D'Exportation v. Russian*

5

*Fed'n*, 361 F.3d 676, 683 (2d Cir. 2004). The showing required to avoid summary confirmation is high. *Encylopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc*., 403 F.3d 85, 90 (2d Cir. 2005). Any grounds that the Respondent may raise would have no merit. Similarly, Section 10 of the FAA delineates four limited circumstances under which courts may vacate an arbitration award, none of which are applicable here.

Therefore, because the scope of this Court's review is necessarily narrow and because the burden is on the Respondent to prove the applicable of any of the factors listed in Article V of the Convention or Section 10 of the FAA, this Court should confirm the Award in its entirety.

## CONCLUSION

Based on the foregoing, Petitioner respectfully requests that this Court enter judgment recognizing and enforcing the Final Award in its's favor, together with such other and further relief as the Court may determine is appropriate in the circumstances.

Dated: New York, New York
      December 14,  2021

Respectfully submitted,

MAZZOLA LINDSTROM LLP

___s/Ruofei Xiang__
Ruofei Xiang
1350 Avenue of the Americas, 2FL
New York, NY 10019
Tel: (646) 663-1860
ruofei@mazzolalindstrom.com
*Attorneys for Petitioner*

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

Hebei Mighty Synthetic Rubber and Plastic Co. Ltd.   :
                                                      :
                                    Petitioner,       :        ECF Case No.
         -vs.-                                        :
                                                      :        **Declaration of Ruofei Xiang**
Global Syn-Turf, Inc.                                 :
                                                      :
                                    Respondent.       :
------------------------------------------------------------- x

Ruofei Xiang, being duly sworn, deposes and says:

1.     I am an attorney admitted to practice before this Honorable Court, and I am with the law firm Mazzola Lindstrom LLP, attorneys for Petitioner Hebei Mighty Synthetic Rubber and Plastic Co. Ltd. ("HMSRP"). I am familiar with the facts, pleadings, and procedural history of this matter.

2.     This declaration is respectfully submitted in support of HMSRP's Petition to Confirm the Arbitration Award rendered in an underlying arbitration between HMSRP and Respondent Global Syn-Turf, Inc. ("GST"). All exhibits annexed hereto are true and correct copies of documents it purports to be.

3.     Annexed hereto as **Exhibit A** is a true and correct copy of the Exclusive Agency Agreement subject to the dispute between the parties, in its original Chinese version and the English certified translations submitted by each party.

4.     In accordance with the arbitration clause in the Exclusive Agency Agreement, GST commenced arbitration proceedings with the International Center for Dispute Resolution, an arm of the American Arbitration Association in 2019. Both parties alleged breach of contract and fraud against each other.

5.   On August 27, 2019, the Tribunal consisting of a sole arbitrator issued a Partial Award confirming the Tribunal's jurisdiction over the dispute and determining the seat of arbitration to be New York.

6.   Annexed hereto as **Exhibit B** is a true and correct copy of the Final Partial Award on Jurisdiction dated August 27, 2019.

7.   On May 17, 2021, the arbitration tribunal rendered a final award in favor of HMSRP, awarding to HMSRP 1) contractual damages in the amount of $130,788, 2) costs of arbitration and legal fees in the amount of $312,046.71, and 3) reimbursement in the amount of $28,378.75 representing portion of said fees and expenses in excess of the apportioned costs incurred by GST. The Final Award also awarded HMSRP interest at the statutory rate of 9% per annum on all monetary sums awarded above (except for the reimbursement of US$28,378.75, in respect of which interest will run 30 days from the date of payment by HMSRP), from 30 days from the date of the Award until payment is made.

8.   Annexed hereto as **Exhibit C** is a true and correct copy of the Final Award dated May 17, 2021.

9.   On June 17, 2021, GST submitted a Request for the Clarification and Modification of the Final Award, which was denied by the Tribunal on July 27, 2021. Annexed hereto as **Exhibit D** is a true and correct copy of the Tribunal's Disposition of Request for Clarification and Modification of Final Award GST's request dated July 27, 2021.

10.   On August 27, 2021, GST submitted a Request for Clarification of Disposition of Request for Modification, which was again denied by the Tribunal on October 11, 2021. Annexed hereto as **Exhibit E** is a true and correct copy of the Tribunal's Disposition of Request for Clarification of Disposition of Requestion for Modification dated October 11, 2021.

11.     The arbitration conforms to the requirements of 9 U.S.C. § 9 governing confirmation of arbitration awards.

12.     No prior application for confirmation of the Final Award has previously been made in this or any other Court.

13.     No application to vacate the Final Award has been filed in this Court or any other court.

14.     I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
         December 14, 2021

Respectfully submitted,

MAZZOLA LINDSTROM LLP

___s/Ruofei Xiang___
Ruofei Xiang
1350 Avenue of the Americas, 2FL
New York, NY 10019
Tel: (646) 663-1860
ruofei@mazzolalindstrom.com
*Attorneys for Petitioner*

# EXHIBIT A

http://127.0.0.1:49427/h/viewimages?id=c33f03b1-2e2c-4f0f-8feb-61

关于空心草.M 形草系列产品在美国市场独家代理

协 议 书

甲方：美国环球人造草坪有限公司　　　　乙方：河北麦迪橡胶股份有限公司

地址：2482 Technology Dr., Hayward,　　　地址：中国河北省石家庄市东开发区

　　　California, 94545. USA　　　　　　　　黄河大道和祁连街交口西南角

　　　　　　　　　　　　　　　　　　　　　润都盛和广场 B 座 10 楼

电话：510 732 2300　　　　　　　　　　　电话：0311-85210888

传真：510 732 6188　　　　　　　　　　　传真：0311-85213888

经甲乙双方共同协商，现就双方合作空心草系列和 M 形草系列人造草坪出口美国（含加拿大）相关事宜，做出如下约定：

**第一条　委任与接受**

1、在本协议有效期内，乙方指定代理商为本协议第四条项下产品的独家代理商，在第三条所规定的区域内招揽顾客的订单销售。代理商同意并接受上述委托。

**第二条　代理商的义务**

代理商不得代表乙方作出任何担保、承诺以及订立契约、合同或作其他对乙方有约束力的行为。对于代理商违反乙方指令或超出指令范围所用的一切作为或不作为，乙方都将不承担任何责任。

**第三条　代理区域**

本协议所指的代理区域是：美国（含加拿大）（以下简称区域）。

**第四条　代理产品**

本协议所指的代理产品是 空心草 M 形草（以下简称产品）。

**第五条　独家代理权**

Zimbra
http://127.0.0.1:49427/h/viewimages?id=c33f03b1-2e2c-4f0f-8feb-61

基于本协议授予的独家代理权，在本协议有效期内，乙方不得在代理区域内，直接地或间接地，通过其他渠道销售、出口代理产品。但其他国家地区客户在乙方或者通过其他国家的贸易公司直接采购的空心草销售到该地区与甲乙双方无关，乙方不负任何责任。如甲方在美国（含加拿大）市场中发现乙方所生产的空心草和 M 形系列产品，是通过乙方或者直接销售给美国（含加拿大）区域内其他任何公司，或以招揽为目的的广告投放，甲方有权使用美国本土法律追究乙方的违约责任（如果乙方违约，甲方将在美国海关及当地法院起诉要求所有已经发生和未来预估的所有经济损失的赔偿）；如果甲方在美国（含加拿大）市场中发现乙方所生产的空心草系列和 M 形产品，是通过中国的贸易公司进入市场，则甲方立即向乙方提出书面通知，乙方有责任和义务立即终止与此贸易公司关于空心草和 M 形产品的所有合作。如乙方未终止，甲方有权使用本土法律追究乙方的违约责任。

**第六条　年采购量含加拿大**

乙方指定甲方为美国（含加拿大）地区的空心草系列和 M 形草系列独家代理商，乙方要求甲方年采购量为：5 万平方米。

**第七条　付款方式**

1、甲方在下每笔订单之日起向乙方支付 30%定金，待货物到达目的港前，甲方支付剩余尾款。

2、产品价格如有变动，乙方应提前与甲方通过谈判确定最终签约价。

**第八条　产品质量责任**

甲方收到货物后，不可能马上检验，货物的仓储时间不定，所以 产品质量如有问题，甲方应在收到其客户投诉 10 日内向乙方提出书面报告：包括货单批号，产品批次以及相关照片来证明产品问题。

**第九条　甲乙双方的权利和义务（只与本协议项下的代理产品对应）**

2

Zimbra                                                          http://127.0.0.1:49427/h/viewimages?id=c33f03b1-2e2c-4f0f-8feb-61...

1、甲方对乙方生产的空心草系列和 M 形草系列产品的代理权，在美国（含加拿大）地区市场中涵盖此款产品的现有型号，以及后续开发的所有空心草系列和 M 形草系列的型号产品。

2、甲方有权在发货前进行验货（含草高、厚度、克重、颜色、针数、行距、背胶、包装、有无色差等），如有差错，甲方拒绝付款收货。由此导致的一切后果，乙方应给予退款。

3、甲方因自身原因无法完成双方签订的年采购量的，甲乙双方进行友好协商，确定是否延续协议。如协商不成，乙方随时有权取消甲方的独家代理权并要求甲方承担乙方因此受到的损失。

4、甲方做出其他损害乙方正当权益和市场秩序的行为，乙方应书面通知甲方，甲方马上停止该行为。如果甲方在收到乙方通知 90 天内尚无停止该行为，则乙方可另行委托第三方作为乙方本协议项下产品的独家代理商，并终止与甲方签订的独家代理协议。

5、乙方在甲方下订单后，根据订单要求及时组织生产和加工。

6、乙方承诺本产品抗 UV 年限为运动草 8 年，休闲草 6 年，在承诺年限内如果出现抗 UV 质量问题，乙方应承担因此产生的所有费用（产品更换和因为更换产品而产生的人工费用）及相关法律责任。

7、乙方需按时交付出口货物组织运输

8、根据订单要求，在发货前乙方要负责仔细全面的对货物品质、规格及数量的检验、签发，并负责提供出口货物的厂检证明及其它出口所需要的证明文件。

9、所运输货物必须由乙方负责妥善包装，以保证其适合远洋和内陆长途运输，任何由乙方包装原因造成的损失由乙方负责。

10、乙方负责 FOB 价格包含的运输等一切费用。

**第十条 违约责任**

1、如乙方出现第五条款中违背代理权的，属于严重违约行为。如甲方在区域内发现乙方以



C-2                                                                        Page 3

Zimbra                                                          http://127.0.0.1:49427/h/viewimages?id=c33f03b1-2e2c-4f0f-8feb-61.

招揽为目的的广告投放，第一次应予以警告，从第二次开始，甲方每发现一次，乙方经核实需向甲方支付 1000 元人民币的违约金。如甲方在区域内发现以乙方名义或通过中国贸易公司出口的产品（在甲方提出书面通知的情况下），乙方需向甲方支付违约合同金额的 25% 作为违约金，并且甲方将在美国就乙方违约行为提起仲裁。

2、如乙方不能按期交货时，乙方应提前说明原因与甲方协商达成新交货期。如未提前通知乙方从而出现甲方不能按要求结款情形时，乙方应承担相应经济损失及相关法律责任（不可抗力因素除外）。

3、如因乙方产品出现技术及质量问题，导致甲方客户违约损失，乙方应承担由此产生的经济损失及其相关法律责任。

**第十一条　仲裁**

在履行本协议过程中，所发生的或与本协议有关的一切争执，首先应由甲乙双方友好协商解决，如未能解决，则应该将争议提交美国仲裁委员会，并根据其仲裁规则进行仲裁，仲裁费应由败诉一方承担，仲裁委员会另有规定的除外。

**第十二条　协议期限**

本协议有效期为 1 年，自 2015 年 4 月 15 日至 2016 年 4 月 14 日止，本协议经双方签字生效。在本协议终止前至少 3 个月，甲乙双方应共同协商协议的续延。如果双方一致同意续延，在上述规定的条款、条件下，附上补充文件，本协议将继续有效另外延长 3 年。

**第十三条　协议的终止**

在本协议有效期内，任何一方当事人不履行合同或违反本协议的条款，双方当事人应争取及时解决争议的问题达到满意。如果在违约方接到书面通知后 30 日内问题仍不能解决，非违约方将有权中止本协议，由此造成的损失、无力偿付债务、清算、以及被第三人兼并，另一方当事人可提出中止本协议，而无需书面通知对方。

4

Zimbra

http://127.0.0.1:49427/h/viewimages?id=c33f03b1-2e2c-4f0f-8feb-61...

**第十四条　不可抗力**

任何一方对由于下列原因而导致不能或暂时不能履行全部或部分协议义务的，不负责任：自然灾害、政府采购或禁令以及其他任何双方在签约时不能预料、无法控制且不能避免和克服的事件。但受不可抗力影响的一方，应尽快地将发生的事件通知对方，并附上证明材料。

**第十五条　准据法**

本协议的有效性、组成以及履行受美国法律管辖。

**第十六条　其它**

1、在代理期间，如发生本协议未尽事宜，双方可通过友好协商的方式另行签订补充协议，补充协议作为本协议附件，与本协议具有同等法律效力。

2、本协议一式四份，甲乙双方各执两份。

3、本协议经双方同意并签署盖章后生效（该协议所规定的双方的权利义务不因甲乙双方的代办变更而变更）。

甲方（公章）：美国环球人造草坪有限公司　　　　乙方（公章）：河北麦通橡胶股份有限公司

法定代表人（签章）：　　　　　　　　　　　　　法定代表人（签章）：

2015 年 4 月 15 日　　　　　　　　　　　　　　2015 年 4 月 15 日

Andrew Gao
CEO

5

# EXHIBIT C-3



ata MEMBER
American Translators Association
ATA No. 263305

### Exclusive Agency Agreement for Hollow Blade, M-Blade Grass Series Products in the U.S. Market

| | | | |
|---|---|---|---|
| Party A: | Global Syn-Turf, Inc. | Party B: | Hebei Mighty Synthetic Rubber and Plastic Co., Ltd |
| Address: | 2482 Technology Dr., Hayward, California, 94545, USA | Address: | Floor 10, Block B, Rundou Shenghe Plaza, South of Huanghe Ave. & Qilian St. Crossing, High Tech Zone, Shijiazhuang City, Hebei, China |
| Telephone: | 510 732 2300 | Telephone: | 0311-85210888 |
| Fax: | 510 732 6188 | Fax: | 0311-85213888 |

This agreement is made and entered into by and between the parties concerned on the basis of equality and mutual benefit, on the matters in relation to both parties' cooperation to export hollow blade and M-blade artificial grass products to the U.S. market (inclusive of Canada):

### 1. Appointment & Acceptance of Appointment

(1) During the term of this agreement, Party B appoints the Agent as the exclusive agent for the products stipulated under Article 4 of this agreement, and the Agent shall promote and solicit customer orders for the products in the territory defined under Article 3 of this agreement. The Agent accepts and assumes the aforementioned appointment.

### 2. The Agent's Duty

The Agent shall not represent Party B to make or undertake any guarantees, promises and shall not enter into any contracts, agreement or undertake any behavior that will be legally binding to Party B. Party B assumes no responsibility for representations made by the Agent in breach of Party B's instructions or any acts or omissions that exceed the authorized scope of the appointment.

### 3. Territory

The Agent shall promote the product(s) within the following territory: the U.S. market (inclusive of Canada) (hereinafter referred to as the "Territory").

### 4. Product(s)

The following products shall be promoted by the Agent under this contract: hollow blade and M-blade artificial grass (hereinafter referred to as the "Products").

CinchTranslations, LLC * 3101 SW 34th Ave Ste 905-453, Ocala, FL 34474, USA
1-855-WETRANS (1-855-938-7267) * support@cinchtranslation.com

2 of 11

C-3

Page 1



ata MEMBER
American Translators Association
ATA No. 263305

## 5. Exclusivity

In consideration of the exclusive rights granted herein, Party B undertakes not to, directly or indirectly, sell or export the Products to the Territory defined above through other channels for the duration of the present agreement. However, in the event that clients from other countries and territories purchases the hollow blade artificial grass products directly from Party B or through a trading company in another country for sale in the Territory, and the transaction is unrelated to both Party A and party B, Party B shall assume no responsibility. If Party A discovers that any hollow blade and M-blade artificial grass products manufactured by Party B in the U.S. market (including Canada) was sold directly by Party B or indirectly to the U.S territory (including Canada) through any other businesses, or any advertisements placed directly to solicit orders in the territory, Party A retains the right to claim damages for breach of contract by Party B in accordance with the laws of the United States of America (In the event of breach of contract by Party B, Party A shall file a claim for compensatory damages with the U.S. Customs and Border Protection and the local courts for all economic losses incurred and other prospective economic losses); If Party A discovers that any hollow blade and M-blade artificial grass products manufactured by Party B in the U.S. market (including Canada) had entered the market through any Chinese trading company, Party A shall notify Party B in writing immediately, and Party B shall assume the responsibility and duty to terminate all cooperation pertaining to hollow blade and M-blade artificial grass products with the trading company in question. Party B's unjustified refusals to terminate such transactions shall be considered as a substantial breach of the contract, and Party A retains the right to claim damages for breach of contract by Party B under the law of local jurisdiction.

## 6. Annual Sales Volume To Include Sales to Canada

Party B is appointing Party A as the exclusive Agent for its hollow blade and M-blade artificial grass products on the terms of the present contract, and Party A will have to meet the annual minimum orders objectives set out: 50,000 square meters.

## 7. Method of Payment

(1) Party A shall make a deposit payment of 30% upfront to Party B on the date when each order is placed, Party A shall then make the balance payment before the goods arrive at their port of destination.

(2) In the event of changes to product pricing, Party B shall notify Party A in advance and both parties shall establish the final contract price through negotiation.

## 8. Product Quality

Upon the delivery of goods, Party A may be unable to carry out immediate inspections due to the fluctuations in inventory lead times. Hence, in the event of

CinchTranslations, LLC • 3101 SW 34th Ave Ste 905-453, Ocala, FL 34474, USA
1-855-WETRANS (1-855-938-7267) • support@cinchtranslation.com

4 of 11

C-3                                                                    Page 2



ata MEMBER
American Translators Association
ATA No. 263305

quality issues with the products, Party A shall notify Party B through a written report within 10 days after receiving any client complaints: the report shall include the order's batch number, the product's batch, and relevant photographic documentation to substantiate the issue(s) of the product.

**9. Rights of Obligations of Party A & Party B (only applicable to products within the scope under the present agency contract)**

(1) Party A is granted Agency rights for the hollow blade and M-blade artificial grass products manufactured by Party B, and the Agency rights apply to all existing models of this product in the U.S. (including Canada) territory, and all subsequent models for the hollow blade and M-blade artificial grass product series to be developed.

(2) Party A retains the right to carry out inspection on all goods prior to their shipment date (scope of inspection may include the grass's height, thickness, weight, color, thread count, spacing, adhesive glue, packaging, color differences and so on), and if the goods do not conform with their specifications based on the order placed, Party A is entitled to reject the goods and refuse to make payment. Party B shall honor the refund request for all consequences arising therefrom.

(3) If, at the end of the year, the minimum volume of orders applicable to such year is not met by Party A, both Parties shall negotiate in good faith to reach an agreement to determine if the contract shall be continued. If an agreement could not be reached through the negotiation, Party B reserves the right to revoke Party A's exclusive agency right at any time, and it may request Party A to be liable for all losses incurred by Party B as a result of the non-performance.

(4) Party B shall notify Party A in writing if Party A engages in any acts that infringe on Party B's legitimate rights and interests and the market order, and Party B shall cease such behavior immediately. If Party A does not cease engaging in such actions upon 90 days of receiving Party B's notification, Party B may re-appoint a third-party as the exclusive Agent of the products defined under this agreement, and the present exclusive agency agreement with Party A shall be terminated.

(5) Upon receiving an order placed by Party A, Party B shall organize, manufacture and process based on the specifications of the order in a timely manner.

(6) Party B guarantees that the product is UV-resistant for a period of 8 years for sports-purposed grass, and for a period of 6 years for leisure-purposed grass. If any UV-related quality issues shall arise within the warranty period, Party B shall be liable to undertake all costs incurred (cost incurred by the exchange of products and the labor costs for the exchange of products) and to assume the relevant legal responsibilities.

(7) Party B shall deliver the goods for export and organize the required transportation in a punctual manner.

CinchTranslations, LLC * 3101 SW 34th Ave Ste 905-453, Ocala, FL 34474, USA
1-855-WETRANS (1-855-938-7267) * support@cinchtranslation.com

6 of 11

C-3                                                                 Page 3



**ata MEMBER**
American Translators Association
ATA No. 263305

(8) Based on the unique requirements of each order, Party B shall inspect and record the quality, specifications, and quantity of the products stringently and prudently before each shipment. Party B shall be responsible for providing the export inspection and certification and other documentation for export compliance.

(9) Party B is responsible for packaging all goods to be transported properly, to guarantee that it is suitable for transatlantic transportation and long-distance transportation by land. Party B shall be liable for any damages arising due to packaging issues caused by Party B.

(10) Party B shall be responsible for all costs associated with FOB involved in the process, including transportation of the goods to the port of shipment.

## 10. Breach of Contract

(1) If Party B engages in a breach against the agency agreement as stipulated in article 5, it shall be considered as a substantial breach of the agreement. If Party A discovers that any advertisements placed by Party B to solicit orders in the territory, it shall issue a formal warning letter on its first occurrence, and on any subsequent occurrences discovered and verified by Party A, Party B shall pay a penalty of 1000 Chinese Yuan to Party A for each occurrence discovered. If Party A discovers any Products manufactured by Party B had entered the Territory in the name of Party B or exported through any Chinese trading company (given that a written notice has been issued by Party A), Party B shall pay a sum equivalent to 25% of the contract value to Party A as a penalty for the breach of contract, and Party A retains the right to file a suit against Party B under the law of the U.S. jurisdiction.

(2) If Party B is unable to deliver a shipment on time, Party B shall provide a justified explanation in advance, and negotiate with Party A on a new delivery date. If Party B is unable to notify Party A in advance, resulting in non-performance of the goods upon the stipulated time of payment, Party B shall be liable for all economic losses and shall assume relevant legal responsibilities (with the exception of Force majeure circumstances beyond the control of the Parties).

(3) If any technical or quality issues arise in Party B's products, resulting in economic losses for Party A in breach to its clients, Party B shall be liable for all economic losses and shall assume relevant legal responsibilities.

## 11. Arbitration

Any disputes arising out of or relating to the performance of this agreement shall be settled through friendly negotiation. If the negotiation fails, the case shall then be submitted for arbitration to the American Arbitration Association, and it shall be arbitrated by the rules of this association. The results of the arbitration shall be final and binding upon both parties, and the costs of the arbitration proceeding shall be borne by the unsuccessful party, unless otherwise stipulated by the arbitrators' judgment.

CinchTranslations, LLC * 3101 SW 34th Ave Ste 905-453, Ocala, FL 34474, USA
1-855-WETRANS (1-855-938-7267) * support@cinchtranslation.com

8 of 11

C-3                                                                 Page 4



**ata MEMBER**
American Translators Association
ATA No. 263305

### 12. Term of Agreement

The term of this Agreement is for a one (1) year period, commencing from the date of April 15, 2015 through the date of April 14, 2016. The Agreement enters into force upon signing by both parties. The Agreement may be extended for another period of three (3) years on the same terms and conditions, and with supplementary documents attached, if the parties hereto mutually agree upon its extension at least three (3) months prior to the termination of this current agreement.

### 13. Termination of the Agreement

If either party breaches in any material respect any of its material obligations under this Agreement, in addition to any other right or remedy, the non-breaching party may terminate this Agreement in the event that the breach is not satisfactorily cured within thirty (30) days after receipt by that party of written notice of the breach. This Agreement may be terminated the non-breaching party in the event of damages, insolvent debt, liquidated damages, and mergers with a third party arising from the breach of contract by the other party, with n prior written notice required.

### 14. Force Majeure

Either party shall not be held responsible if the performance by either party of all or any of its obligations under this contract is prevented or delayed due to the following reasons: natural disaster, government procurement or intervention or any other events which could not be predicted, controlled, avoided or overcome at the time of the signing of this agreement by both parties. However, the party who is affected by the event of Force Majeure, shall inform the other party its occurrence and provide any supporting evidence and documentation as soon as possible.

### 15. Applicable Law

This Agreement shall be governed by, and construed in accordance with, the law of the United States of America.

### 16. Miscellaneous

(1) During the term of this agency agreement, any matters not covered herein may be expressed in a supplemental agreement that is consented to mutually. All supplemental agreement(s) entered into are equally legally binding as the agreement herein.

(2) The present Agreement is executed in 4 copies, with both Party A and Party B holding 2 copies respectively.

CinchTranslations, LLC * 3101 SW 34th Ave Ste 905-453, Ocala, FL 34474, USA
1-855-WETRANS (1-855-938-7267) * support@cinchtranslation.com

10a of 11

C-3                                                                                              Page 5



ata MEMBER
American Translators Association
ATA No. 263305

(3) The present Agreement shall enter into force at the date of its signature (any change in representatives of either party shall not affect nor change the rights and obligations of both parties as stipulated by the Agreement herein).

| Party A (Official Seal): | Global Syn-Turf, Inc. | Party B (Official Seal): | Hebei Mighty Synthetic Rubber and Plastic Co., Ltd *[Seal: Hebei Mighty Synthetic Rubber and Plastic Co., Ltd]* |
|---|---|---|---|
| Legal Representative (Signature): | *[Signature: Andrew Gao, CEO]* April 15, 2015 | Legal Representative (Signature): | *[Signature]* April 15, 2015 |



**ata MEMBER**
American Translators Association
ATA No. 263305

## *Certification of Translation Accuracy*

Translation of **EXCLUSIVE AGENCY AGREEMENT**

From **CHINESE** to **ENGLISH**

We, CinchTranslations, LLC, a professional translation services company hereby certify that the above-mentioned document has been translated by experienced and qualified professional translators and that, in our best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a correct and true translation of the original document.

This is to certify the correctness of the translation only. We do not guarantee that the original is a genuine document, or that the statements contained in the original document are true. Further, CinchTranslations, LLC, assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Doyle L Witcher
President
CinchTranslations, LLC
Dated:  January 20, 2019

CinchTranslations, LLC  *  3101 SW 34th Ave Ste 905-453, Ocala, FL 34474, USA
1-855-WETRANS (1-855-938-7267)  *  support@cinchtranslation.com

# EXHIBIT C-4

# Exclusive Agency Agreement for Hollow Blade, M-Blade Grass Series Products in the U.S. Market

Party A:     Global Syn-Turf. Inc.

Address:     2482 Technology Dr., Hayward, California, 94545, USA

Telephone:   5107322300

Fax:           5107326188

Party B:     Hebei Mighty Synthetic Rubber and Plastic Co., Ltd.

Address:     Floor 10, Block B, Rundou Shenghe Plaza, South of Huanghe Ave. & Qilian St. Crossing, High Tech Zone, Shijiazhuang City, Hebei, China

Telephone:   0311-85210888

Fax:           0311-85213888

After joint consultation between the two Parties, the following matters have been agreed on the export of hollow blade and M-blade grass series synthetic turf to the United States (including Canada):

**Article 1 Appointment & Acceptance**

Within the validity period of this Agreement, Party B appoints Party A as the exclusive agent to solicit orders for the commodity stipulated in Article 4 from customers in the territory stipulated in Article 3, and Party A agrees and accepts the above-mentioned appointment.

**Article 2 Obligations of Agent**

The Agent shall not make any guarantees, promises, contracts or any other acts binding on Party B on behalf of Party B. Party B will not be responsible for any acts or omissions used by the Agent in violation of Party B's instructions or beyond the scope of the instructions.

C-4

**Article 3 Agency Territory**

The agency territory referred to in this Agreement is: United States (including Canada) (hereinafter referred to as the Territory)

**Article 4 Agency Commodity**

The agency commodity referred to in this Agreement are hollow blade and M-blade grass series (hereinafter referred to as the Commodity).

**Article 5 Exclusive Agency Rights**

1. In consideration of the exclusive rights granted herein, during the validity period of this Agreement, Party B shall not, directly or indirectly, sell or export the Commodity to customers in the United States (including Canada) through channels other than Party A. However, the sales of the Commodity in the Territory done by clients from other countries which are directly purchased from Party B or through other trading companies has nothing to do with both Parties, Party B shall not be responsible for any of this. If Party A finds the Commodity produced by Party B in the US (including Canada) market which is sold directly by Party B or through any other companies in the US (including Canada), or any advertising of the Commodity for the purpose of solicitation, Party A has the right to use US domestic law to hold Party B's liability for breach of Agreement (if Party B defaults, Party A will sue in US Customs and local courts for all economic losses that have occurred and estimated in the future). If Party A finds that the Commodity in the US (including Canada) market sold through other Chinese trading companies, Party A should immediately submits a written notice to Party B, and Party B has the responsibility and obligation to immediately terminate the cooperation of hollow blade and M-blade grass series with the trading company. If Party B fails to do so, Party A has the right to use local laws to investigate Party B's liability for breach of the Agreement.

**Article 6 Annual Purchase Amount (including Canada)**

Party B appoints Party A as the exclusive agent for the hollow blade and M-blade grass series in the United States (including Canada). Party B requires Party A to purchase 50,000 square meters per year.

**Article 7 Payment Terms**

1. Party A shall pay Party B 30% advance payment as soon as each order is confirmed and Party A shall pay the balance before the goods arriving at the destination port.

2. If the price of the product changes, Party B shall negotiate with Party A in advance to determine the final contract price.

**Article 8 Product Quality Responsibility**

After Party A receives the goods, because of the uncertain storage time, it is impossible for Party A to check immediately. Therefore, if there is any problem with the quality of the goods, Party A shall submit a written report to Party B within 10 days of receiving complaints from its clients, including manifest batch number, production batch number and relevant pictures to indicate the problem of the goods.

**Article 9 Rights and Obligations of Both Parties (only corresponding to the agency commodity under this Agreement)**

1. Party A is granted exclusive agency rights for the hollow blade and M-blade grass series in the US (including Canada), covering the existing models of the Commodity as well as models of the Commodity developed subsequently by Party B.

2. Party A has the right to inspect the goods before delivery (including grass height, thickness, weight, color, number of stitches, line spacing, adhesive, packaging, color difference, etc.). If Party A refuses to pay for the goods because there is quality problem, Party B shall refund for the goods.

3. If Party A is unable to complete the annual purchase amount signed in the Agreement for its own reasons, Party A and Party B shall conduct friendly consultation to determine whether to continue with the Agreement. If the negotiation fails, Party B shall have the right to cancel the exclusive agency right of Party A at any time and request Party A to bear the losses caused for Party B.

4. If any actions performed by Party A damage Party B's legitimate rights or market order, Party B shall notify Party A in writing and Party A shall immediately stop the action. If Party A fails to stop the action within 90 days after receiving Party B's notice, Party B may entrust a third Party as the exclusive agent of the Commodity

C-4

under this Agreement and terminate the Exclusive Agency Agreement signed with Party A.

5. After Party A places an order, Party B shall organize production and processing in time according to the order requirements.

6. Party B promises that the anti-UV period is 8 years for sports grass and 6 years for leisure grass. If there is anti-UV quality problem within the promised period, Party B shall bear all the expenses incurred (product replacement and labor costs incurred due to replacement of the product) and related legal responsibilities.

7. Party B shall deliver the goods for export on time.

8. According to the order requirements, Party B shall be responsible for inspecting the goods carefully and comprehensively for quality, specifications and quantity before delivery, and shall be responsible for providing the factory inspection certificate and other documents required for export.

9. The goods to be exported must be properly packaged by Party B to ensure that it is suitable for long-distance transportation by sea and land. Party B is responsible for the losses caused by the packaging of the goods.

10. Party B is responsible for all costs in the FOB price.

**Article 10 Liability for Breach of the Agreement**

1. If Party B violates the agency right mentioned in Article 5, it is considered a serious breach of the Agreement. If Party A finds Party B's advertisement for the purpose of soliciting orders in the Territory, Party B should be warned for the first time. From the second time on, Party B needs to pay Party A a penalty of RMB 1,000 for each time of violation after verification. If Party A finds that Party B exporting goods to the US (including Canada) directly or through Chinese trading companies (in the case that Party A has submitted written notice to Party B), Party B shall pay Party A 25% of the amount of the default contract as liquidated damages. Arbitration will be initiated in the US regarding Party B's breach of the Agreement.

2. If Party B cannot deliver the goods on time, Party B shall notify and explain in advance and negotiate a new delivery time with Party A. If Party B fails to notify Party A in advance and Party A cannot settle the payment as required, Party B shall

bear the corresponding economic losses and relevant legal responsibilities (except for force majeure factors).

3. If technical and quality problems of the goods cause the default loss of Party A's clients, Party B shall bear the corresponding economic losses and related legal responsibilities.

**Article 11 Arbitration**

In the course of the performance of this Agreement, all disputes arising out of or related to this Agreement shall firstly be settled through friendly negotiation between both Parties. If it is not resolved, the dispute shall be submitted to the American Arbitration Commission and the arbitration shall be conducted in accordance with its arbitration rules. The arbitration fee shall be borne by the losing Party, unless otherwise specified by the Arbitration Commission.

**Article 12 Term of the Agreement**

This Agreement is valid for one year, from April 15, 2015 to April 14, 2016. This Agreement shall enter into force upon being signed and sealed by both Parties. At least three months prior to the termination of this Agreement, both Parties shall negotiate the continuation of the Agreement jointly. If both parties agree to the continuation, supplementary documents will be attached to the terms and conditions specified above, and this Agreement will be extended for another three years.

**Article 13 Termination of the Agreement,**

During the validity period of this Agreement, if either Party fails to perform the contract or violates the terms of this Agreement, both Parties shall positively resolve the dispute in time to their satisfaction. If the dispute cannot be resolved within 30 days after the breaching Party receives the written notice, the non-breaching Party shall have the right to terminate this Agreement. With the resulting loss, insolvency, liquidation or merger by a third Party, the Party may request to terminate this Agreement without providing the other Party with a written notice.

**Article 14 Force Majeure**

Neither party shall be liable for failure or delay in fulfillment of all or any part of its obligations in this Agreement for any of the following reasons: natural disasters,

government procurement or prohibitions and any other events which cannot be predicted, controlled, avoided or overcome by the Parties at the time of Agreement signing. However, the Party affected by the force majeure shall inform the other Party of the event as soon as possible with supporting materials.

### Article 15 The Applicable Law

The validity, composition and performance of this Agreement shall be governed by the laws of the United States.

### Article 16 Others

1. During the agency period, if there is anything not covered herein, both Parties may enter into a supplementary agreement through friendly negotiation, which shall be attached to this Agreement and shall have the same legal effect as this Agreement.

2. This agreement is made in quadruplicate with each Party holding two.

3. This Agreement shall enter into force upon being signed and sealed by both Parties (The rights and obligations of both Parties stipulated in this Agreement shall not be changed due to the agency change of both Parties).

Party A (official seal): Global Syn-Turf. Inc.

Legal representative (signature): Andrew Gao

April 15, 2015

Party B (official seal): Hebei Mighty Synthetic Rubber and Plastic

Co., Ltd.

Legal representative (signature): Han Shimin

April 15, 2015

C-4

## Translation Certificate

We, Shijiazhuang Longwin Translation Service Co., Ltd., hereby certify that the above-mentioned document has been translated by experienced and qualified professional translator. And the translated text is in conformity with the original document.

Wang Xueling

Translator

Shijiazhuang Longwin Translation Co., Ltd.

Dated: March 15, 2019

# EXHIBIT B

INTERNATIONAL CENTER FOR DISPUTE RESOLUTION
International Arbitration Tribunal

**GLOBAL SYN-TURF, INC.**

Claimant

-AND-

**HEBEI MIGHTY SYNTHETIC RUBBER AND PLASTIC CO, LTD.**

Respondent

**ICDR Arbitration No. 01-19-000-5581**

_____

**Final Partial Award on Jurisdiction**

_____

I, THE UNDERSIGNED ARBITRATOR, HAVING BEEN DESIGNATED IN ACCORDANCE WITH THE ARBITRATION AGREEMENT ENTERED INTO BETWEEN THE ABOVE-NAMED PARTIES AND DATED APRIL 15, 2015, AND HAVING BEEN DULY SWORN, AND HAVING DULY HEARD THE PROOFS AND ALLEGATIONS OF THE PARTIES, DO HEREBY, AWARD, AS FOLLOWS:

## I.      INTRODUCTION

1.      This Final Partial Award deals with jurisdictional objections made by Respondent Hebei Mighty Synthetic Rubber and Plastic Co. Ltd. ("HMSRP").

## II.     PROCEDURAL HISTORY

2.      This arbitration was commenced by Claimant Global Syn-Turf, Inc. ("Global") by way of a Notice of Arbitration dated February 20, 2019.

3.      In a "Letter for Objection on Jurisdiction" dated March 15, 2019, HMSRP made an objection to the jurisdiction of the ICDR, stating:

> There is only one Chinese version of the Agreement signed by MIGHTY GRASS Co. LTD (Hebei Mighty Synthetic Rubber and Plastic Co., Ltd) and Global Syn-Turf, Inc. The English version of the agreement submitted by Global Syn-Turf Inc. are not signed by two parties. Dispute shall be submitted to the American Arbitration Commission in accordance with article 11 of the Agreement signed by two parties. Actually American Arbitration Commission does not exist, so this arbitration clause is null. ICDR shall not have jurisdiction on this arbitration.

(Letter for Objection on Jurisdiction, p.1.)

4.      On March 17, 2019, HMSRP sent a further letter correcting certain minor details that do not bear on the merits of the jurisdictional objection.

5.      On March 21, 2019, Global responded to HMSRP's jurisdictional objections, observing that HMSRP's jurisdiction objection was incorrect for the following reasons:

> (1) In contrast to their assertions, there is no ambiguity in the arbitration clause; (2) Hebei relies on a translation of the arbitration clause performed by a company with weak and unknown credentials; (3) Even if there were an ambiguity in the

1

> arbitration clause—which there is not—as a matter of United States law governing here any doubts concerning arbitrability are to be resolved in favour of arbitration; (4) Finally, if there were an ambiguity in the arbitration clause—which there is not—the United States policy of favouring arbitration is even stronger in the context of international business transactions such as the case in hand.

(Letter from Global dated March 21, 2019 at p.2.)

6.    On March 28, 2019, the International Centre for Dispute Resolution ("ICDR") wrote to the parties, acknowledging the correspondences dated March 15, 2019, March 17, 2019, and March 21, 2019 (above), and informed the parties that "[t]he parties' contentions have been made a part of the file and will be forwarded to the Tribunal upon appointment, at which time the parties may submit their jurisdictional or arbitrability arguments to the Tribunal for determination." (March 28, 2019 Letter from the ICDR at p.2.)

7.    On April 2, 2019, HMSRP provided further objections and observations. HMSRP continued to object to the jurisdiction of the ICDR on the basis that the "[t]wo Parties did not select the ICDR/AAA in the Chinese version Agreement." (Letter from HMSRP dated April 2, 2019 at p.1.) Notably, HMSRP also noted that:

> If ICDR/AAA does have the final jurisdiction, we request locale be New York. We insist this opinion. The reason of this follows: (1) Respondent is in China, Claimant is in U.S.A. (2) Respondent's witnesses and documents are in China. (3) The place of performance of contract is in China and in U.S.A. The materials of the contract are located all around U.S.A. We select New York as the place of arbitration. We do not agree to select San Jose, California. Because Claimant is in California, if the place of arbitration is in California too, the arbitration may not justice. We believe choose the place which both parties are not located as the place of arbitration shall be justice. If ICDR/AAA does not jurisdiction, New York the location of ICDR/AAA will be the most suitable place for arbitration.

(*Id*. at p.2.)

8.    On the same day, the ICDR responded noting that:

> The ICDR understands that Respondent has again objected to the jurisdiction of the AAA/ICDR to administer this matter. The ICDR has previously considered

and determined this objection. The parties may raise this objection for consideration before the Tribunal once appointed.

We understand that Respondent has asserted that the proper language of this arbitration is Chinese. Claimant is invited to provide comments on this point on or before 5 April 2019. Please be advised that, until such time as a determination is made to the contrary, the language of administration shall remain English. The parties are directed to submit all administrative correspondences in the English language for consideration. Respondent is invited to resubmit its administrative comments of 2 April 2019.

(Letter from ICDR dated April 2, 2019 at p.1.)

9.    On April 19, 2019, the ICDR designated San Jose, California as the seat of the arbitration. The ICDR noted that the Tribunal has the authority, upon a party's request, to determine finally the place of arbitration.

10.   The Sole Arbitrator and the parties attended a Preparatory Conference call on May 31, 2019. On the call, Counsel for the Respondent outlined the jurisdictional objections but requested more time for the jurisdictional objections to be briefed. The Sole Arbitrator, with the agreement of both parties, established a briefing schedule for the jurisdictional objections. It was agreed that the briefing would be done in English.

11.   On June 8, 2019, the Claimant confirmed that it would submit an amended notice of arbitration.

12.   On June 9, 2019, the Sole Arbitrator issued Procedural Order No. 1., which memorialized the briefing schedule discussed on the May 31, 2019 call:

On the call, Counsel for the Respondent also raised the issue of a jurisdictional objection that the Respondent was making, and which both parties have briefed before the International Center for Dispute Resolution. The jurisdictional objection was briefly addressed by both parties on the call, but the Respondent sought written briefing on the issue before the Sole Arbitrator, particularly because proceedings on that issue have been recently instituted before the Chinese courts.

Accordingly, the Respondent is to file its written submission addressing its jurisdictional objections by **June 14, 2019**.

3

The Claimant is to file a responsive submission on the Respondent's jurisdictional objections by **June 25, 2019**.

While the Sole Arbitrator has read the parties' respective submission to date, the Sole Arbitrator requests that the above submissions on the jurisdictional objections be comprehensive and incorporate whatever points either party continues to rely on, such that each submission "stands alone" without reference to the parties' earlier written submissions on the issue. This is to enable the Sole Arbitrator to consider and address the arguments made by the parties on this important issue.

(Procedural Order No.1 at p.1-2.)

13.   On June 15, 2019, the Respondent filed its submission on jurisdiction.

14.   On June 18, 2019, the Claimant filed its Amended Notice of Arbitration.

15.   On June 26, 2019, the Claimant filed its Opposition to Respondent's jurisdictional objection.

16.   On July 17, 2019, the Sole Arbitrator sent an email requesting the parties' assistance on the following questions:

Would the parties please address the following questions that would help me resolve the jurisdictional objections:

1.   Are there any cases that discuss the process by which the Tribunal is to determine what law or principles should apply to determine the validity of an arbitration agreement? Specifically, are the following two cases relevant to resolving the Respondent's jurisdictional objections? (1) Sul America v Enesa Engenharia [2012] EWCA Civ 638 https://www.trans-lex.org/311350/_/sulamerica-cia-nacional-de-seguros-sa-v-enesa-engenharia-sa-%5B2012%5D-ewca-civ-638/ (2) BCY v BCZ [2016] SGHC 249 https://www.supremecourt.gov.sg/docs/default-source/module-document/judgement/bcy-v-bcz-(for-release)-(08-11-2016)-pdf.pdf (The parties should feel free to raise any other cases or authorities that they feel bear on this issue.)

2.   Is the contractual issue of whether the parties agreed to an arbitration agreement, and if so, what the terms are (or what we would interpret them to be), an issue to be determined by the substantive governing law of the agreement (as chosen by the parties, as appropriate)?

4

3. Does the doctrine of separability prevent the chosen governing law of the main agreement from applying to govern the validity and interpretation of the arbitration agreement?

4. What is the relevance of Paragraph 15 of the Agreement "Applicable Law", which provides that the Agreement shall be "governed by and construed in accordance with, the law of the United States of America."

5. Is a choice of "the law of the United States of America" as it applies to contractual matters a choice of general contractual principles as applied by U.S. states? Is an expression of these principles to be found in the Restatement of Contracts?

6. Are there any principles in the Restatement of Contracts that would aid in the interpretation of the arbitration agreement? Are § 201 and § 203(a) of any application in this case?

17. The parties filed their respective responses to the Sole Arbitrator's questions on July 26, 2019.

18. On August 6, 2019, the Sole Arbitrator wrote to the parties asking for briefing on an additional case:

> The Respondent has raised two cases from the Chinese courts. In order that we have what I think would be a more complete picture of PRC law and the approach of the PRC courts, would the parties' please review the case of *Chinalight International Trade Co. Ltd v Tata International Metals (Asia) Ltd*, a decision from the Beijing No. 4 Intermediate People's Court, and to submit any comments they have on that case and the relevance of that cases to this case and the two Chinese cases cited by the Respondent, by Monday **August 12, 2019**.

> The parties are not to brief any other cases or issues without leave. If the parties wish to raise any other cases, please advise the Sole Arbitrator and the opposing party by **August 9, 2019** so that the submission of August 12, 2019 will address those cases will be the final word on the matter from both sides.

19. On August 12, 2019, both parties provided their comments on the *Chinalight* case above in response to the Sole Arbitrator's request of August 6, 2019.

## III. HMSRP'S BASIC OBJECTIONS TO JURISDICTION

20. The parties' key arguments on jurisdiction are set out in this and the next section. The arguments are set out in summary form only, and the aim is not to comprehensively set

out every detail and every argument made by the parties in their submissions. Nevertheless, the Sole Arbitrator has carefully studied all the arguments made by both parties in their submissions. The fact that a specific argument has not been set out below does not mean that it has not been considered.

21. On June 14, 2019, HMSRP filed its comprehensive written objections to jurisdiction ("HMSRP Objections").

22. HMSRP argues that PRC Law governs the enforceability of the arbitration provision. This is because Shijiazhuang should be designated as the seat of the arbitration, leading to PRC law governing the validity of the Arbitration Provision. (HMSRP Objections at p.2-4.)

23. HMSRP argues that, in the alternative, even if San Jose is the seat of the arbitration, California's Choice of Law rules would still nevertheless result in the application of PRC law to judge the validity of the arbitration provision. (*Id*. at p.4-6.)

24. HMSRP also argues that the Hebei court has the jurisdiction to review the validity of the arbitration provision, and the tribunal should wait for, and defer to, the Hebei court's decision on this issue. (*Id*. at p.7.)

25. HMSRP argues that under PRC law, the arbitration agreement at issue is invalid. HMSRP advances several reasons for this. First, the arbitration agreement contains conflicting (and thus unclear) dispute resolution provisions. HMSRP argues that Articles 5, 10(1), and 11 contain contradictory references to various forums in which claims should be asserted, with the result that the matters that are required to be arbitrated and the appropriate "arbitration commission" is unclear. Second, HMSRP argues that Article 11 of the agreement between the parties refers to arbitration before the "American Arbitration Commission"—an institution that does not exist. Third, that the agreement does not contain any provision for the law governing the arbitration or the seat of the arbitration. HMSRP claims that this is a material omission, especially given that unclear terms that HMSRP has highlighted. (*Id*. at p.7-8.)

26. HMSRP points out that Article 18 of the Arbitration Law of the PRC provides:

> If an arbitration agreement contains no or unclear provisions concerning the matters for arbitration or the arbitration commission, the parties may reach a supplementary agreement. If no such supplementary agreement can be reached, the arbitration agreement shall be null and void.

27. In response to questions put forward by the Sole Arbitrator on July 17, 2019, HMSRP argues that the cases of *Sulamerica Cia Nacional De Seguros S.A. and Ors -v- Enesa Engenharia S.A.* [2012] EWCA Civ 638 ("*Sulamerica*") and *BCY v. BCZ.* [2016] SGHC 249 ("*BCY*") are distinguishable on the basis that those cases deal with a situation where the parties had chosen the seat of the arbitration:

> In sum *Sulamerica* and *BCY* discuss the law or principles that should be applied to determine the validity of an arbitration agreement when parties have clearly designated the law governing the main contract and the seat of arbitration. These decisions did not address the situation in which, as here, (i) the law chosen by the parties to govern the main contract is amorphous and unclear, and (ii) the arbitration provision does not designate a seat of arbitration. Further, the Agreement designates an arbitral commission ("American Arbitration Commission") that does not exist. Given these circumstances, *Sulamerica* and *BCY* are distinguishable and are not persuasive authority for the Tribunal in this case.

(Respondent Letter on Jurisdictional Issues, p.7.)

28. HMSRP argues instead that the cases that it cites—*China Hi-tech* and *Weingartiner*—are directly relevant because, in those cases, the parties did not select a seat of arbitration or the law governing their arbitration agreement. (*Id*. at p.8.) The approach of the Chinese courts as evidenced in *China Hi-tech* and *Weingartiner* is that to determine the "validity" of the arbitration agreement, the Chinese courts will apply: (1) The law chosen by both parties, if this has been chosen; (2) where the parties did not choose an applicable law but agreed upon the seat of arbitration, the laws of the seat of arbitration will apply, and (3) where no applicable law or seat of arbitration had been chosen or the agreement on the seat of arbitration is not clear, the laws of the place where the court is located will apply.

29. HMSRP argues that the Chinese court's reasoning in those cases is that, where the parties did not chose the law to govern the arbitration agreement or the seat of the arbitration, the law selected by the parties to govern their main agreement cannot be used to determine the validity of the parties' arbitration agreement. Instead, the Chinese cases instruct that

the validity of an arbitration provision should be determined in accordance with the law of the court in which an action is pending.

30. HMSRP does not agree that the contractual issue of whether the parties agreed to an arbitration agreement, and if so what the terms are, are issues governed by the substantive governing law of the agreement. HMSRP argues that the reference to "United States law" is unclear, and that PRC law is "diametrically opposed to the presumption (in non-PRC cases such as *Sulamerica*) that an arbitration agreement is governed by the same law as the main contract." (*Id*.)

31. On separability, HMSRP agrees that the doctrine of separability does not prevent the chosen governing law of the agreement from applying to govern the validity and interpretation of the arbitration agreement. (*Id*. at p.9.)

32. On the relevance of paragraph 15 of the Agreement on "Applicable Law", HMSRP submits that this is merely the parties' choice of the substantive law governing the agreement itself, and not a reference to the law that governs the validity of the arbitration provision. (*Id*. at p.10.)

33. HMSRP posits that the choice of "the law of the United States of America" is a choice of the general contractual principles applied by the U.S. states, including choice of law rules in contract cases, and that U.S. courts typically treat the Restatement of Contracts as authoritative of these principles in the absence of any contrary authority. (*Id*. at p.10.)

34. HMSRP does not think that the Restatement of Contracts ought to apply in this case, as the applicable principles are that of PRC law. (*Id*. at p.11-12.)

35. On the *Chinalight* case, HMSRP argues that the case was wrongly decided, and that this Tribunal should not follow that decision. The parties' agreement in *Chinalight* did not define a seat of arbitration or the place where the arbitration commission is located. The Chinese court incorrectly assumed that because the parties agreed to arbitration before the "Singapore International Economic and Trade Arbitration Commission", that Singapore should be designated as the seat of the arbitration. (Respondent's Submission on Jurisdiction of 12 August 2019, p.3.)

8

36. Instead, the *Chinalight* case contradicts the *China Hi-tech* and *Weingartiner* cases. In *Weingartiner*, the arbitration provision was invalid because the "Nanjing International Trade Arbitration Commission" does not exist and it was not clear whether the seat of the arbitration was Nanjing. The Supreme People's Court therefore correctly concluded that the parties had not selected a seat of arbitration or an arbitral commission. Similarly, in *China Hi-tech*, the contract did not specify the arbitral body, the seat of arbitration, or the governing law of the arbitration agreement. Again, the Supreme People's Court concluded that the parties had not selected a seat of arbitration or an arbitral commission. Because the parties here did not select either a seat of arbitration or a place where the arbitration commission is located, the law of the place of the court proceeding should apply to the arbitration provision. That is what the *Chinalight* court should have done. (*Id.* at p.3.)

37. Instead, the *Chinalight* court determined that Singapore was the seat of arbitration and that Singapore law applied to the arbitration clause. The court's assumption that the "parties agreed to pursue an arbitration process under Singapore law" has no basis under PRC law. It was also improper for the court to base its decision on the "principle of making an arbitration agreement valid as much as possible" or "the environment of international arbitration". PRC is a civil law jurisdiction where the courts must apply statutes and not freestanding principles or policies without a clear basis in PRC statutes. (*Id.* at p.4.)

38. Finally, HMSRP argues that the Tribunal should give more weight to the two decisions of the Supreme People's Court, rather than *Chinalight*, which is an outlier decision from the No.4 Beijing Intermediate People's Court. (*Id.*)

## IV.   GLOBAL'S BASIC ARGUMENTS OPPOSING HMSRP'S OBJECTIONS

39. On June 25, 2019, Global filed its opposition to HMSRP's jurisdictional objections.

40. Global argues that while both parties have submitted their own English translations of the agreement, including the arbitration provision at issue, the Sole Arbitrator should find that the arbitration provision refers to "American Arbitration Association" and not "American Arbitration Commission". This is for the simple reason that the translation

company used by Global (Cinch Translations) is more reliable, with its work accepted by the United States Citizenship and Immigration Services, federal, state, and local governments. Moreover, Cinch Translations does not rely on machine translation services; translations are completed by human translators who have passed a certification process and have at least five years of translation experience. (Global Opposition at p.3.) Conversely, the translation company used by HMSRP has "weak and unstated credentials." (*Id*.) For this reason alone, Global argues, the Sole Arbitrator should find that the parties contracted for AAA arbitration.

41.  Global argues that, in any event, the parties manifested a clear intent to arbitrate, as evidenced by either translation of the arbitration provision at issue (*Id*. at p.4.):

> "Any disputes arising out of or relating to the performance of this agreement shall be settled through friendly negotiation. If the negotiation fails, the **case shall then be submitted for arbitration to the American Arbitration Association, and it shall be arbitrated by the rules of this association. The results of the arbitration shall be final and binding upon both parties**." (emphasis added).

(Global's translation.)

> "In the course of the performance of this Agreement, all disputes arising out of or related to this Agreement shall firstly be settled through friendly negotiation between both Parties. If it is not resolved, the **dispute shall be submitted to the American Arbitration Commission and the arbitration shall be conducted in accordance with its arbitration rules.**" (emphasis added).

(HMSRP's translation)

42.  Global points out that in any event, HMSRP's own translation makes clear that paragraph 10 of the Agreement shows that the parties intended to arbitrate, and in the United States: "**Arbitration will be initiated in the US regarding Party B's [Hebei's] breach of the Agreement**." (emphasis in original.) (*Id*.)

43.  Global concludes that there is no ambiguity in the arbitration provision and that, in any event, the parties have showed a clear intent to arbitrate. (*Id*.)

44.  Global also emphasizes that the parties have explicitly agreed in paragraph 15 of the Agreement that United States law is the "Applicable Law." HMSRP's translation of this

clause reads: "The validity, composition and performance of this Agreement shall be governed by the laws of the United States." (emphasis added.) (*Id*. at p.5.)

45. As the parties have chosen the laws of the United States to apply to this Agreement, this brings into play the US policy of favouring arbitration. This means that even if the arbitration clause designates "American Arbitration Commission", Section 5 of the Federal Arbitration Act sets forth a mechanism for naming a substitute arbitrator when the agreement's designated arbitrator is unavailable to hear the matter, and will result in an arbitration by the American Arbitration Association—as the closest match to the "American Arbitration Commission". (*Id*. at p.7.)

46. Global also argues that the ICDR has already made the determination that San Jose, California is the seat of the arbitration and the Sole Arbitrator should defer to that determination. Even if the Sole Arbitrator considers the factors that Global previously raised to the ICDR to led the ICDR to decide that the seat was San Jose (namely, (1) location of the parties, (2) location of witnesses and documents, (3) locations of site or place of materials, (4) necessary of an on-site inspection of the project, (5) consideration of relative cost to the parties, (6) place of performance of the contract, laws applicable to the contract, and place of previous court action, (7) location of the Tribunal, and (8) China's use of exit bans), the Sole Arbitrator should still conclude that the seat is San Jose. (*Id*. at p.8-12.)

47. Global also goes into some detail to argue that if the Tribunal applies California law, instead of Federal law, the conclusion would still be the same: and the matter would still end up being arbitrated before this tribunal. (*Id*. at p.12-16.)

48. In response to the Sole Arbitrator's questions of July 17, 2019, Global argues that the cases of *Sulamerica* and *BCY* show that if the parties have not expressly stated the choice of law that should govern the arbitration provision, the choice of law for the main contract should apply. (Supplemental Briefing in Opposition to Jurisdictional Objections, p.4.) This presumption that the law governing the main contract would also apply to the arbitration agreement would only be overturned if there were strong factors weighing

11

against it—for example where to apply the law governing the main contract would negate the arbitration agreement. (*Id*.)

49. Global explains that in our case, both parties agree that there is no express choice of the law that is to govern the arbitration agreement. The Sole Arbitrator should therefore apply the second step of the approach adopted by the courts in *Sulamerica* and *BCY* and *Sulamerica* and *BCY* determine what the "implied choice" of the parties would be with respect to the arbitration agreement. Here, the translations of both parties how that the parties had chosen United States law and the governing law of the main agreement. (*Id*.)

50. Global argues that this is an even clearer case for applying the governing law of the main agreement to the arbitration agreement, since in both *Sulamerica* and *BCY*, the parties in those cases chose the seat of the arbitration and that may have been a factor that would cut against applying the presumption that the governing law of the main agreement should also govern the agreement to arbitrate. Global therefore says that the law that should apply to the arbitration agreement is the same as that chosen by the parties to apply to the main agreement, United States law. (*Id*.)

51. But even if the Sole Arbitrator does not consider that the second "implied choice" step of the approach would resolve the issue, and applies the last "closest and most real connection" step, the connections are all with the United States. (*Id*. at p.5.)

52. On whether the contractual issue of whether the parties agreed to an arbitration, and if so, what the terms are, Global's position is that this should be governed by the substantive governing law of the agreement. (*Id.* at p.6-7.)

53. On the issue of separability, Global argues that the doctrine of separability does not prevent the chosen governing law of the main agreement (United States law) from applying to the arbitration agreement. The doctrine of separability exists to ensure that the arbitration agreement remains intact regardless of whether the arbitrator decides if the main agreement is valid. It is a pro-arbitration doctrine that should not be used to invalidate the arbitration agreement, as HMSRP tries to use it for. (*Id*. at p.7-8.)

54.    Global submits that paragraph 15 of the agreement that deals with "Applicable Law" makes clear that the parties agreed to apply United States law to the entire agreement, including the arbitration clause. (*Id.* at p.8.) Moreover, under the *Sulamerica* and *BCY* analysis, there is a presumption that this express choice creates an implied choice of United States law to the arbitration agreement, and there are no factors weighing against this implied choice. (*Id.* at p.8-9.)

55.    On the *Chinalight* case, Global argues that the *Chinalight* case shows that a Chinese court would also rule in favour of this arbitration, even if HMSRP's translation is correct, since the *Chinalight* court ordered arbitration the parties had agreed on a non-existent arbitral body with the name of non-Chinese country in its title. The *Chinalight* court also held that the parties' inclusion of the word "Singapore" was dispositive of their intent for Singapore for Singapore to be the seat of arbitration. So too in this case, the reference to "American" in the arbitration clause is dispositive of the parties' intent that the seat of the arbitration is the United States. (Global Second Supplemental Brief of August 12, 2019, p.2.)

56.    Global further argues that the two Chinese cases cited by HMSRP, *China Hi-Tech* and *Weingartiner* are consistent with *Chinalight*, in that neither case deals with a situation where the parties had agreed to a non-existent arbitral body whose name included the name of a non-Chinese country. Instead, in *China Hi-Tech* the parties did not name an arbitral body. In *Weingartiner*, the parties agreed to arbitrate with a non-existent arbitral body with the first word of "Nanjing". These are different from the *Chinalight* case, where the parties had chosen to have their arbitration outside China, with the result that Chinese law did not apply to determine the validity of the arbitration agreement. (*Id.* at p.2-3.)

57.    Global also argues that the rule that the law of the "place of the court" should determine the validity of the arbitration agreement is "nonsensical and self-serving" because the only reason why Chinese law might be said to apply to determine the validity of the arbitration agreement here is because HMSRP filed a petition before the Chinese court, and the place of the court could be changed if Global had made a filing in the United

States court. Thus, the idea that HMSRP could circumvent the arbitrator's authority by making a submission in the preferred country is circular and self-serving. (*Id*. at p.3-4.)

58. Finally, *Chinalight* is the most recent case and expresses the recent policy position of the Chinese courts, and is the most relevant judicial opinion for this case. (*Id*. at p.5.)

## V.    THE TRIBUNAL'S REASONING

59. Before the Sole Arbitrator are two key questions: First, does the Sole Arbitrator have jurisdiction over the parties' dispute. Second, what is the seat (or place with which the arbitration has its legal link) of this arbitration.

*Jurisdiction and validity of the arbitration agreement*

60. As a preliminary point, this Tribunal has the jurisdiction to under the ICDR Rules to rule on its own jurisdiction, including on objections as to the validity of the arbitration agreements:

> Article 19: Arbitral Jurisdiction
>
> 1. **The arbitral tribunal shall have the power to rule on its own jurisdiction**, **including any objections with respect to** the existence, scope, or **validity of the arbitration agreement(s)**, or with respect to whether all of the claims, counterclaims, and setoffs made in the arbitration may be determined in a single arbitration.

(ICDR Rules, Art. 19.)(emphasis added) There is no need for the Tribunal to defer to or to wait for the Chinese courts on this issue.

61. In this case, whether the Sole Arbitrator has jurisdiction over this dispute depends on whether there is a valid agreement to arbitrate. The parties dispute the law that the Sole Arbitrator should apply to decide the validity of the arbitration agreement.

62. HMSRP argues that to determine the applicable body of law to assess the validity of the arbitration agreement, the approach of the Chinese courts should be adopted. The approach of the Chinese courts as evidenced in *China Hi-tech* and *Weingartiner* is that the Chinese courts will apply: (1) The law chosen by both parties shall be applied, if this has been chosen; (2) where the parties did not choose an applicable law but agreed upon

the seat of arbitration, laws of the seat of arbitration will apply, and (3) where no applicable law or seat of arbitration had been chosen or the agreement on the seat of arbitration is not clear, the laws of the place of the court is located will apply. Here, argues HMSRP, there is no chosen law and no chosen seat, and the law of the place where the court is located will apply. This leads to the application of PRC law since the issue of whether the arbitration agreement is valid is before the PRC courts.

63.     Conversely, Global argues that it should be United States law, as this is the law chosen by the parties to govern the entire agreement in Paragraph 15 of the Agreement ("Applicable Law"), that should apply to assess the validity of the arbitration agreement. Global says that in any event, accordingly to the approach adopted by the courts in *Sulamerica* and *BCY*, the Sole Arbitrator would reach the same conclusion and apply United States law under the "Implied Choice" limb of that approach. Global further argues that the recent case of *Chinalight* shows that even under PRC law, the fact that the parties referred to arbitration before the "American Arbitration Commission" (assuming for the sake of argument that HMSRP's translation is correct), the reference to "American" would lead a Chinese Court to conclude that the seat of the arbitration is in the United States, and result in the application of United States law to determine if the arbitration agreement is valid.

64.     I conclude that under either the *Sulamerica* and *BCY* approach or the Chinese *China Hi-tech*, *Weingartiner, and Chinalight* approach, the law that is to determine the validity of the arbitration agreement is **United States law**.

65.     As an initial matter, as I explain in more detail below, I do not agree that the parties have not chosen the seat. While there is some debate as to the state or city in which the arbitration is seated, I find that the parties have selected the United States as the seat of the arbitration. The parties' intent for the place of arbitration to be the United States is evidenced by HMSRP's translation of the Agreement, which provides in Article 10 that "Arbitration will be initiated **in the US** regarding Party B's breach of the Agreement." Accordingly, even under the *China Hi-tech* and *Weingartiner* approach, **United States**

**law** would apply to determine validity of the arbitration agreement—as this is the law of the agreed seat of the arbitration.

66. But even assuming for the sake of argument that the parties did not choose the seat of the arbitration, it is likely that PRC law will find that United States law governs the validity of the arbitration agreement. In *Chinalight*, the Beijing Intermediate court was confronted with an arbitration clause that read:

> "All disputes arising out of the execution of this contract or in connection with this contract shall be settled by friendly negotiation between the parties. If it cannot be settled through negotiation, the dispute shall be submitted to the Singapore International Economic and Trade Arbitration Commission for arbitration in accordance with the US arbitration rules".

67. That case, as HMSRP argues, was a case where there was a reference to a nonexistent arbitral institution. As the Beijing court observed, there is no institution called the "Singapore International Economic and Trade Arbitration Commission". However, the Beijing court held that the reference to the non-existent **Singapore** International Economic and Trade Arbitration Commission nonetheless evidenced the parties' intention for the **place of arbitration** and the **place of the arbitral institution** to be **Singapore**. Under PRC law, in the absence of express choice by the parties, the law of the place of arbitration or the place of the designated arbitral institution governs the arbitration agreement. Accordingly, the Beijing court proceeded to determine the validity of the arbitration agreement in accordance with Singapore law, as opposed to PRC law, and upheld the validity of the agreement.

68. I find that the *Chinalight* case is not inconsistent with the *China Hi-tech* and *Weingartiner* cases as *Chinalight* deals with a specific situation where the parties had chosen the seat or place of arbitration by ostensibly choosing a nonexistent arbitral institution outside China—which would lead to the application of the law of that place to determine the validity of the arbitration agreement. This is precisely the situation we have at hand. Neither *China Hi-tech* and *Weingartiner* involved the parties attempting to choose a foreign arbitral institution, with the result that PRC law applied to determine the validity of the arbitration agreement. I also find that the *Chinalight* case is the most recent pronouncement of the Chinese courts on the appropriate approach to assessing the

16

validity of arbitration clauses, and evidences the current pro-arbitration approach of the Chinese courts on this issue.

69. Applying the reasoning of *Chinalight* to our case, even accepting HMSRP's argument that the parties' agreement refers to "American Arbitration Commission", the reference to "American" in an apparent reference to a non-existent arbitral institution would still evidence the parties' intention for the place of arbitration or place of the arbitral institution to be "America" or the United States. The approach of the Chinese court in *Chinalight* would therefore also result in the application of **United States law** to determine the validity of the arbitration agreement.

70. Under the *Sulamerica* and *BCY* approach, the result is the same. *Sulamerica* and *BCY* instruct that typically the law that governs the main agreement will also govern the validity and interpretation of the arbitration agreement. Here, the parties have clearly agreed that United States law will govern the main agreement, and in the absence of any other factors, that law will also govern the arbitration agreement. I find that there are no factors or reasons not to apply the law governing the main agreement to the arbitration agreement. Accordingly, the issue of whether there is a valid arbitration agreement and the terms of that agreement falls to be governed by "the law of the United States of America" (Agreement, paragraph 15) and therefore **United States law** applies to determine the validity of the arbitration agreement.

71. Accordingly, regardless of which approach we adopt, the issue of validity of the arbitration agreement falls to be governed by United States law, which the Sole Arbitrator regards as contract interpretation principles that are commonly applied in the states throughout the United States (HMSRP agrees with this view (Respondent Letter on Jurisdictional Issues, p.10)). United States law would assess whether the arbitration agreement is valid by interpreting the arbitration agreement, and ascertaining and giving effect the intent of the parties.

72. Here, the parties differ as to whether the arbitration agreement at issue refers to arbitration at the "American Arbitration Association" or "American Arbitration Commission". Regardless of whose translation is to be preferred, the Sole Arbitrator

17

finds that the intent of the parties was to agree to arbitration before the "American Arbitration Association". It is noteworthy that two well-known arbitration associations in China are the "Beijing Arbitration Commission" and the "Shanghai Arbitration Commission". Accepting for the sake of argument only that HMSRP's translation is correct and the operative Chinese word refers to "Commission" and not "Association", it may be the case that the drafter of the arbitration agreement simply used the word "Commission" when referring to the "American Arbitration Association" as that is how some prominent arbitral institutions are referred to in China. Accordingly, even if we were to accept, again for the sake of argument, that the proper translation of the agreed arbitral institution is to the "American Arbitration Commission", the Sole Arbitrator finds that the parties' intent was to agree to arbitration before the "American Arbitration Association". Whatever the proper translation is, there is no doubt as to the intent of the parties, as there is no other arbitral institution that the parties could have been referring and could have intended to agree to arbitrate before.

73.    Even if we accept HMSRP's translation to be the correct one, this is at most akin to a typographical or a translation error, and differs from other cases where one cannot readily tell which arbitral institution the parties were referring to. Even if it could be said that the arbitration agreement did not refer precisely to the "American Arbitration Association" in the Chinese language, I do not find that the Chinese version of the arbitration agreement refers to a non-existent arbitral institution. Applying United States law to the issue, it is clear whether the original Chinese language arbitration agreement refers to "American Arbitration Commission" or "American Arbitration Association", that the parties could only have had in mind and could only be referring to the latter. (Restatement of Contracts, § 201. "Whose Meaning Prevails: (1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning. (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made: (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party. . . .")

18

(HMSRP accepts that U.S. courts typically treat the Restatement of Contracts as authoritative of these principles of law typically applied in U.S. states in the absence of any contrary authority. (Respondent Letter on Jurisdictional Issues, p.10.))

74. It is also a principle of "United States" law that when interpreting a clause, an interpretation that gives the agreement a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. (Restatement of Contracts, § 203: Standards of Preference in Interpretation. In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect . . . .") United States rules of contract interpretation instruct that an interpretation that would give effect to the terms of the agreement, specifically the arbitration agreement (and HMSRP does not dispute there is an agreement to arbitrate) rather than an interpretation that would nullify the entire arbitration agreement, should be adopted, and those rules of contract interpretation would require a finding that the reference is to a valid arbitral institution, rather to an invalid and non-existent one.

75. Applying United States law to interpret the wording of the arbitration agreement, I conclude that the parties agreed to arbitration at the "American Arbitration Association". I also do not find that the parties' agreement contains unclear or conflicting dispute resolution provisions: The arbitration agreement is clear and enforceable. There being no other objection to the validity of the arbitration agreement, I find that the arbitration agreement is valid and that this Tribunal has jurisdiction over the dispute.

### *Seat or place of the arbitration*

76. On the issue of the seat, the seat is undoubtedly in the United States, and not in China.

77. First, HMSRP's translation of the Agreement provides in Article 10 that "**Arbitration will be initiated in the US** regarding Party B's breach of the Agreement." (emphasis added)

19

78.  Second, HMSRP in its April 2, 2019 communication, stated that "[i]f ICDR/AAA does have the final jurisdiction, we request locale be New York. We insist this opinion . . . We select New York as the place of arbitration. We do not agree to select San Jose, California. Because Claimant is in California, if the place of arbitration is in California too, the arbitration may not justice. **We believe choose the place which both parties are not located as the place of arbitration shall be justice**. If ICDR/AAA does **[have]** jurisdiction, **New York the location of ICDR/AAA will be the most suitable place for arbitration.**" (*Id*. at p.2.)

79.  Both the HMSRP's own translation of Article 10 and its statements of April 2, 2019 show that it recognizes that it had agreed to arbitration in the United States (or strictly speaking, an arbitration seated in the United States). HMSRP also took the position that if the AAA has jurisdiction that the seat of the arbitration should be New York, which is called a "suitable place for arbitration." In fact, it appears that HMSRP "insisted" on the seat of the arbitration being New York—before it decided that it would commence proceedings in China to invalidate the arbitration agreement and realized the significance of the seat on the issue of validity and started arguing that the seat of the arbitration was in China. HMSRP's April 2, 2019 statement also candidly admits that there is an element of unfairness in seating the arbitration at a place where either of the parties is located.

80.  The Sole Arbitrator concludes that the seat is in the United States, as HMSRP acknowledges both in Article 10 of the translation it tendered and also its statements of April 2, 2019. The Sole Arbitrator also determines that the seat of the arbitration is New York. HMSRP had previously taken the position that New York is "the most suitable place for arbitration", and the Sole Arbitrator agrees that a neutral city in the United States would be the most appropriate place for the arbitration.

81.  The Sole Arbitrator would note that it is open to the parties to agree to have the hearing at some other location, but the seat or the place with which this arbitration has its legal link is New York.

82.  The Sole Arbitrator will shortly communicate with the parties on the next steps to be taken in the arbitration.

20

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Partial Award was made in New York, New York, United States of America.

August 27, 2019

Daniel Tan
Sole Arbitrator

State of California        )
                           )   SS:
County of Alameda          )

I, Daniel Tan, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

August 27, 2019
Date

Arbitrator

State of California        )
                           )   SS:
County of Alameda          )

On this 27 day of August, 2019, before me personally came and appeared Daniel Tan, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ANN STERLING KRAYNAK
Notary Public – California
Alameda County
Commission # 2142270
My Comm. Expires Mar 9, 2020

21

INTERNATIONAL CENTER FOR DISPUTE RESOLUTION
International Arbitration Tribunal

**GLOBAL SYN-TURF, INC.**

CLAIMANT

-AND-

**HEBEI MIGHTY SYNTHETIC RUBBER AND PLASTIC CO, LTD.**

RESPONDENT

**ICDR Arbitration No. 01-19-000-5581**

_____

**Final Award**

_____

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated 15 April 2015, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby AWARD as follows:

**1.    PARTIES**

1.1    Claimant in this arbitration is Global Syn-Turf, Inc. ("GST" or "Claimant"), a company incorporated in the United States of America.[1] Claimant's contact details are as follows:

> 5960 Inglewood Drive, Suite 150
> Pleasanton, CA 94588, USA
> Tel. +1 510-732-2300
> Email: ghbfirst@gmail.com

---

[1] Respondent's Ex. R-70 at page 1.

1

1.2    Claimant is represented by:

> Mr. Mark R. Figueiredo, Esq.
> Ms. Jackie M. Ford, Esq.
> Mr. Christopher G. Addy, Esq.
> Structure Law Group, LLP
> 1754 Technology Drive, Suite 135
> San Jose, CA 95110, USA
> Tel. +1 408 441 7500
> Email: mrf@structurelaw.com
>            jford@structurelaw.com
>            caddy@structurelaw.com

1.3    Respondent is Hebei Mighty Synthetic Rubber and Plastic Co., Ltd. ("Mighty Grass" or "Respondent"), a company incorporated in China.[2] The contact details are as follows:

> Floor 10, Block B, Rundou Shenghe Plaza
> South of Huanghe Ave. & Qilian St. Crossing, High Tech Zone
> Shijiazhuang City
> Hebei 050000, China
> Tel. + 86 311 85210888
> Email: gang@mighty.cc

1.4    Respondent is represented by:

> Ms. Katherine Burghardt Kramer, Esq.
> Mr. Rongping Wu, Esq.
> DGW Kramer LLP
> One Rockefeller Plaza
> Suite 1060
> New York, NY 10020
>
> Email:
> kkramer@dgwllp.com
> lwu@dgwllp.com

## 2.    SOLE ARBITRATOR

The Sole Arbitrator in this case is:

> Mr. Dan Tan
> Dan Tan Law
> 305 Broadway, Suite 750,
> New York, NY 10007

---

[2] SOD at page 2.

Tel. +1 646 580 0080
Email: dan@dantanlaw.com

## 3.    ADMINISTRATOR

These proceedings are administered by the ICDR in accordance with the International Centre for Dispute Resolution ("ICDR") International Dispute Resolution Rules and Procedures effective 1 June 2014 (the "ICDR Rules"). The contact details for the ICDR are as follows:

International Centre for Dispute Resolution
American Arbitration Association
9 Greenway Plaza, Suite 1275
Houston, TX 77046 USA
Tel. +1 832 308 5626
Email: yanettquiroz@adr.org

## 4.    DISPUTE RESOLUTION PROVISIONS

4.1    Claimant brought this arbitration pursuant to the arbitration clause contained in Section 11 of an Exclusive Agency Agreement dated 15 April 2015 (the "EAA").[3] This clause provides[4] as follows:

### 11. Arbitration

Any disputes arising out of or relating to the performance of this agreement shall be settled through friendly negotiation. If the negotiation fails, the case shall then be submitted for arbitration to the American Arbitration Association, and it shall be arbitrated by the rules of this association. The results of the arbitration shall be final and binding upon both parties, and the costs of the arbitration proceeding shall be borne by the unsuccessful party, unless otherwise stipulated by the arbitrators' judgment.[5]

(English translation provided by Claimant)

### Article 11 Arbitration

In the course of the performance of this Agreement, all disputes arising out of or related to this Agreement shall firstly be settled through friendly negotiation between both Parties. If it is not resolved, the dispute shall be submitted to the American

---

[3] Global Syn-Turf Inc.'s Documentary Exhibits List ("Claimant Ex"), C-2, Exhibits in Support of Respondent and Cross-Claimant Hebei Mighty Synthetic Rubber and Plastic Co., Ltd.'s Final Pre-hearing Rejoinder ("Respondent Ex"), R-29-1.
[4] Quotations are set forth "as is". Any grammatical or typographical errors are in the original documents, as is any bolding, italics, or underlining unless otherwise indicated.
[5] Claimant Ex. C-3 at page 4.

> Arbitration Commission and the arbitration shall be conducted in accordance with its arbitration rules. The arbitration fee shall be borne by the losing Party, unless otherwise specified by the Arbitration Commission.[6]

(English translation provided by Respondent)

4.2　Further to Article 11 of the ICDR Rules, if the parties have not agreed on the number of arbitrators, one arbitrator shall be appointed unless the Administrator determines in its discretion that three arbitrators are appropriate because of the size, complexity, or other circumstances of the case.

## 5.　JURISDICTION

5.1　Article 19 of the ICDR Rules provides that the Tribunal may rule on its own jurisdiction under the Rules, including any objections with respect to the existence, validity, or scope of the arbitration agreement.

5.2　As noted above at para 4.1, all parties in this case are parties to the EAA, which contains the arbitration clause.

5.3　Respondent has raised objections to the scope of the Tribunal's jurisdiction that the Sole Arbitrator addressed in the Final Partial Award on Jurisdiction (the "Partial Award") dated 27 August 2019, which the Tribunal incorporates in its entirety in this decision.

5.4　The Tribunal accordingly has jurisdiction over the parties' dispute, subject to Respondent's objection that the scope of the arbitration provision excludes certain disputes—an objection that is dealt with in this Award.

## 6.　NUMBER OF ARBITRATORS

The number of arbitrators is one.

## 7.　LANGUAGE OF ARBITRATION

The language of arbitration is English.[7]

## 8.　PLACE OF ARBITRATION

For the reasons set out in the Partial Award dated 27 August 2019, the seat of the arbitration is New York, United States of America.[8]

---

[6] Claimant Ex. C-4 at page 5.
[7] Procedural Order No. 2, at para 4.
[8] Partial Award, at para 81.

## 9. APPLICABLE LAW

9.1 Section 15 of the EAA is translated as follows:

> **15. Applicable Law**
>
> This Agreement shall be governed by, and construed in accordance with, the law of the United States of America.

(English translation provided by Claimant)

9.2 Further to Article 17 of the ICDR Rules, the Tribunal shall decide the substance of the dispute in accordance with the law agreed upon by the parties. Failing such a designation by the parties, the Tribunal shall apply the rules of law that it determines to be appropriate.

9.3 The Sole Arbitrator determined that the law of the United States would govern these proceedings.[9]

## 10. PROCEDURAL RULES

10.1 Pursuant to Procedural Order No. 2 by the Sole Arbitrator dated 6 November 2019, the parties had agreed to arbitrate their dispute pursuant to the Rules of the AAA, including the Procedures for Large, Complex Commercial Disputes and ICDR International Dispute Resolution Procedures effective 1 June 2014.[10]

## 11. PROCEDURAL HISTORY

11.1 The main procedural steps in this arbitration have been the following.

11.2 On 20 February 2019, Claimant submitted its Notice of Arbitration, and the case was deemed commenced on March 1, 2019.

11.3 On 15 March 2019, Respondent made an objection to the jurisdiction in a "Letter for Objection on Jurisdiction".[11] On 17 March 2019, Respondent sent a further letter correcting certain minor details.

11.4 On 21 March 2019, Claimant responded to Respondent's jurisdictional objections in a letter to ICDR.[12]

11.5 On 24 March 2019, Respondent submitted its Arbitration Answering Statement and Counterclaim or Joinder/Consolidation Request.

---

[9] Procedural Order No. 2, at para 5.
[10] Procedural Order No. 2, at para 3.
[11] Letter for Objection on Jurisdiction; Answer, at page 1.
[12] Responsive Comments on Hebei's Objection to ICDR Jurisdiction.

11.6    On 28 March 2019, the ICDR wrote to the parties, acknowledging the correspondences dated 15 March 2019, 17 March 2019, and 21 March 2019 (above), and informed the parties that their contentions have been made part of the file and will be forwarded to the Tribunal upon appointment.[13]

11.7    On 2 April 2019, Respondent provided further objections and observations in a second Letter to ICDR. On the same day, ICDR acknowledged the additional objections to jurisdiction and Respondent's assertion that the language of the arbitration is Chinese.

11.8    On 19 April 2019, the ICDR designated San Jose, California as the seat of the arbitration. The ICDR noted that the Tribunal has the authority, upon a party's request, to determine finally the place of arbitration.

11.9    On 31 May 2019, the Sole Arbitrator and the parties attended a Preparatory Conference call. Counsel for the Respondent outlined the jurisdictional objections and sought written briefing on the issue before the Sole Arbitrator.

11.10   On 8 June 2019, Claimant confirmed that it would submit an amended notice of arbitration.

11.11   On 9 June 2019, the Sole Arbitrator issued Procedural Order No. 1, which memorialized the briefing schedule discussed on the 31 May 2019 call.

11.12   On 15 June 2019, Respondent filed its submission on jurisdiction.

11.13   On 18 June 2019, Claimant filed its Amended Notice of Arbitration.

11.14   On 26 June 2019, Claimant filed its Opposition to Respondent's jurisdictional objection.

11.15   On 17 July 2019, the Sole Arbitrator sent an email requesting the parties' assistance on questions relating to the jurisdictional objections. Parties then filed their respective responses to the Sole Arbitrator's questions on 26 July 2019.

11.16   On 6 August 2019, the Sole Arbitrator wrote to the parties asking for briefing on additional cases, and on 12 August 2019, both parties provided their comments on the Sole Arbitrator's request.

11.17   On 27 August 2019, the Sole Arbitrator issued the Partial Award which determined the jurisdictional objections by Respondent. In brief, the Sole Arbitrator found that the arbitration agreement is valid, and that this Tribunal has jurisdiction over the dispute. Further, the seat of the arbitration is New York, United States of America.[14]

---

[13] Letter from the ICDR 1, at page 2.
[14] Partial Award, at para 75-76.

11.18 On 18 September 2019, Respondent filed its Answer to Claimant's Amended Notice of Arbitration.

11.19 On 24 September 2019, Respondent filed a brief statement outlining its counterclaims.

11.20 On 17 October 2019, the Sole Arbitrator and the parties attended a Preparatory Conference call to discuss logistical and scheduling issues.

11.21 On 6 November 2019, after inviting comments from the parties, the Sole Arbitrator issued Procedural Order No. 2 regarding the agreed Procedural Timetable.

11.22 On 9 December 2019, the parties agreed to modify the briefing schedule to accommodate the change in counsel for Claimant. Parties agreed for the Claimant's Statement of Claim to be moved to January.

11.23 On 7 February 2020, Claimant filed its Statement of Claim ("SOC"). The SOC was accompanied by the Claimant's filings of declarations by Mr. Brandon Johnson, owner of Tough Turtle Turf, dated 6 February 2020, as well as Mr. Andrew Gao, CEO and founder of Global Syn-Turf, in support of the Claimant's SOC, dated 7 February 2020 ("Gao 1").

11.24 On 24 March 2020, the Sole Arbitrator declared the proceedings suspended pending the receipt of outstanding deposits, pursuant to Article 36(3) of the ICDR Rules.

11.25 On 20 May 2020, Respondent sent a letter to the Sole Arbitrator asking the arbitrator to dismiss the claims of Claimant for failure to make timely deposits.

11.26 On 8 June 2020, Respondent filed a Statement of Defense and Counterclaim. Citations to Respondent's Statement of Defense and Counterclaim are abbreviated "SOD". The SOD was accompanied by the Respondent's filing of the Declaration by Mr. Guang Cheng ("Mr. Cheng"), Manager of Mighty Grass, in support of the Respondent's SOD ("Cheng 1").

11.27 On 9 June 2020, the Sole Arbitrator issued Procedural Order No. 3 to lift the suspension dated 24 March 2020, and accepted the procedural timetable agreed by the parties for the resumed proceedings.

11.28 On 26 June 2020, Claimant filed its Statement of Defense to Counterclaim (the "SODC"), submitted with the second Declaration of Mr. Andrew Gao ("Mr. Gao") ("Gao 2") in support of the Claimant's SODC.

11.29 On 30 June 2020, the parties filed their Requests for Production of Documents ("Document Requests") in accordance with Procedural Order Nos. 2 and 3.

11.30 On 24 July 2020, the parties submitted the Parties' Joint Redfern Schedule ("Redfern Schedule") to the Tribunal.

11.31 On 18 August 2020, the Sole Arbitrator issued the decision on Document Requests.

11.32 On 25 August 2020, the Sole Arbitrator issued Procedural Order No. 4. The Sole Arbitrator adopted the procedural timetable for the remainder of the proceedings, including the parties' submissions, expert reports, and setting down the date of the Final Evidentiary Hearing.

11.33 On 4 September 2020, Claimant filed the Claimant's Supplemental Responses Re Arbitration Ruling – Document Requests and Interrogatories ("Supplemental Interrogatories").[15]

11.34 On 30 September 2020, Claimant filed the expert report of Mr. Michal A. Malkiewicz (the "Malkiewicz Report"), and Respondent filed the expert report of Mr. Tianjun Wen ("Mr. Wen") (the "Wen Report").

11.35 On 16 October 2020, Claimant filed its Response to Respondent's SOD ("Response"), and a supplemental Declaration of Mr. Gao in support of Claimant's Response ("Gao 3").

11.36 On 16 October 2020, Respondent filed its Final Pre-hearing Rejoinder ("Rejoinder"), along with the Witness Statements of Mr. Abner Han ("Mr. Han") ("Han 1"), Mr. Cheng ("Cheng 2"), and Ms. Junchan Li ("Ms. Li") ("Li 1").

11.37 On 2 November 2020, the Sole Arbitrator issued Procedural Order No. 5, detailing the Hearing schedule and preparatory matters for the virtual Hearing.

11.38 On 2 to 5 November 2020, 9 to 10 November 2020, and 1 December 2020, the Tribunal held the Hearing virtually via Zoom.

11.39 At the Hearing, Mr. Gao, Mr. Cheng, Ms. Li, Mr. Malkiewicz, Mr. Han, and Mr. Wen were cross-examined with the assistance of an interpreter for Mr. Cheng, Ms. Li, Mr. Han, and Mr. Wen.

11.40 A court reporter was present and made a transcript of the Hearing. Citations to the transcript are abbreviated "Tr." followed by the day, page, and line reference.

11.41 On 8 December 2020, the parties submitted tables summarizing their cost submissions, and Respondent also submitted a compilation table of evidence of damages regarding Respondent's counterclaims, as requested by the Sole Arbitrator during the 1 December 2020 Hearing.[16]

11.42 On 5 March 2021, the Sole Arbitrator closed the Hearing.

---

[15] Respondent's Ex. R-59.

[16] Day 7 Tr. 803:20-25 (Arbitrator) (Kramer); Day 7 Tr. 866:3-6 (Arbitrator).

11.43   On April 29, 2021, the ICDR asked the parties to approve an extension to render the Award, which was approved by both parties.

## 12.   REQUESTS FOR RELIEF

12.1   In its Notice, Claimant sought the following relief:

    *1.   USD $5,000,000 for the breach of contract.*[17]

12.2   In its Answer, Respondent asked the Tribunal:

    *1.   To find that ICDR/AAA has no jurisdiction;*
    *2.   To reject the Claimant's claims for $5,000,000;*
    *3.   To find that if ICDR/AAA does have jurisdiction, to request the locale be New York, three arbitrators, and the arbitration conducted in Chinese.*[18]

12.3   In its Statement of Claim, Claimant asked that the Tribunal:

    *1.   Award to GST, as against the Respondent, punitive damages in an amount to be determined at hearing;*
    *2.   Award to GST, as against the Respondent, for the full pre-award and post-award interest, costs, attorney's fees to the Claimant; and*
    *3.   Award to GST for a refund of the full contract price, in the sum of $5,536,607.52, it paid for a "bargain" it did not receive.*[19]

12.4   In its Statement of Defense and Counterclaim, Respondent asked the Tribunal to:

    *1.   Deny the Claimant's claims in their entirety;*
    *2.   Award Mighty Grass damages, interest, and attorney's fees for a total of at least $633,103.47, based upon its counterclaims.*[20]

12.5   In its SODC, Claimant sought for the Tribunal to find that the Respondent is entitled to nothing on its counterclaims.[21]

12.6   In its Rejoinder, Respondent asked the Tribunal:

    *1.   To deny GST's claims in their entirety; and*
    *2.   Award Mighty Grass damages, interests, and attorney's fees on its counterclaims.*[22]

---

[17] Notice at page 1.
[18] Answer at page 1.
[19] SOC at para 75-77.
[20] SOD at page 31-32.
[21] SODC at para 20.
[22] Rejoinder at page 45-46.

12.7    During the Hearing, Claimant orally summed up the relief it was seeking:

> For those reasons we're going to be seeking the damages as set forth in – in our declarations, our proposed declaration and we would submit that at the end of this proceeding an award should be made in GST's favor and against the counterclaim, which is essentially for non-payment for a defective product.[23]

> The summary of the damage calculations is 13.8 million… We filed this claim without benefit of an expert, an economist to do the expert calculation. We used numbers based on documents that were provided, but now that Mr. MALKIEWICZ has gone through… and taken everything into account, we definitely defer, and GST's position is based on Mr. Malkiewicz's statement of damages which you see the date that was provided considering all of the evidence in terms of what is being sought.[24]

> Fifty-five percent[25] of that two million dollar number should be awarded for the Cool Blue, and the remaining forty-five percent could be subject to some adjustment… as well, the remediation cost and the calculation of that is set forth in this document.[26]

> [For the remaining warranty claims] we would ask that the arbitrator take into consideration some sort of escalation, because these are products that are being watered down and degrading over time.[27]

12.8    During the Hearing, Respondent summed up that it was seeking the following relief in relation to its counterclaims:

> So we have here the PI ending at 39LU. Our first counterclaim is for GST's failure to pay this invoice… So the balance that's due on this invoice is $130,788… on a breach of contract claim.[28]

> And next we have the pro forma invoice ending in 40LU. This is the second counterclaim we have… The balance due on this invoice is also $130,788.[29]

> Third, we have counterclaims for expenses incurred by Mighty Grass for raw materials… The total for this set of raw materials is about $260,000.[30]

---

[23] Day 1 Tr. 16:20-25 (Figueiredo).
[24] Day 7 Tr. 684:22–685:13 (Figueiredo).
[25] Malkiewicz Report, at para 25; Supplemental Interrogatory - Response to Interrogatory No. 3.
[26] Day 7 Tr. 693:22–694:11 (Figueiredo).
[27] Day 7 Tr. 691:22-25 (Figueiredo).
[28] Day 1 Tr. 58:7-20 (Kramer).
[29] Day 1 Tr. 58:22–59:4 (Kramer).
[30] Day 1 Tr. 59:6-22 (Kramer).

*A separate counterclaim for adhesive glue that Mighty Grass purchased in reliance on a particular order from GST.*[31]

*Fifth, we have unshipped inventory from some purchase orders that GST placed and then never authorized the shipping… these losses are approximately $20,000.*[32]

*Six, we have our counterclaim for the wrongful refunds that were given… We have a counterclaim for return of that money because those were misrepresentations. We were misled into giving those refunds.*[33]

## 13.    FACTUAL AND CONTRACTUAL BACKGROUND

13.1    The dispute stems from breach of contract claims between Claimant GST, a California-based company in the business of selling synthetic turf products, and Respondent Mighty Grass, a Chinese manufacturer of synthetic turf.

13.2    In late 2014, the parties began negotiations about a manufacturing agreement.[34] Claimant requested product samples of differing colors and textures, and Mr. Gao selected a turf that was the color and texture that Claimant preferred.[35]

13.3    On or about 15 April 2015, Claimant and Respondent entered an "Exclusive Agency Agreement" ("EAA") where Claimant would be the "exclusive agent" to "promote and solicit customer orders" for the hollow-blade turf. The original written agreement is in Chinese.[36] Both Claimant and Respondent have submitted certified English translations of the EAA.[37] This EAA was stated to be in effect for a term from 15 April 2015 to 14 April 2016.[38] The EAA provided as follows:

### 6. Annual Sales Volume to Include Sales to Canada.

[Respondent] is appointing [Claimant] as the exclusive Agent for its hollow blade and M-blade artificial grass products on the terms of the present contract, and [Claimant] will have to meet the annual minimum orders objectives set out: 50,000 square meters.

---

[31] Day 1 Tr. 59:23-25 (Kramer).
[32] Day 1 Tr. 60:6-11 (Kramer).
[33] Day 1 Tr. 60:12-15 (Kramer).
[34] SOD at page 3.
[35] SOC at para 5 and 7, SOD at page 3.
[36] Claimant's Ex. C-2, Respondent's Ex. R-29-1.
[37] Claimant's Ex. at C-3 and C-4.
[38] Claimant's Ex. C-3 at page 1, C-4 at page 1.

**7. Method of Payment.**

(1) [Claimant] shall make a deposit payment of 30% upfront to [Respondent] on the date when each order is placed, [Claimant] shall then make the balance payment before the goods arrive at their port of destination.

…

**10. Breach of contract.**

(3) If any technical or quality issues arise in [Respondent's] products, resulting in economic losses for [Claimant] in breach to its clients, [Respondent] shall be liable for all economic losses and shall assume relevant legal responsibilities.

**12. Term of Agreement**

The term of this Agreement is for a one (1) year period, commencing from the date of April 15, 2015 through the date of April 14, 2016. The Agreement enters into force upon signing by both parties. The Agreement may be extended for another period of three (3) years on the same terms and conditions, and with supplementary documents attached, if the parties hereto mutually agree upon its extension at least three (3) months prior to the termination of this current agreement.

…

**16. Miscellaneous**

(1) During the term of this agency agreement, any matters not covered herein may be expressed in a supplemental agreement that is consented to mutually. All supplemental agreement(s) entered into are equally legally binding as the agreement herein.

(These translations are taken from Claimant's translation of the EAA, though these portions of the translation are not disputed, and the Sole Arbitrator is of the view that no issue in dispute turns on any differences in the translations of these sections put forward by the parties.)

13.4   Between 2015 and 2018, Claimant ordered from Respondent a specific kind of synthetic turf called "hollow-blade", which means that the fibers of the turf have a little hole.[39]

13.5   Claimant began ordering the hollow-blade turf from April 2015, and the first shipment was delivered in August 2015.[40] Claimant ordered a specific kind of

---

[39] SOC at para 1-3.
[40] SOC at para 9.

synthetic turf they called "Cool Blue-Hollow" with a 90-ounce per square yard face weight, and another product called "Hollow Blade-73", including a product described as "THD" that was cut to smaller sizes.[41] From 2015 to 2018, Claimant placed at least 54 purchase orders with Respondent for the hollow-blade turf, totaling more than $5,500,000.[42]

13.6   According to Claimant, the specification of the turf's "face weight" by ounce is defined as the "*weight of the product's pile (fibers) per square yard of product*."[43] The parties dispute whether this is a term of their agreement and whether this requirement has been complied with, specifically whether the face weight is calculated based on a per square yard or per square meter.

13.7   Claimant claimed that during the discussions with Respondent, it requested that Respondent manufacture turf with a 90-ounce face weight per square yard.[44] However, Respondent contends that Respondent never made an agreement with Claimant to provide artificial turf with a face weight of 90-ounces per square yard,[45] because Respondent does not measure products in "square yards".[46]

13.8   According to Respondent, face weight was first raised as a question by Claimant in January 2016.[47] Respondent believed the issue to be resolved after Claimant's representative, Mr. Tao Guo, made periodic checks of the manufacturing facility and products of Respondent.[48]

13.9   Respondent defined "density" as the number of stiches used in the turf, which is normally stated as stiches per square meter. DTEX means the weight (in metric gram) per 10,000 meters of yarn.[49]

13.10  In June 2017, Mr. Gao and Mr. Cheng had a conversation regarding the product with density of 16800 and "DTEX" value 14000. In a complaint letter sent by Claimant to Respondent dated 14 June 2017, Claimant laid out the complaints about the color tones, bent grass seedlings, and too many folds that affect product quality. Furthermore, Claimant mentioned the conversation with Mr. Cheng and placed a production contract of two PIs.[50] Claimant and Respondent agreed to make this adjustment as reflected in the 16 June 2017 invoice from Respondent.[51]

13.11  Beginning on or about 15 July 2017, Claimant alleged such defects in Respondent's product. To maintain the business relationship, Respondent made payments to Claimant in the form of discounts.[52]

---

[41] Response at page 1-2.
[42] Claimant's Ex. C-6, SOD at page 2.
[43] SOC at para 4.
[44] SOC at para 4-6.
[45] SOD at page 5.
[46] SOD at page 7.
[47] SOD at page 5; Respondent's Ex. R-30-1 at page 4.
[48] *Id*, Cheng 1 at para 8.
[49] SOD at page 8.
[50] Respondent's Ex. R-19a at page 29.
[51] SOC at para 12, SOD at page 8.
[52] *Id.* at page 13.

13.12 On or about 31 August 2017, there was an email conversation between Ms. Gina Huang ("Ms. Huang"), Claimant's representative, and "summer" (Ms. Li), Respondent's representative. Ms. Huang acknowledged that "the 89.6 oz is per square meter, not square yard".[53] In the email exchange, Ms. Huang was asking to increase the weight to 3 kilograms per square meter. In response, "summer" suggested three solutions as follows:

> *Solution 1: Stitch: 20 stitch/10cm (21000 stitch/m2), DTEX: 14000 (straight yarn 10000; curly yarn 4000); grass fiber is 3.077kg/square meter*

> *Solution 2: Stitch: 19 stitch/10cm (19950 stitch/m2), DTEX: 14400 (straight yarn 10000; curly yarn 4000); grass fiber is 3.021kg/square meter*

As well as Solution 3 in tabular format, citing a turf density of 16800 stitch and 4000+10000 DTEX.[54]

13.13 After the solutions above were proposed, Claimant requested samples but continued to order the same turf products as before. They did not place orders with Respondent for turf matching any of the three solutions.[55]

13.14 On or around 1 December 2017, Claimant's representative, Ms. Gina Huang, stated in an email in a warranty claim to "deduct this amount on the next payment if you are not able to visit the field sooner."[56] Similarly on 8 February 2018, Claimant invited Respondent's representatives to look at the defective turf and verify that the turf was theirs.[57] But Respondent did not send representatives to examine the defective turf in the United States.

13.15 On or around 1 December 2018, Claimant made it known to Respondent that it had called an order of blue hollow-blade turf into question because the weight was only 79-ounce. Respondent detailed this complaint in its response letter, stating that they did not find any request for the turf fiber weight to be measured by per square yard, but requests were all based on turf fiber weight per square meter.[58] Respondent cited the earlier email conversations as detailed at paragraph 13.12 as evidence.

13.16 On 3 December 2018, Claimant received a letter of demand from an attorney for San Diego Best Window Dba Tough Turtle Turf ("Tough Turtle").[59] Tough Turtle accused Claimant of providing turf that did not meet the product

---

[53] SOC at para 13, SOD at page 9, Claimant's Ex. C-79 at page 2.
[54] Claimant's Ex. C-79 at page 2-3.
[55] Day 2 Tr. 172:5-23 (Kramer) (Gao).
[56] Respondent's Ex. R19 at page 7.
[57] Respondent's Ex. R-19-a at page 15, which was a document signed 8 February 2018, originally translated from a handwritten note by Mr. Cheng that "after repeated communication, the customer said that we must go to the site to verify the actual situation for better cooperation in the future."; Day 2 Tr. 203:7-13, 204:6-18 (Kramer) (Gao); Day 2 Tr. 254:1-10 (Figueiredo) (Gao).
[58] Claimant's Ex. C-79 at page 1.
[59] SOC at para 16, SOD at page 12.

specifications, including test results from a third-party lab who had inspected the turf and found that the face and total weights did not meet the 90-ounce specifications.[60]

## 14. PARTIES' KEY CLAIMS

14.1 In preparing this Award, the Sole Arbitrator has considered all the allegations, evidence and arguments in the record but refers only to those considered relevant to the reasoning and decisions. The fact that the Sole Arbitrator does not refer to a certain fact or argument does not mean that it has not been considered.

### A. Claimant's Claims as set out in Statement of Claim

14.2 First, Claimant contends that Respondent breached the parties' contract for 90-ounce per square yard turf. Respondent failed to comply with the contract terms because it provided hollow-blade turf that did not comply with the contractual specifications and was of compromised quality.[61]

14.3 Moreover, even though Respondents claimed to have calculated face weight based on using square meters, Claimant argues that the actual tested turf in any case falls short of the Respondent's own 90-ounce per square meter face weight requirement.[62]

14.4 As a result of the compromised product standards, Claimant claims to have suffered ongoing and evolving economic losses after end-users realized that Claimant's marketed products were nonconforming and were of poor quality.[63]

14.5 Second, Claimant brings a fraud claim against Respondent. Claimant contends that Respondent intentionally concealed and misrepresented the quality of the product to provide them with a cheaper product than that specified in the parties' agreement.[64]

14.6 Third, Claimant claims that Respondent violated the Uniform Commercial Code ("UCC")'s provision for Express Warranty and Implied Warranties for Merchantability, and Fitness for Particular Purpose in the following ways:

> (1) Respondent's representations that Claimant would receive a product with 90-ounce per square yard face weight, 16800 density, and 14000 DTEX constituted an express warranty.[65] The product did not meet the quality of the description, and Claimant repeatedly notified Respondent of the issues as demonstrated by communications regarding the turf specifications.[66]

---

[60] Claimant's Ex. C-77 at page 5.
[61] SOC at para 29.
[62] SOC at para 32; Claimant's Ex. C-77.
[63] Id.
[64] *Id.* at para 34, 41-42.
[65] *Id.* at para 47.
[66] *Id.* at para 48-50.

(2) The implied warranty of merchantability applies to sellers who are merchants with respect to goods being sold. Respondent should be considered a "merchant" under the UCC. Claimant asserts that the hollow-blade turf produced by Respondent was not merchantable or fit for the ordinary purposes for which it is used, as confirmed by the complaints and test results.[67]

(3) Due to the hollow-blade turf's premature deterioration and deficient face weight, it did not live up to the "particular purpose" expected by Claimant's end customers. Thus, Respondent breached its implied warranty of fitness by providing turf short of the 90-ounce per square yard or meter mark.[68]

14.7   As a result of the claims above, Claimant's damages claim in its SOC includes, but are not limited to legal claims, compensation, and costs associated with re-installation, refunds, and replacements for its end-customers. The minimal estimate of Claimant's damages specifically includes, but are not limited to, the entire contracted purchase price amount of $5,536,607.52 for the deficient hollow-blade turf it ordered between 2015 to 2018. As discussed below, Claimant's entire damages case was subsequently revised in the Malkiewicz Report and at the Hearing.

14.8   Claimant contends that Respondent's fraudulent acts should result in punitive damages in an amount to be determined at the Hearing.[69] These damages are warranted in part to punish Respondent for its improper actions and to compensate Claimant for the ongoing uncertainty in costs, claims, and other related expenses reasonably expected from the Respondent's non-conformity in the agreement.[70]

14.9   Claimant also claims interest, costs, and attorneys' fees in connection with this arbitration, as a matter of cost recovery pursuant to the California Civil Code (the "California Civ. Code").[71]

## B.   Respondent's Defenses

14.10   In response to Claimant's claims above, Respondent denies that there was a breach of contract, and avers that there was no misrepresentation and no breach of any warranty.

14.11   As a threshold matter, Respondent contests that the scope of the arbitration clause in the EAA excludes a majority of Claimant's claims. As the EAA was in effect from 15 April 2015 to 14 April 2016,[72] without subsequent renewal by way of signing another exclusive agency agreement, Respondent claims that the

---

[67] *Id.* at para 54-58.
[68] *Id.* at para 64.
[69] *Id.* at para 67 and 71.
[70] SOC at para 67.
[71] *Id.* at para 74.
[72] Claimant Ex. C-3 at page 5.

Tribunal does not have jurisdiction over disputes arising outside the period of the EAA.[73]

14.12 Furthermore, the EAA itself is separate from the purchase orders, and the purchase orders do not contain their own arbitration clause.[74] Respondent thus contends that the elements of the parties' dispute fall outside the scope of this arbitration and should not form the basis for any portion of the Sole Arbitrator's Award.[75]

14.13 Respondent argues that it did not breach any material term of the parties' agreements and Claimant cannot prevail upon a claim for breach of contract. Under the EAA, Respondent's obligations were to use Claimant as an exclusive agent for the sale of its products in the United States, and to produce a certain volume of goods for the duration of the contract. Respondent complied with this exclusivity agreement and produced the agreed-upon volume of goods during the term of the EAA.[76]  There is no allegation that Respondent breached the EAA.[77]

14.14 Respondent denies providing non-conforming turf in breach of the parties' purchase agreements because there was never a verbal or oral agreement for Respondent to provide a product with a face weight of 90-ounces per square yard.[78]

14.15 By referring to communications and pro-forma invoices issued by Claimant, Respondent asserts that Claimant sometimes ordered hollow-blade turf with 16800-density and 14700-density.[79] Claimant sold the different products under the same Product Specifications Sheet that was neither known nor authorized by Respondent.[80] Therefore, the assertion that Claimant was unaware of the change in products is not credible.[81]

14.16 Respondent asserts that Claimant's claims of low-quality turf are without merit because there is insufficient evidence to demonstrate the claimed quality problems.[82] Along with the UCC principles stated at paragraph 14.19 below, Respondent also points out that Claimant had a full opportunity to inspect and accept the goods. Once the hollow-blade turf was sold, the extensive chain of intervening events destroys any link between Respondent's manufacturing and purported "deterioration" or other issues.[83]

14.17 Respondent argues that Claimant's claims for fraud, intentional misrepresentation and concealment are without merit. Respondent denies that

---

[73] SOD at page 15.
[74] *Id.* at page 16.
[75] *Id.* at page 17.
[76] Id.
[77] Id.
[78] *Id.* at page 18.
[79] *Id.* at page 19.
[80] Id.
[81] Id.
[82] *Id.* at page 20.
[83] Id.

there are any facts sufficient to make out a tort claim apart from the parties' contractual relationship, which in turn bars these claims because of the economic loss rule.[84]

14.18 Respondent asserts that it did not withhold any material facts from Claimant, nor make false statements as each pro-forma invoice reflected the specifications of the order products. Respondent has never represented to Claimant that it would provide turf with the face weight of 90-ounces per square yard.[85]

14.19 Respondent contends that the UCC precludes Claimant's claims because Claimant accepted all goods without timely objection after time to inspect. The pro-forma invoices stated the condition that "in case of quality discrepancy, the buyer should file claim within 20 days after the arrival of the goods at the port of destination."[86] Claimant waited years to notify Respondent of the supposed non-conformity. The lack of timely notification means that Claimant had accepted the goods without reservation.[87]

14.20 In addition, Respondent submits that it did not violate any warranties under the UCC, express or implied because:

(1) Respondent did not make any express warranties to Claimant regarding the 90-ounce per square yard face weight. Respondent asserts that it should not be made liable for any unilateral representations made by the Claimant to its own customers through the provision of a Product Specification Sheet.[88]

(2) Respondent does not dispute that they are a "merchant" of artificial turf for the purposes of the UCC. Respondent however did not violate any implied warranties of merchantability because there is no evidence that Respondent sold goods that were not reasonably fit for their intended purpose. As an experienced buyer in artificial turf, Claimant should be held to assume the risks as to all defects which a professional in the field ought to have been able to observe.[89]

(3) Respondent did not breach any implied warranty of fitness for a particular purpose. Claimant failed to identify any particular use for the turf that was not met by the hollow-blade turf provided by Respondent and cannot have relied on Respondent's skill or judgment to select or furnish suitable goods.[90]

---

[84] *Id.* at page 21.
[85] *Id.* at page 22.
[86] *Id.* at page 23.
[87] *Id.* at page 24.
[88] *Id.* at page 25.
[89] *Id.* at page 26.
[90] *Id.* at page 26-27.

(4) The pro-forma invoices contained conditions that functioned as a disclaimer of implied warranties, that any such claims needed to be raised within 20 days of receipt of the goods.[91]

14.21   Respondent asserts that Claimant's damages theory is meritless on the basis that Claimant fails to account for its own profits in putting forward its calculation of damages. Claimant erroneously seeks rescission damages in attempting to simultaneously retain the benefits of the parties' agreements (i.e., its profits and proceeds from reselling the hollow-blade turf) and obtain a full refund of all payments it had made to Respondent.[92]

14.22   Respondent also contends that it made several refunds or credits based on their good faith desire to maintain a good client relationship with the Respondent, but Claimant fails to account for such refunds or credits by seeking a second refund of those orders in these proceedings.[93] Further, Respondent denies any colorable basis for punitive damages, and argues that Claimant's assertions that it took action to defraud Claimant are wholly without merit.[94]

## C.    Respondent's Counterclaims

14.23   Respondent advances several counterclaims in these proceedings. Respondent brings claims against Claimant for (1) breach of contract, including failure to pay amounts owed to Respondent, and (2) intentional misrepresentation including the Respondent's reimbursement to Claimant based upon fraudulent claims of defect. Respondent therefore claims damages of at least $633,103.47, plus interest and attorney's fees.[95]

14.24   The breach of contract claims flow from the following incidents: [96]

(1) On or about 26 September 2017, while there was a supply contract between parties, Claimant abruptly cancelled its order without reason. Respondent thus counterclaims for $260,088.43 in damages, as well as the loss of the total value of its glue inventory worth $31,267.25.

(2) On or about 9 August 2018, the parties entered into a supply contract for $186,840. Claimant made payment for $56,052 to Respondent, and after Respondent delivered the goods ordered under the contract, Claimant failed to pay the remaining balance of $130,788.[97]

(3) On or about 22 August 2018, the parties entered into a supply contract with a total contract amount of $186,840. Despite repeated requests from Respondent, Claimant failed to send shipping

---

[91] *Id.* at page 27.
[92] *Id.* at page 27-28.
[93] *Id.* at page 28.
[94] *Id.* at 28-29.
[95] *Id.* at page 29.
[96] *Id.* at page 30-31; Day 7 Tr. 799:2 – 802:21 (Kramer).
[97] Respondent's Ex. R-15 and R-15A.

19

instructions. Claimant also failed to pay the remaining balance of $130,788.

(4) Between October 2016 and July 2018, Respondent accumulated unshipped supply materials related to orders placed by Claimant, for approximately $20,850.36.

14.25 Further, Respondent brings counterclaims against Claimant for intentional misrepresentation beginning on or about 15 July 2017. Starting on that date, Claimant claimed defects in Respondent's hollow-blade turf, despite not believing that such defects existed, Respondent provided certain discounts to preserve the commercial relationship with Claimant. Respondent claims that Claimant's demands for discounts were fraudulent because the claimed defects were fabricated, and Respondent is therefore entitled to recover the $59,321.44 that it had paid to Claimant.[98]

## D.    Claimant's Defense to Counterclaim

14.26 Claimants denies that it is liable to Respondent. Claimant acknowledges making two orders from Respondent on 9 and 22 August 2018, amounting to $186,840 each. Claimant paid deposits of $56,052 for each order. The product was delivered for the 9 August 2018 order, but Claimant cancelled the 22 August 2018 order due to the continued quality complaints received by Claimant around that time. The unused turf was processed for return to Respondent, but Respondent refused to take it.[99]

14.27 Claimant argues that Respondent does not have evidence to substantiate Mr. Cheng's allegation that Claimant cancelled the 26 September 2017 order that caused the loss of $260,088.43.[100] Likewise, Claimant argues that Respondent issued the invoices related to the accumulated unshipped supply referenced in paragraph 14.24(4) to acknowledge that Claimant paid in full.[101]

14.28 Claimant asserts that Respondent cannot succeed on its claim for unused inventory and unshipped supply materials because Claimant has no obligation to pay for them. There is no evidence or language under the EAA or any of the invoices that Claimant cannot cancel an order before or even after a product is delivered.[102] Respondent has not cited any contract terms that Claimant breached, and there is no evidence that Respondent suffered any damages for unused materials. Similarly, Respondent does not cite legal theories to establish claims of interest and attorney's fees.[103]

14.29 Claimant contends that Respondent should not succeed on their counterclaim for fraud because Respondent cannot demonstrate that it reasonably relied upon Claimant's alleged misrepresentations. Honoring the request for the sake of the

---

[98] *Id.* at page 32, Cheng 1 at para 55; Day 7 Tr. 803:3-19 (Kramer).
[99] SODC at para 6.
[100] *Id.* at para 4.
[101] *Id.* at para 7.
[102] *Id.* at para 12-13.
[103] *Id.* at para 16.

business relationship does not constitute fraud.[104] Further, there is no indication as to how the sum of $59,321 was calculated, nor discussions or supporting evidence as to why the discounts were given in the first place.[105]

14.30 Respondent's claims go back to at least 2016, and since the parties continued to work with each other into 2018, Claimant contends that Respondent has a duty to take reasonable steps to mitigate those damages. Respondent could have utilized the materials Claimant's future orders or sought to resell the product to another buyer.[106]

14.31 Finally, Claimant asserts that Respondent waived any claims it had against Claimant for breach of contract or in tort when they issued invoices that Claimant paid in full.[107] The facts regarding any potential financial loss were known to Respondent at the time it issued Claimant a revised invoice, and thus Respondent knowingly waived its rights to future payment.[108]

**E.     Claimant's Response to Respondent's Statement of Defense**

14.32 Claimant generally reiterates their position outlined in their SOC. The issues surrounding the face weight dispute go to their contract, fraud and UCC causes of action.[109] Claimant also addresses the scope issue raised by Respondent, which will be dealt with at paragraph 16.7 of this Award.

14.33 Claimant asserts that it was rightfully entitled to revoke its acceptance of the goods in accordance with UCC § 2-608. Its acceptance was reasonably induced by the difficulty of discovering the latent defects of the turf that substantially impaired its value.[110] The defects were dormant for a certain period and therefore Claimant did not discover the latent defects until years after.[111]

14.34 To respond to Respondent's claim of lack of knowledge and no breach of express warranty, Claimant refers to Exhibit C-114 of an internal document by Respondent, where it was plainly stated as 90-ounce per square yard. This exhibit was later withdrawn, as discussed later in this Award at paragraph 17.32.

14.35 In relation to their arguments on implied warranties, Claimant argues that the UCC § 2-314 requirement that goods be "fit for the ordinary purpose for which such goods are used" is breached when the product is defective to the normal buyer making ordinary use of the product.[112] It must be a fundamental defect

---

[104] *Id.* at para 14.
[105] *Id.* at para 15.
[106] *Id.* at para 17.
[107] *Id.* at para 18.
[108] *Id.* at para 19.
[109] Response at page 3.
[110] Response at page 4-5.
[111] Response at page 5 citing *Chaplin v. Bessire & Co.*, 361 S.W.2d 293, 294-95, 297 (Ky. Ct. App. 1962) and *Birkner v. Purdon*, 27 Mich. App. 476, 481-82 (1970).
[112] *Id.* at page 8 citing *Brittalia Ventures v. Stuke Nursery Co., Inc.*, 153 Cal. App. 4th 17 (3d Dist. 2007).

that "impact the structural integrity" of the product, not cosmetic defects, that renders the product unfit for its ordinary purpose.[113]

14.36   Claimant asserts that the implied warranties were breached by latent defects that were undiscoverable at the time of sale.[114] The defective nature of Respondent's supplied turf was not "fit for the ordinary purposes" used by Claimant's end customers, and the defects impacted the structural integrity of the product.[115] Furthermore, Respondent is an expert turf manufacturer, and it had knowledge of Claimant's particular purpose, which is to sell high quality turf to its end customers. Therefore, Respondent breached its implied warranty of fitness for a particular purpose.[116]

14.37   On damages, Claimant submitted a new damages case contained in the Malkiewicz Report, which performed an economic damages analysis. Mr. Malkiewicz found that the total amount of quantifiable direct and consequential damages[117] to Claimant as a result of Respondent's alleged conduct is $13,840,852. This figure is comprised of the following:[118]

- *Direct Damages under the Agency Agreement: $2,060,365 in direct economic damages based on the difference between GST's expected financial performance but-for Mighty Grass's alleged breaches and GST's actual financial performance during the period when the Exclusive Agency Agreement for Hollow Blade, M-Blade Grass Series Products in the U.S. Market was in effect.*

- *Expected Remediation Costs: $10,624,723 in out-of-pocket remediation costs based on expected total costs of replacing or refunding Mighty Grass's out-of-specification and/or defective synthetic turf sold by GST to its customers.*

- *Lost Profits from Non-Tough Turtle Turf Customers: $472,690 in lost profits from lost sales of "hollow blade" synthetic turf products to customers other than Tough Turtle Turf during the period from October 2018 (the first month after the date of the last commercial invoice issued to GST by Mighty Grass) through June 2020 (the first month of GST's relaunch of "hollow blade" products from a different, non-Mighty Grass manufacturer).*

- *Lost Profits from Tough Turtle Turf (through June 2020): $521,533 in lost profits from lost sales to Tough Turtle Turf during the period from October 2018 (the first month after the date of the last commercial invoice issued to GST by Mighty Grass) through June 2020 (the first*

---

[113] *Id.* citing *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010) and *Carey v. Chaparral Boats, Inc.*, 514 F. Supp. 2d 1152, 1155–1156 (D. Minn. 2007).
[114] *Id.* citing *Mexia v. Rinker Boat Co., Inc.*, 174 Cal.App.4th 1297, 1304–1305 (2009).
[115] *Id.* at page 9.
[116] *Id.* at page 9-10.
[117] Day 5 Tr. 506:24–507:8 (Malkiewicz).
[118] Malkiewicz Report at para 13; Schedule 3.1.

*month of GST's relaunch of "hollow blade" products from a different, non-Mighty Grass manufacturer).*

- *NPV Lost Profits from Tough Turtle Turf (July 2020 through June 2023): $161,541 in net present value of lost profits from expected lost sales to Tough Turtle Turf during the period from July 2020 (the first month after GST's re-launch of "hollow blade" products from a different, non-Mighty Grass manufacturer) through June 2023 (a 3-year forecast period).*

14.38   Claimant defends its submission of the Malkiewicz Report, as it gave notice to Respondent that it was to provide further evidence at the expert discovery phase of proceedings. Claimant is also seeking damages for all the products and that the "*minimal amount of damages included the full purchase amounts of $5,536,607.52 for the deficient Turf it ordered between 2015 and 2018*".[119]

14.39   Claimant submits that it suffered and will further demonstrate quantifiable, direct, and consequential economic damages because of Respondent's breaches of the EAA. In addition to the damages included in the SOC, Claimant includes losses such as, *inter alia*, additional losses relating to future loss of clients as well as future remediation, reputational interests, loss of goodwill and general disruption to its business operations and activities. Therefore, Respondent should be required to compensate Claimant for all its losses.[120]

## F.      Respondent's Final Prehearing Rejoinder

14.40   Respondent avers that the parties never agreed to a 90-ounce per square yard face weight specification for any product purchased by Claimant. Without a contract for a particular term or agreement, there can be no breach of contract based on that term.[121]

14.41   Respondent provides its own factual account of the four turf products and one sample ordered by Claimant and interprets the four products according to the Document Requests and discovery.[122] From its account, Respondent argues that Claimant was fully aware of the face weight of each of its purchases from the beginning.

14.42   Respondent finds that Claimant's "Product Specifications Sheet"[123] is not credible. First, there is no other document that purports to interpose a contract term for the 90-ounce face weight into all of Claimant's purchase orders.[124] Second, Claimant intentionally misrepresented features of the turf product in its marketing materials.[125]

---

[119] Response at page 2-3.
[120] Response at page 10.
[121] Rejoinder at page 2, 31.
[122] *Id.* at page 14-18.
[123] Claimant's Ex. C-5 at page 1.
[124] Rejoinder at page 22.
[125] *Id.*

14.43   Respondent asserts that Claimant intentionally destroyed $232,000 worth of turf it had in storage during the pendency of this arbitration, without consulting Respondent or the Tribunal.[126] From this intentional destruction of evidence, Respondent calls for the Tribunal to draw an adverse inference against Claimant.[127]

## 15.   KEY ISSUES TO BE DECIDED

In the Sole Arbitrator's view, in order to resolve the dispute between the parties in this arbitration, it is necessary to determine the following key issues:

(1)   Does the scope of the arbitration clause in the EAA cover all of Claimant's claims (the "Scope" issue)?

(2)   In relation to the "Cool Blue Hollow" product, is Claimant entitled to damages for breach of contract by Respondent for failing to provide hollow blade turf products with 90-ounce face weight per square yard specifications (the "Face Weight Specifications" issue)?

(3)   Is Claimant entitled to damages for a breach of contract by Respondent for supplying hollow blade turf products of compromised quality (the "Quality" issue)?

(4)   Can Claimant's fraud claims be made out (the "Fraud" issue)?

(5)   If Claimant is successful on its face weight specification and quality issues, or fraud or misrepresentation claims, what damages is Claimant entitled to?

(6)   Respondent's counterclaims

(7)   Claims for attorney's fees and costs of the arbitration

I set out below the arguments made by both parties on each of the issues, before providing my reasoning and ruling on each issue. To the extent that a particular claim is resolved by resolving some but not all the parties' arguments, I do not propose to resolve every argument where it is unnecessary to do so.

## 16.   ISSUE 1: DOES THE ARBITRATION CLAUSE IN THE EAA COVER ALL OF CLAIMANT'S CLAIMS (THE "SCOPE" ISSUE)?

### A.   Respondent's arguments

16.1   Respondent argues that the scope of the dispute subject to arbitration is limited to the term of the agreement containing the arbitration clause.[128] The arbitration

---

[126] Rejoinder at page 6, Respondent's Ex. R-59 at page 9; Day 7 Tr. 789:2–13 (Kramer).
[127] *Id.* at page 32, citing *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998).
[128] SOD at page 14.

clause is contained within the EAA, which was in effect only from 15 April 2015 to 14 April 2016.[129] Therefore, the Tribunal does not have jurisdiction over disputes outside the period of the EAA and should not form the basis for any portion of the Tribunal's Award.[130]

16.2   Respondent argues that the claims beyond April 2016 do not "arise out of" nor "relate to" the EAA. Respondent concludes that no dispute may be ordered to arbitration unless it is within the scope of the arbitration agreement.[131]

16.3   According to Mr. Cheng, the parties intentionally allowed the EAA to expire with no discussions of renewal.[132] The parties negotiated the time period, where initially Claimant wanted a three-year term while Respondent wanted a one-year term. Parties ultimately agreed on a one-year term that could be renewed but was not renewed by parties.[133]

16.4   Instead, most of the Claimant's claims are related to the parties' subsequent purchase agreements and none of those agreements contained an arbitration clause.[134] The arbitration clause is contained in the EAA, which is separate and apart from each of the purchase orders.[135]

16.5   Respondent's position is therefore that any claims that could be brought in this arbitration are limited only to those that relate to products sold during the period of the EAA. The only product sold within the relevant time frame is defined by Respondents as "Product No. 1"[136] with the specifications of "Hollow Blade Turf, Black Backing, 14700 Density", which was resold under the name "Hollow Blade 73".[137] Claimant's claims for alleged breach of contract are beyond the contractual period of the EAA and should not be within the scope of this arbitration.

16.6   Respondent submits that when the contract containing an arbitration clause expires, future actions are not subject to that arbitration clause because there is no demonstrable intent to arbitrate.[138] Even if the parties continue to engage in contractual arrangements that would imply an extension of the expired agreement, absence of a clearly expressed intention to renew the arbitration agreement would not bind the parties to arbitrate.[139]

---

[129] SOD at page 15, citing *Deephaven Distressed Opportunities Trading, Ltd. v. 3V Capital Master Fund Ltd.*, 72 A.D. 3d 562, 563.
[130] SOD at page 17.
[131] SOD at page 15, *Titolo v. Cano*, 157 Cal. App. 4th 310, 317 (2007); see also *Howard v. Goldbloom,* 30 Cal. App. 5th 659, 663 (Ct. App. 2018)
[132] Rejoinder at page 41–42, Cheng 2 at para 31-36.
[133] Rejoinder at page 11, Cheng 2 at para 31; Respondent's Ex. at R-61, page 10; Day 1 Tr. 26:7–27:8 (Kramer).
[134] Rejoinder at page 42; Day 1 Tr. 24:4-10 (Kramer).
[135] SOD at page 16.
[136] Rejoinder at page 14.
[137] *Id.* at page 19, 42.
[138] SOD at page 16, citing *Dash & Sons, Inc. v. Tops Markets, LLC*, 30 A.D. 3d 998, 999 (4th Dept. 2006)
[139] *Donnkenny Apparel v. Lee*, 291 A.D. 2d 224, 224–225 (1st Dept. 2002), *Matter of Waldron [Goddess]*, 61 N.Y.2d 181, 185 (1984), *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell*, 76 Cal. App. 4th 227, 230 (1999)

### B. Claimant's response

16.7 In its Response, Claimant argues that it is prejudicial for Respondent to raise the issue of scope of the arbitration. Despite having full knowledge of the claims raised by Claimant, Respondent failed to raise the issue earlier. Claimant contends that the timing is prejudicial, as it has been required to brief its entire case, and the parties had already undergone extensive discovery, including a second round of discovery allowed to Respondent.[140]

16.8 Claimant asserts that Respondent is in violation of Article 19 of the ICDR Rules,[141] and furthermore, Respondent has waived its rights to bring raise the question of admissibility as to a large portion of Claimant's claims.[142]

16.9 In relation to the expiry of the EAA, Claimant contends that the EAA did not expire by its terms and remained effective, both by its terms and the understanding of the parties.[143] Although the parties did not sign a formal extension of the EAA, the provision does not require that the EAA could only be extended in a written agreement signed by the parties.[144]

16.10 Even if the Agency agreement did expire by its terms after 14 April 2016, the parties continued to operate and work together as if the EAA was still in effect. Claimant cites that the parties' conduct gives rise to an implication that they mutually assented to a new contract containing the same provisions as the old.[145] Likewise, relief can be granted under an implied contract even if a valid express contract exists, so long as their material terms do not conflict.[146]

16.11 Claimant contends that there were no procedural differences in how the parties conducted business with each other before and after 14 April 2016. Respondent's acknowledgment that their reluctance to sour relations between parties by "embarking on the American market" is deemed as a concession. It evinces Respondent's assumption that the EAA governed the parties' relationship.[147]

16.12 Claimant asserts that the EAA forms the basis of the parties' relationship, and every order placed by Claimant with Respondent arose out of or was related to the performance of the EAA. Therefore, the entirety of the dispute is arbitrable.[148]

---

[140] Response at page 11.
[141] *Id.* citing Article 19, Arbitral Jurisdiction, subd. 3 "A party must object to the jurisdiction of the tribunal or to arbitral jurisdiction respecting the admissibility of a claim, counterclaim, or setoff no later than the filing of the Answer, as provided in Article 3, to the claim, counterclaim, or setoff that gives rise to the objection. …"
[142] *Id.*
[143] Day 1 Tr.74:17–75:13 (Figueiredo) (Gao).
[144] Response at page 11.
[145] *Id.* at page 12, citing *Rubenstein v. Primedica Healthcare, Inc.*, 755 So. 2d 746, 749 (Fla. Dist. Ct. App. 2000); *see* also *Baker v. City of Topeka*, 231 Kan. 328, 332 (1982).
[146] Id. at page 12, citing *Santa Clara Waste Water Co. v. Allied World Nat. Assur. Co.,* 18 C.A.5th 881, 889 (2017)
[147] *Id.*
[148] *Id.* at page 13.

16.13   In response to the Sole Arbitrator's questioning regarding the expiry of the contract, Mr. Gao testified that he could not recall negotiations or talks about extending the EAA three months before the expiry.[149] Mr. Gao's understanding of the supplemental documents needed for extension were the continuous orders and purchases.[150] While the EAA was drafted by both parties, Mr. Gao recalled that the requirement to have agreement in place was from Claimant.[151] There was no extension document signed, but Mr. Gao asserted there was an understanding that extended the EAA to 2019.[152]

16.14   During cross-examination, Mr. Cheng maintained that the EAA expired.[153] According to him, the contract between the parties after the expiry of the contract were the series of pro-forma invoices, and each of them is an individual contract that is not related to the agreement.[154]

16.15   In addressing the Sole Arbitrator's question[155] relating to the United States Supreme Court *Granite Rock Co. v. Int'l Bhd. of Teamsters* decision,[156] Claimant argues that the parties "didn't simply agree to arbitrate disputes arising out of disagreement. Our position is that related to expands the scope of arbitration… applying *Granite Rock* to the arbitration clause in this case, it is clear that the parties intended not just disputes arising out of, but also relating this agreement with the arbitrator.[157] In addition, as a matter of waiver and estoppel, Claimant advances that Respondent should be estopped from saying that it gets to arbitrate its counterclaims.[158]

16.16   Respondent's position is that the "arbitration clause in the agency agreement does not show that there was agreement between the parties to arbitrate the dispute related to any individual purchase agreement after April of 2016, and looking at *Granite Rock*, the question of whether the parties in fact agreed to submit one or more particular disputes to arbitration is generally a question for the courts to describe, not an issue to be decided in the arbitration."[159] Respondent further qualifies that there is no waiver because the counterclaims and various defenses were brought in alternative to the jurisdictional issue.[160]

---

[149] Day 3 Tr. 288:4–289:14 (Arbitrator) (Gao).
[150] Day 3 Tr. 289:15–290:14 (Arbitrator) (Gao).
[151] Day 3 Tr. 290:15–291:7 (Arbitrator) (Gao).
[152] Day 3 Tr. 292:12-21 (Arbitrator) (Gao).
[153] Day 3 Tr. 362:18–363:2 (Figueiredo) (Cheng); Day 3 Tr. 389:19–390:14 (Figueiredo) (Cheng).
[154] Day 4 Tr. 412:14–413:8 (Arbitrator) (Cheng).
[155] Email correspondence from the Sole Arbitrator to parties dated 20 November 2020. The question was: "On the jurisdictional objection on scope, how have the US courts construed the language used in the arbitration clause, in particular how the US courts deal with "broad" arbitration provisions. Does the US Supreme Court decision in Granite Rock v Teamsters shed any light on this issue?"
[156] 130 S. Ct. 2847 (2010).
[157] Day 7 Tr. 662:3–663:14 (Figueiredo).
[158] Day 7 Tr. 663:15–664:1 (Figueiredo).
[159] Day 7 Tr. 710:14–711:14 (Kramer).
[160] Day 7 Tr. 712:17–713:13 (Kramer).

### C. Sole Arbitrator's reasoning

16.17 To recap, the arbitration clause contained in the EAA under either translation provided by the parties provides that "any" (Claimant's translation) or "all" (Respondent's translation) "disputes arising out of or related to this Agreement" shall after negotiation "be arbitrated" (Claimant's translation) or "submitted to [arbitration]" (Respondent's translation):

#### 11. Arbitration

Any disputes arising out of or relating to the performance of this agreement shall be settled through friendly negotiation. If the negotiation fails, the case shall then be submitted for arbitration to the American Arbitration Association, and it shall be arbitrated by the rules of this association. The results of the arbitration shall be final and binding upon both parties, and the costs of the arbitration proceeding shall be borne by the unsuccessful party, unless otherwise stipulated by the arbitrators' judgment.[161]

(English translation provided by Claimant)

#### Article 11 Arbitration

In the course of the performance of this Agreement, all disputes arising out of or related to this Agreement shall firstly be settled through friendly negotiation between both Parties. If it is not resolved, the dispute shall be submitted to the American Arbitration Commission and the arbitration shall be conducted in accordance with its arbitration rules. The arbitration fee shall be borne by the losing Party, unless otherwise specified by the Arbitration Commission.[162]

(English translation provided by Respondent)

16.18 To resolve the issue as to whether claims fall within the scope of the arbitration clause in the EAA, and therefore within the scope of this arbitration, emphasis must placed on the scope language used by the parties, in this case, disputes "arising out of **or related to this [a]greement**." (emphasis added.) The phrase "related to" this agreement is generally construed as being broad in scope and is usually interpreted not to restrict the scope of the arbitration provision only to contractual claims that "arise out of" or "arise under" the contract in which the arbitration clause is found.

16.19 Accordingly, as the parties have used broad scope language "related to this agreement", Respondent's argument that the only claims that would fall within the scope of the clause would be those that arise out of or arise during the period in which the agreement is valid between the parties, cannot be accepted.

---

[161] Claimant Ex. C-3 at page 4.
[162] Claimant Ex. C-4 at page 5.

16.20  I also do not accept Respondent's argument that the claims that stem from the subsequent pro-forma invoices that followed the expiry of the EAA do not "relate to" the EAA. The EAA evidenced the basis and formal commencement of the parties' commercial relationship. There is no need for the pro-forma invoices or disputes that stem from products supplied under them to arise from or out of the EAA, these disputes only need to "relate to" the EAA, and I find that they do. Accordingly, I find that the claims brought by Claimant are "related to" the EAA and fall within the scope of the arbitration provision in it. Those claims are therefore properly before me in these proceedings.

16.21  At least in relation to the issue of scope of the arbitration provision, there is no need to resolve the issue of whether the EAA was extended beyond its expiry date. Even if the EAA was not so extended, and was allowed to expire, the disputes arising from the parties' conduct and relationship following the EAA are still "related to" the EAA and would be captured by the wording of the arbitration provision in the EAA. The wording of the arbitration provision in the EAA therefore evinces the parties' intention that their disputes "related to" the EAA, even those arising after the expiry of the EAA, should be resolved through arbitration.

16.22  For the avoidance of any doubt, Claimant has not objected to the Respondent's counterclaims as falling outside the scope of the arbitration provision and, there is no need for a ruling on that issue.

## 17.  ISSUE 2: IN RELATION TO THE "COOL BLUE HOLLOW" PRODUCT, IS CLAIMANT ENTITLED TO DAMAGES FOR BREACH OF CONTRACT BY RESPONDENT FOR FAILING TO PROVIDE HOLLOW BLADE TURF PRODUCTS WITH 90-OUNCE FACE WEIGHT PER SQUARE YARD SPECIFICATIONS (THE "FACE WEIGHT SPECIFICATIONS" ISSUE)?

### A.  Claimant's factual contentions

17.1  As outlined in paragraph 14.2, Claimant's SOC initially focuses their face weight breach of contract claim on the "Cool Blue Hollow" turf.[163] However, Claimant later clarified in their Supplemental Interrogatories,[164] Response,[165] and Mr. Gao's testimony[166] that Claimant ordered two kinds of hollow blade turf from Respondent.[167]

17.2  The turf products were sold as "Cool Blue Hollow" and "Hollow Blade-73" by Claimant. The Hollow Blade-73 turf included a product described as "THD", where the products were identical to Hollow Blade-73 but cut to smaller sizes.[168] Claimant admits that the face weight specification issue only arises in relation

---

[163] SOC at para 1.
[164] Respondent's Ex. at R-59, page 5-6.
[165] Response at page 2.
[166] Day 1 Tr. 68:10-20 (Figueiredo) (Gao).
[167] Day 1 Tr. 22:17-21 (Kramer).
[168] *Id.*; Response at page 2.

to Cool Blue Hollow, but not Hollow Blade-73 products.[169] At the same time, both Cool Blue Hollow and Hollow Blade-73 suffer from deficient manufacturing and quality issues—though this is an issue that will be dealt with separately.[170]

17.3    Factually, Claimant argues that the 90-ounce face weight specification was a key term of the parties' agreement from the start. Claimant recounts verbal discussions about potential terms for a manufacturing agreement, where it first requested the 90-ounce face weight per square yard specification to Respondent.[171]

17.4    Respondent sent samples for Claimant's consideration, and Claimant reiterated their request that the turf sent be 90-ounce face weight.[172] After Mr. Gao selected the sample, parties entered the EAA on or about 15 April 2015.[173] Claimant relied on Respondent producing 90-ounce face weight per square yard turf and marketed Cool Blue Hollow to individuals and contractors using the Product Specification Sheet.[174]

17.5    Claimant began ordering the hollow blade turf from April 2015 and the first shipment was delivered in August 2015. When asked about how Claimant communicated the required 90-ounce face weight orders, Mr. Gao testified that he did not personally get involved in the communications with Respondent for the production of the Cool Blue Hollow product, but it may have been his team or [Claimant's] representative in China.[175] Thereafter, Claimant began receiving various complaints about the quality of the hollow blade turf from its end users through its customers.[176]

17.6    Claimant contends that it would be difficult to ascertain approximate face weight by looking at or feeling this type of turf, even to someone who is experienced in the industry.[177] It is generally the case that products with higher face weight look and feel denser, but there are exceptions. The air gap in the "hollow blade" can make the product look and feel thicker to the touch.[178]

17.7    Mr. Gao testified that "specification or the face weight related or deterioration" cannot be inspected.[179] The one foot by one-foot samples sent by the Respondent could not be tested for its face weight in the United States. Since Claimant does not do the technical testing themselves, it would have to send to the independent lab which required a minimum piece of turf the size of one foot by nine foot.[180]

---

[169] Day 1 Tr. 132:10-25 (Kramer) (Gao); Day 7 Tr. 695:22–699:20 (Arbitrator) (Figueiredo).
[170] Response at page 2.
[171] SOC at para 4.
[172] Id. at para 5; Respondent's Ex. R-60 at page 2.
[173] SOC at para 7.
[174] Claimant's Ex. at C-5; Id. at para 8.
[175] Day 3 Tr. 309:6–310:18 (Arbitrator) (Gao).
[176] SOC at para 11 and 15.
[177] Day 3 Tr. 304:12–305:3 (Arbitrator) (Gao).
[178] SOC at para 4-5.
[179] Day 1 Tr. 69:13–70:23 (Figueiredo) (Gao).
[180] Day 1 Tr. 71:6–72:4 (Figueredo) (Gao).

17.8    According to Mr. Gao, Claimant only made sampling types of visual inspection before shipment where the Claimant's representative in China would be sent to look at one or two rolls of turf from the aesthetic standpoint.[181] When the turf products are shipped to Claimant's warehouses in the United States, Claimant does not usually inspect unless it is a cut order, and those are all visual inspections at the cutting table.[182]

17.9    In the cross-examination of the common terminologies and specifications for turf, Mr. Gao explains that Claimant only has requests for a certain face weight:

> *As a manufacturer they take the face weight and they translate it into other technical forms into density or into DTEX, into gauges, into stitch rate to come up with the result of the face weight we ask for… From all the communications you see, there's no such request of "I want this stitch rate. I want this DTEX. I want this gauge." There's never, and with all the communications you have there's clarifications "hey, do not use square meters to mix with us." That's not right. We clarify. Okay. We don't want them to make mistake. But our requirements, it's very straight-forward. Just make the face weight. We do this to our own manufacture.*[183]

17.10   The Sole Arbitrator asked whether Claimant was able to make their own calculations on face weight based on the pro-forma invoices or documents from Respondent. Mr. Gao responded that Claimant does not do their own calculations and are "*under the impression they are making it per our specification… We assume they use those technical specification numbers to make the face weight we want.*"[184]

17.11   Claimant recalls a phone conversation between Respondent's Mr. Cheng and Mr. Gao, occurring on or about 16 June 2017, to address the quality issues and further confirm the 90-ounce face weight requirements. According to Mr. Gao, it came as a surprise that Mr. Cheng said Respondent would need to increase the turf's density from 14700 to 16800 and the DTEX value from 13000 to 14000 to get the desired face weight. It was a concern because Claimant told Respondent that it needed 90-ounce face weight per square yard. Respondent agreed to make this adjustment and thus the new density and DTEX was reflected on the 16 June 2017 pro-forma invoice.[185]

17.12   Regarding the 31 August 2017 email conversation between Ms. Huang and Ms. Li (as per paragraph 13.12), Claimant argues that this was when Respondent was "*offering the excuse that the turf specifications were being calculated at 89.6 ounces face weight per square **meter**, not square **yard**.*"[186]

---

[181] Day 1 Tr. 69:13–70:23 (Figueiredo) (Gao).
[182] Id.
[183] Day 1 Tr. 94:10–95:15 (Kramer) (Gao).
[184] Day 1 Tr. 100:15–101:7 (Arbitrator) (Gao).
[185] SOC at para 12.
[186] Id.

17.13  The excerpt of the email by Ms. Huang was as follows:

> *The 89.6-oz is per square meter, not square yard: ask them if we do 106-oz per square meter, how many more stitches we should add? So the question is:*
> *If the grass fiber weight is adjusted and increased to 3kg/square meter, how many more stitches should we add?*[187]

17.14  Claimant took Ms. Li's assurance that increasing the DTEX from 13000 to 14000 and increasing the density of the turf from 14700 to 16800 as an explicit reassurance and knowledge of what Claimant wanted for the 90-ounce face weight.[188] However, Respondent delivered the lower density/DTEX product in the very next round.[189]

17.15  According to Claimant, in Ms. Huang's 9 November 2017 email, she asks for 90-ounce turf "same as 1016-31L". This was a reference to the hollow blade turf with 16800 density and DTEX of 14000, at a higher price. Face weight was not reflected in the invoices.[190]

17.16  On or about October or November 2018, Mr. Gao had a follow up phone conversation with Respondent's representative to confirm the 90-ounce face weight and notified them of the continued complaints it was receiving around that time.[191]

17.17  When Tough Turtle, a customer of Claimant, sent a demand letter to Claimant on 3 December 2018, it included several test results from a third-party lab who had inspected the turf and found both its face and total weights were around 100-ounces and 69-ounces per square yard, respectively.[192] Claimant asserts that Respondent's reply that it was calculating the weight of the turf in ounces per square meters not square yards was indicative that Respondent was improperly trying to strip fibers from a larger area to increase the measurement.[193]

17.18  Claimant suggests that at separate times both in 2017 and 2018, Respondent began quietly decreasing the quality of the hollow blade turf, where there was a change from the 16 October 2017 invoice (16800 density/14000 DTEX turf) consistent with the parties' communications to the 14 June 2018 invoice where the density was dropped to 14700 and DTEX dropped to 13000. Claimant asserts that it was unaware of this change.[194]

17.19  For these reasons, Claimant argues that there were at least four separate occasions where Claimant told Respondent it needed 90-ounce face weight per

---

[187] Claimant's Ex. C-79 at page 2.
[188] SOC at para 13.
[189] Claimant's Ex. C-33 to C-35.
[190] SOC at para 14.
[191] Gao 1 at para 19.
[192] SOC at para 16.
[193] SOC at para 17.
[194] SOC at para 18.

square yard. All other significant measurements discussed and specified were in the United States Customary Units of measurement, and it is axiomatic that one uses the same system of measurement for all dimensions.[195]

## B. Respondent's factual contentions

17.20 Conversely, Respondent argues that Claimant did not include 90-ounce face weight per square yard as a key term in the contract. Respondent denies agreeing to Claimant's face weight specifications and asserts that Claimant failed to identify any evidence of Respondent agreeing to provide turf with 90-ounce face weight per square yard.[196]

17.21 Mr. Cheng claims that Respondent was never apprised of Claimant's 90-ounce face weight per square yard specifications requirement because it never saw the Product Specification Sheet.[197] Further, the Product Specification Sheet identifies turf with 21,000 stitches per square meter, but Respondent never sold any turf with such stitch density and is not identified on any contracts between parties. Respondent contends that Claimant's Product Specification Sheet was a unilateral deviation from the terms of the parties' contracts.[198]

17.22 Respondent maintains that it does not measure in "square yards" to calculate parameters for manufacturing turf.[199] It is Respondent's understanding that Chinese industry standards do not include "face weight",[200] and usually the industry standard includes Pile Height, Gauge, Density and DTEX.[201]

17.23 Respondent contends that Claimant wanted to explore options for increasing the density of artificial turf in late 2016.[202] Respondent had a conversation with Mr. Gao about increasing the density/DTEX of the hollow blade turf products around that time. However, Respondent counters that Mr. Gao never said that the product needed to have face weight of 90-ounces per square yard.[203]

17.24 Respondent characterizes the changes in density/DTEX specifications as changes in orders between Hollow Blade-73 and Cool Blue Hollow products, and thus denies that it failed to deliver Cool Blue Hollow products with 90-ounce face weight specifications.[204]

17.25 In its Rejoinder, Respondent points out that Claimant ordered 14700 density and 13000 DTEX with blue backing turf product from April 2016 and discontinued it in December 2016.[205] Respondent argues that Claimant misrepresented this product to its customers as Cool Blue Hollow with 90-ounce

---

[195] SOC at para 19.
[196] SOD at page 6, Rejoinder at page 22.
[197] SOD at page 7, Cheng 1 at para 14-15.
[198] SOD at page 6.
[199] Id.
[200] SOD at page 10.
[201] Rejoinder at page 9.
[202] SOD at page 7; Day 1 Tr. 51:23–54:16 (Kramer).
[203] SOD at page 7.
[204] SOD at page 8, 19.
[205] Rejoinder at page 15,

face weight. Respondent notes that this product had the same density and DTEX specifications as Hollow Blade-73, but the only difference was the blue, not black backing.[206]

17.26   With regards to the exchange between Ms. Huang and Ms. Li, Respondent argues that it was evidence of Claimant's understanding that the 89.6-ounce measurement was "per square meter, not square yard". Respondent used this exchange as evidence in its reply letter dated 1 December 2018.[207] Likewise, during the cross-examination of Mr. Gao, Mr. Gao conceded that the first part of Ms. Huang's email is a statement, not a question.[208]

17.27   Further, Respondent argues that even when presented with solutions to produce turf with 106-ounce face weigh, Claimant did not make orders to increase the weight of the hollow blade turf. Following the response of the two options to have a face weight of 3 kilograms per square meter, Claimant ordered samples for Option 1 (21000 density 14000 DTEX).[209] Despite requesting for Respondent to produce product samples with a weight of 106-ounce face weight per square meter, Claimant never placed an order for this potential product.[210]

17.28   Respondent argues that Tough Turtle complained about the weight of Claimant's Cool Blue Hollow, including on 17 May 2017.[211] This was because Claimant was still selling the product with density 14700 and DTEX 13000 under the name "Cool Blue Hollow". Claimant had not commenced orders with an increased product weight until June 2017.

17.29   According to Mr. Cheng, he prepared a detailed quote on 20 May 2017 responding to Claimant's new customized request for heavier turf.[212] On 27 May 2017, Respondent prepared three product samples and after Claimant received and tested the samples, Ms. Huang sent an email to Mr. Cheng to request for two new pro-forma invoices for 90-ounce.[213]

17.30   To refute Mr. Gao's testimony at paragraph 17.7 that the samples sent were too small to be tested, Respondent's cross-examination of Mr. Gao verified that samples in Respondent's Exhibits R-63[214] and R-64[215] included samples of a size that is 4.5 meters by 0.6 meters. Counsel for Respondent asked Mr. Gao:

> *Q. ... If that were -- so we can just say if four and a half meters by .6 meters is more than one foot by nine feet, then an independent laboratory would be able to test the face weight; correct?*
> *A. Yes, ma'am.[216]*

---

[206] Rejoinder at page 20-21.
[207] Claimant's Ex. C-78 and C-79.
[208] Day 2 Tr. 164:16-21 (Kramer) (Gao).
[209] Respondent's Ex. R-63 to R-65.
[210] Rejoinder at page 18-19; SOC at page 9-10.
[211] Rejoinder at page 23, Claimant's Ex. C-70 at page 29-30.
[212] SOD at page 7-8.
[213] Cheng 1 at para 19-20.
[214] Day 1 Tr. 118:2-5 (Kramer) (Gao).
[215] Day 1 Tr. 119:1–121:11 (Arbitrator) (Kramer) (Gao).
[216] Day 1 Tr. 121:20–122:20 (Kramer) (Gao).

17.31   In Respondent's cross-examination of Mr. Gao, Respondent challenged Claimant's assertion that Respondent purposefully delivered the lower density/DTEX product (outlined in paragraph 17.7). In his earlier testimony, Mr. Gao agreed that Respondent delivered the 73-ounce turf because that was what Claimant ordered. Mr. Gao admitted that he did not check exhibits C-33 to C-35 referenced in his witness statement carefully, so he opined that the exhibit attached to this sentence has to be changed to the ones applicable to Cool Blue Hollow.[217]

17.32   The Sole Arbitrator notes the withdrawal of Claimant's Exhibit C-114 due to an objection raised by Respondent. Claimant bases their claim that Respondent knew of the 90-ounce face weight per square yard issue and cites Exhibit C-114 as Respondent's internal specification sheet. This exhibit is mentioned in Claimant's Response[218] and Opening Statement.[219] Respondent finds the probative value of the document to be low because the document was created during the course of this arbitration in 2020, and not during the relevant time period.[220] Mr. Cheng testified that the document was created in April 2020 after the initiation of the arbitration proceeding.[221]

## C. Parties' Legal Arguments on breach of contract

17.33   The parties concur that the elements of a breach of contract claim under New York Law comprise of four elements: (1) formation of a contract, (2) performance by plaintiff, (3) defendant's failure to perform, and (4) resulting damages.[222] Likewise, the parties do not dispute that the parties formed a contract.[223]

17.34   On the first point on formation and contract terms, Claimant contends that the EAA did not contain any technical specifications for the turf products because it was understood that specifications were a term to be agreed upon by the parties outside the written EAA.[224] Claimant raises sections 9(2), 10(3), and 16(1) in the EAA to support their reasoning.[225] Thus, the parties expressly understood that Claimant would provide specifications to Respondent and Respondent would provide the turf matching those specifications.[226]

17.35   With regards to the second point on performance of contract terms, Claimant's notes on invoices and related wire transfer records demonstrate that Claimant regularly paid for the turf in full. Claimant also ordered well in excess of the minimum annual amounts required by the EAA.[227]

---

[217] Day 2 Tr. 171:17–173:6 (Kramer) (Gao).
[218] Response at page 3.
[219] Day 1 Tr. 15:3-9 (Figueredo).
[220] Day 1 Tr. 15:13–16:3 (Kramer).
[221] Day 3 Tr. 357:1–358:10 (Kramer) (Cheng).
[222] SOC at para 24; SOD at page 17; New York Pattern Jury Instructions – Civil § 4.1.
[223] SOC at para 25.
[224] SOC at para 25.
[225] Claimant's Ex. at C-3.
[226] Id.
[227] SOC at para 28.

17.36   On the third point of failure to perform the contract terms, Claimant argues that it told Respondent from the beginning that it wanted 90-ounce face weight turf, and relied on these specifications in its marketing to clients.[228] In June and September 2017, Respondent stated that it needed to increase the density of the turf from 14700 to 16800 and DTEX from 13000 to 14000, and Claimant instructed Respondent to do,[229] as reflected in the June 16, 2017 invoice.[230] Demonstrated by the invoices, the face weight was decreased again for several shipments in September 2017.[231]

17.37   Claimant asserts that even if Respondent was truly calculating ounces over a square meter, the test results provided by Tough Turtle measured that the turf was 69.7 ounces. When converted, the product was calculated to be 82.5 ounces per square meter.[232] Therefore, Respondent was providing Claimant with product that was well short of the promised 90-ounces, and thus failed to perform under the contract by not providing Claimant with the product it wanted.[233]

17.38   As to the fourth point on resulting damages, Claimant "suffers ongoing and evolving economic losses as a result of [Respondent] providing [Claimant] with deficient turf… to customers and other end users who are now beginning to recognize the non-conformity in what they in turn were promised." Pursuant to Section 10(3) of the EAA, Respondent agreed to be "liable for all economic losses and shall assume relevant legal responsibilities."[234]

17.39   In contrast, Respondent argues that there was no evidence of breach by Respondent of the EAA or the purchase agreements.[235] The turf produced by Respondent complied with the identified product specifications on each pro-forma invoice.[236] Claimant's requirement of having a face weight of 90-ounce per square yard was never agreed upon, either verbally or in writing.[237] Accordingly, Respondent cannot be liable for a purported breach of a non-contractual term.[238]

17.40   Respondent argues that Claimant was fully aware of the face weight of each of its purchases from the beginning.[239] By knowing the grass height, line spacing, density, and DTEX values, Claimant could calculate the face weight of the turf.[240] Despite the discussions that took place on September 2017, and Respondent sending product samples of the two proposed options with face

---

[228] SOC at para 29, Claimant's Ex. C-5.
[229] SOC at para 30.
[230] Claimant's Ex. at C-27.
[231] SOC at para 30.
[232] Claimant's Ex. C-77 at page 5.
[233] SOC at para 32, Response at page 4.
[234] SOC at para 33.
[235] SOD at page 17.
[236] SOD at page 19, Rejoinder at page 32.
[237] SOD at page 19.
[238] SOD at page 19, Rejoinder at page 31.
[239] Rejoinder at page 31.
[240] SOD at page 20; Cheng 1 at para 27.

weight equivalent to 90-ounces per square yard, Claimant did not order this heavier turf.[241]

D.  **Sole Arbitrator's Analysis**

17.41   Key to resolving Claimant's claim that Respondent had breached the parties' agreement by failing to supply 90-ounce face weight per square yard is whether this is even a term in the parties' agreement, and therefore a contractual requirement. If the parties had never agreed to make the face weight specification a term of their agreement, then Respondent cannot have breached the agreement by failing to comply with the face weight specification that Claimant says Respondent needed to comply with. The parties have put forward different factual accounts as to whether Claimant communicated its requirement that the turf it ordered had to be 90-ounce face weight per square yard. There is no evidence aside from Claimant's claim and Mr. Gao's testimony that this requirement was orally communicated to Respondent. But even if Claimant did orally communicate the face weight requirement, this would still not be a term of the parties' agreement, or a contractual requirement, unless Respondent agreed to it and such an agreement can be proved.

17.42   Without any evidence that there was such an oral agreement or agreement by conduct from the evidence in the record on a face weight requirement, aside from Claimant's claims of such in these proceedings, the contractual specifications the turf had to comply with are to be found in the EAA and the pro-forma invoices that constitute written evidence of the terms of the parties' agreement. As Respondent points out, in none of these written documents is there a requirement that the turf had to comply with the requirement of 90-ounce face weight per square yard. The EAA does not contain contractual specifications of the product themselves. The pro-forma invoices contain a variety of other technical requirements. For example, looking a sample of pro-forma invoices exhibited at Exhibits C-8, C-27, C-49, and C-51, a variety of contractual specifications are listed: Material, pile height, color, type of yarn, density, DTEX, length, width, and area. These pro-forma invoices, which were issued by Respondent and accepted by Claimant, evidence the contractual specifications that Respondent had agreed to fulfill.

17.43   While it is possible that additional requirements could be made part of the parties' agreement, it would need to be shown that there was a meeting of minds and an understanding between the parties that these would also form part of the agreement between the parties. The evidence on when and how the face weight requirement was agreed to, and whether this was agreed to be on a per square yard or square meter basis is inconclusive. I find that Claimant has not demonstrated that the parties had agreed on the 90-ounce face weight per square yard requirement, or indeed any face weight requirement at all. For clarity, as Claimant has also advanced an express warranty claim, I also do not find there is any express warranty on any specific face weight requirement, as this can only come into existence if both parties had agreed to such an express warranty.

---

[241] SOD at page 19, Rejoinder at page 31.

17.44   Had Claimant wanted a specific face weight to be a contractual requirement, it should have insisted that the requirement be evidenced in the pro-forma invoices, or at least have made a written record of that agreement or understanding. It is significant that this is not a case where the written records in the form of the pro-forma invoices contain only a few or vague specifications. As noted above, the pro-forma invoices in fact list several technical specifications. The fact that face weight is not part of the specifications leads to some doubt as to whether the supposed face weight requirement was a contractually-required specification. If face weight were a term of the parties' agreement, one would have thought that it would be set out alongside the other technical specifications in the purchase orders. It is also significant that Claimant appears to argue that when parties agreed to increase the face weight requirement, this was somehow expressed in the form of an increase in the density requirements in the pro-forma invoices. If anything, this reinforces the view that the Respondent never agreed to supply turf of any face weight, even when asked to, and would only agree to increase the "density" of the turf. Claimant has not argued that the turf did not meet any of the technical specifications, including density, listed in the pro-forma invoices.

17.45   There is also some debate between the parties that whether, assuming a 90-ounce face weight requirement was in fact communicated and, further that the parties agreed to make it a contractual requirement if the face weight requirement was one based on ounces per square yard or ounces per square meter. This is not technically an issue that has to be addressed as I do not think that face weight was a term of the parties' agreement, but I address it here for completeness. Claimant makes the point that face weight is always calculated on a per square yard basis. I do not find that Claimant has satisfied its burden of proving this as a matter of industry custom, such that a mere mention of face weight would universally be understood in the industry as referring to face weight in ounces per square yard.

17.46   Claimant has also argued that it is uncommon to mix measurement systems, such that a weight expressed in ounces must always be expressed in relation an area in square yards and not square meters. While there is a certain logic to this argument, the evidence is that the face weight specification is not one that Respondent appears to use. Mr. Han in his witness statement also testified that face weight is not a typical metric to use.[242] Consistent with this testimony, face weight is also not listed as one of the technical specifications in the pro-forma invoices. If this is a requirement that Claimant wished to include in their agreement with Respondent, it would be incumbent on Claimant to clearly specify this technical requirement with precision.

17.47   As a party placing orders with a counterparty in China, if it is intended that the technical specifications should be in a unit of measurement other than that used in China (i.e., meters for length and square meters for area), the onus would be on Claimant to make clear that its face weight requirement was one based on ounces per square yard. That such a requirement has not been clearly specified

---

[242] Han 1 at para 38.

casts further doubt as to whether the face weight requirement was one agreed to be a contractual term to begin with.

17.48 I also find it significant that despite Claimant's claim that the 90-ounce per square yard requirement was a key contractual requirement that ended up causing it loss, that when Claimant was alerted to the fact that Respondent was supplying turf-based face weight geared towards square meters, Claimant never placed orders for turf that would satisfy their 90 ounce per square yard requirement, but merely ordered the same turf that Respondent had been supplying all along. That Claimant would continue to order and accept turf while knowing that the turf did not match what Respondent says it needed makes it implausible that the 90 ounce per square yard requirement was a material term of the agreement. One would have expected that if that were a requirement that once Claimant was alerted that it was being supplied turf that did not meet its requirements, that it would have taken immediate steps to ensure that all future orders would meet this requirement.

17.49 For the reasons above, Claimant's claim based on Respondent's failure to supply turf that complies with a specific face weight requirement (i.e., the Face Weight Specifications issue) is dismissed.

## 18. ISSUE 3: IS CLAIMANT ENTITLED TO DAMAGES FOR A BREACH OF CONTRACT BY RESPONDENT FOR SUPPLYING HOLLOW BLADE TURF PRODUCTS OF COMPROMISED QUALITY (THE "QUALITY" ISSUE)?

### A. Parties' Factual Contentions

### Claimant's Factual Arguments

18.1 In addition to the Face Weight Specifications issue, Claimant also contends that **all** the turf supplied by Respondent had Quality issues. Claimant's claims for compromised product quality are in relation to all the of the products supplied by Respondent.[243]

18.2 In its SOC, Claimant recounts that it "began receiving various complaints about the quality of the Turf from [their] end users through [their] customers".[244] Claimant received complaints including but not limited to:

    (a) Fiber blades detaching from the backing and coming lose;
    (b) Visible fold lines or creases when laid flat;
    (c) Blue backing color seeping through and staining hands and clothing;
    (d) The turf being of such different heights that it required a trim;
    (e) Matted turf;
    (f) Divots; and
    (g) Twisted blades.[245]

---

[243] Day 2 Tr. 231:9-15 (Figueiredo) (Gao).
[244] SOC at para 11. Ex C-52 – C-76, C-82.
[245] Ibid.

18.3    On or about 16 June 2017, Mr. Gao had a phone conversation with Mr. Cheng to address the quality issues, among other things.[246] However, despite engaging in further discussions, Claimant continued to receive complaints regarding the quality of the turf.[247]

18.4    As noted above, on 3 December 2018, Claimant received a demand letter from an attorney representing Tough Turtle making accusations (among other things) that Claimant provided turf with twisted blades, blades of varying lengths affecting the appearance of the product, discoloration, and not meeting "product specifications".[248]

18.5    As Mr. Gao explained in his declaration:

> "Tough Turtle accused GST of providing turf with twisted blades, blades of varying lengths affecting the appearance of the product, discoloration, and "product specifications" as advertised and promised."[249]

18.6    Later in its Response, Claimant explains that it had ordered different types of turf, namely the "Cool Blue-Hollow", "Hollow Blade-73", and "THD". Claimant claims that all these products ordered from Respondent were discovered to be deficiently manufactured and suffered from the same issues such as poor quality, premature deterioration, discoloration / color leaking, uneven cut lengths, and other warranty issues.[250]

18.7    Claimant further says that Respondent repeatedly provided Claimant with turf that it knew was of low quality and suffering from multiple latent defects, causing Claimant to be vulnerable to continuing warranty and additional legal claims due to Respondent's poor-quality product and misrepresentations.[251]

18.8    Mr. Gao testified that Claimant dealt with customer complaints regarding the deterioration of the hollow blade turf with a "no questions asked" policy, meaning that it would offer a replacement or refund immediately.[252]

18.9    In summary, Claimant submits that there are the following complaints regarding Quality issues:

(a)    24 complaints arising from turf supplied by Tough Turtle to the end customers (Exhibits C-53 to C-76).[253]

(b)    27 complaints arising from turf supplied by other suppliers like Gator Grass, Synthetic Grass Masters, Curb A Lawn, Tucson Professional Landscaping

---

[246] SOC at para 12.
[247] SOC at para 15.
[248] SOC at para 16. Ex C-77.
[249] Gao 1 at para 22.
[250] Response at paras 3-20.
[251] Response at paras 12-19.
[252] Day 3 Tr. 322:18–323:15 (Gao).
[253] Ex C-52 – C-69, C-71 – C-76, C-82.

Inc., and other suppliers. (Exhibits C-82 to C-109). These exhibits include warranty claims made by Claimant to Respondent at the material time.[254]

18.10   Additionally, Claimant adds that the deficient turf subjects it to continuing liability from its end-customers.[255] These claims will be discussed in further detail below.

**Respondent's Factual Arguments**

18.11   As to Claimant's Quality issues allegations, Respondent argues in its SOD that Claimant's early deterioration or other quality issues allegations are lacking factual support. Respondent contends that Claimant's allegations are vague, generalized, and inherently implausible, particularly given Claimant's repeated purchases of turf from Respondent in more than 50 transactions over the course of several years. Further, Respondent is of the view that "the purported evidence of "quality concerns"—to the extent that it exists—is unreliable and appears fabricated".[256]

18.12   Respondent explains that it has internal quality control standards and systems, which ensures the quality and conformity of its products. Particularly, Respondent uses the industry standard to test its product, namely testing the quality of products per roll instead of testing one piece of the grass roll.[257] Additionally, Respondent points out that each of the pro-forma invoices contained a condition: "in case of quality discrepancy, the buyer should file claim within 20 days after the arrival of the goods at port of destination", and Claimant failed to make any claims within this specified period.[258]

18.13   With regards to the customer complaints raised by Claimant, Respondent raises the following arguments:[259]

(1)  Claimant has failed to provide sufficient evidence for Respondent to be able to ascertain the source of the alleged complaints.

(2) It is not clear from the complaints forwarded by Claimant that the turf was even supplied by Respondent.

(3) The contract number and pictures provided by Claimant seemed wrong and duplicated.

(4) Claimant has not substantiated the complaints it supposedly received from customers.

---

[254] Day 6 Tr. 682: 1-13 (Figueiredo).
[255] SOC at para 43.
[256] SOD at page 3.
[257] SOD at page 10; Cheng declaration at para 28.
[258] SOD at page 10; Ex C-7a.
[259] SOD at page 11; Cheng declaration at paras 44-47.

(5) The product pictures provided by Claimant do not prove that the product in the pictures is from Respondent (or that the photographs of turf do not reflect turf obtained from Respondent).

(6) Respondent suspects that Claimant has fabricated customer complaints.

18.14 In its Rejoinder, Respondent argues that the Quality issues claims are ill-defined. Respondent says that it has rigorous quality control procedures, and none of the distributors who have purchased the hollow-blade turf have complained about its quality.[260]

18.15 Respondent also sets out the production stages and explains as follows:

(1) The turf Claimant bought was manufactured, inspected, and tested with state-of-the-art equipment at every stage of production.[261]

(2) Before Claimant's orders left Respondent's factory, Claimant's China-based representative had an opportunity to personally inspect the turf and approve each shipment and did so on a regular basis.[262]

(3) When Claimant's representative did not come to inspect, Mr. Cheng would personally carry out the final inspection of the products.[263]

(4) Afterward, the turf would be loaded into containers and sealed until it was delivered to Claimant (who at that point was contractually required to inspect the goods and accept or reject them).[264]

(5) Claimant accepted all shipments of goods from Respondent and resold them at a profit.[265]

18.16 Respondent points out that only two years after Claimant's first order, in July 2017, did Claimant submit its first customer "claim" ostensibly involving Respondent's turf.[266] Initially, Respondent agreed to grant Claimant's compensation requests in an effort to placate it, but over time Respondent became increasingly suspicious of what appeared to be duplicate photographs of turf, photographs showing good-quality turf, and claims submitted regarding non-existent order numbers.[267] When Respondent requested further documentation, Claimant refused to provide any.[268]

18.17 After more than a year of accepting the claims, Respondent told Claimant that it would not process further claims starting in August 2018. Shortly thereafter,

---

[260] Rejoinder at page 5; Han Statement at paras 19-22, 31; Cheng Statement at paras 65-66.
[261] Rejoinder at page 5; Han Statement at paras 19-22.
[262] Rejoinder at page 5; Cheng Statement at paras 62-63.
[263] Rejoinder at page 5; Cheng Statement at para 64.
[264] Rejoinder at page 5.
[265] Ibid.
[266] Ibid.
[267] Rejoinder at para 6; Cheng Statement at para 76.
[268] Rejoinder at para 6; Li Statement at paras 32-33.

Respondent refused to pay the balance due to Claimant.[269] Respondent's argument is that despite the "dubious" nature of the claims submitted to date, Claimant is now trying to extrapolate from a handful of claims the conclusion that all end customers will soon request refunds. Respondent submits that this speculation is self-serving and lacks credibility, particularly given the questionable nature of the prior "claims" and Claimant's other, repeated and often admitted duplicitous behavior.[270]

18.18    In addition, Respondent points out that Claimant has intentionally destroyed voluminous evidence that could have proven or disproven its assertions about quality. In particular and as noted above, Claimant has sold or destroyed $232,000 worth of Respondent's turf that Claimant held in storage, without consulting or notifying either Respondent or the Tribunal.[271]

18.19    Accordingly, Respondent argues that Claimant's claims are grounded in falsehood and completely without merit.[272]

18.20    Additionally, in its Rejoinder, Respondent argues that Claimant's vague assertions about poor quality turf from Respondent are contrary to the evidence.[273] Respondent contends that not only does it have rigorous internal controls for quality and customer satisfaction which is recognized, it also takes many steps to ensure the quality of its turf:[274]

(1) First, Respondent is vertically integrated and does not source turf fibers from any other party, it manufactures its own turf fibers and therefore can maintain a flow of quality product with assurance of the quality.[275]

(2) Second, Respondent has an on-site laboratory, with one department for quality control and one for inspection. The inspection department ensures that the turf meets all safety and quality specifications. After production, all products are tested by both departments, and only when both departments have signed off can the product leave the production line.[276] Respondent regularly sent results of its inspections and testing to Claimant.[277]

(3) Third, Respondent employs 24-hour, on-site quality control personnel to oversee every stage of the manufacturing process.[278]

(4) Fourth, in the rare event that a defective batch is discovered, Respondent does not ship that product, and instead will redo the order.[279]

---

[269] Rejoinder at page 6; Cheng Statement at paras 83-84.
[270] Rejoinder at page 6; Ex C-70, Ex R-53.
[271] Rejoinder at page 6; Ex R-59 (p 9).
[272] Rejoinder at page 8.
[273] Rejoinder at page 24.
[274] Ibid.
[275] Han Statement at para 18.
[276] Rejoinder at pages 24-25.
[277] Cheng Statement at para 67; Ex R-52, C-47, C-48.
[278] Han Statement at paras 17-26.
[279] *Id,* at para 28.

18.21 Respondent emphasizes again that it invited Claimant to review the turf before it was shipped from the factory and that Claimant's representative, Mr. Tao Guo, frequently visited Respondent's factory to inspect the turf before it was shipped to Claimant—only after Claimant had approved the product would Respondent load and seal the product for shipping.[280]

18.22 Respondent argues that the customer "claims" submitted by Claimant are inherently not credible, and they are contrary to Respondent's experience with all other customers. Respondent points out that it distributes its hollow blade turf to two other distributors in the world, one in Australia and one in Spain. Neither distributor has ever reported issues with quality of the hollow blade turf.[281] Respondent also says that it is rare for customers to report quality concerns, and that if a quality concern is reported it is made soon after delivery of the product to the distributor. Apart from the claims submitted through Claimant, Respondent never received complaints about the products more than a few months after delivery, and such complaints were very rare. The long period of delay between delivery of the turf to Claimant and the submission of many of the claims raises questions about the legitimacy of such claims.[282]

18.23 Respondent categorizes Claimant's Quality issues or complaints into two general categories as follows:[283]

(1) Aesthetic concerns e.g., twisted blades, fold lines, uneven blade height, and matted turf.

(2) Premature deterioration of the turf including fibers coming loose and sun damage to the turf's color.

18.24 As to the aesthetic concerns, Claimant never raised those concerns despite having at least two opportunities to inspect the turf before it went to their customers (either by Mr. Tao Guo or Mr. Cheng who would send pictures for approval).[284] Claimant also could inspect the turf again upon arrival in the United States. At no point did Claimant itself raise a complaint about quality of the turf, and thus it is not believable that any such aesthetic issues had arisen while the turf was in Respondent's possession. Any such occurrences—folding, matting, twisting—must have occurred in Claimant's possession or afterwards. Moreover, Mr. Gao himself assured Tough Turtle that such superficial issues were not indications of quality problems and could be easily remedied.[285] Likewise, Claimant's own warranty states that "[v]isual lines caused by variation of the color of yarns and manufacturer tufted stitch lines are not consider a defect . . . and is a common occurrence among all tufted products."[286] Many of the "claims" submitted by Claimant fall into this category.

---

[280] Rejoinder at page 25; Cheng Statement at para 63.
[281] Rejoinder at page 25; Han Statement at paras 29-31.
[282] Ibid.
[283] Rejoinder at pages 25-26.
[284] Rejoinder at page 26; Cheng Statement at paras 63-64.
[285] Exhibit C-70 pp 10-16.
[286] Ex R-44.

18.25   As to premature deterioration, Respondent argues that Claimant's evidence is sparse and unreliable.[287] There are few complaints in this regard, and most of the complaints ostensibly derived from customers in Arizona, where heat and UV exposure are extreme.[288] In fact, Claimant itself warns customers that its warranty is quite limited in Arizona.[289] Respondent's expert, Mr. Wen, also opines that it becomes very difficult to measure turf specifications after more than six months, as artificial turf always changes once exposed to the environment, and these changes do not reflect any defect.[290]

18.26   In or around October 2017, Claimant shipped a sample of allegedly defective turf to Respondent for testing, which is the only time Claimant has provided physical corroboration of any claimed defect.[291] Based on Respondent's testing, it was concluded that it has never seen similar damage to turf exposed to natural conditions, and the most likely explanation for the damage was exposure to a combination of exceptionally high temperature and extreme UV radiation.[292] After inquiry, Claimant confirmed that the product had been installed in Arizona. After the test, Claimant continued ordering turf from Respondent for nearly another year.[293]

18.27   As to the photographs submitted by Claimant, Respondent argues that the repeated photographs of someone holding a few pieces of turf are not credible because those fail to demonstrate any problem with the turf or that the pictured turf was manufactured by Respondent.[294] Respondent challenges the authenticity of the claim documentation, given the frequency of the identical sequence of pictures, turf from distant angles, plus a hand holding a few pieces of green material.[295] When asked for additional documentation, Claimant refused to provide even basic corroborating documents such as proof of sale.[296]

18.28   Respondent argues that Claimant's claim of loose turf blades is not credible as Respondent tests its products for durability in their on-site laboratory with a pull-test to ensure that the fibers do not readily come loose.[297] However, Respondent notes that when a turf is cut during installation and if cutting is not skillfully done, some fibers can come loose particularly around the edges.[298]

18.29   As to the quality complains from Tough Turtle customers, Respondent attributes them to Tough Turtle's marketing materials which may have misled customers as to the face weight of the products. As density and weight of the

---

[287] Rejoinder at page 26.
[288] Ibid.
[289] Ex R-44.
[290] Rejoinder at page 27; Tian Wenjun Report at page 4.
[291] Rejoinder at page 27.
[292] Rejoinder at page 27; Ex R-19a.
[293] Rejoinder at pages 27-28.
[294] Rejoinder at page 28.
[295] Ibid.
[296] Ibid.
[297] Ibid.; Han Statement at paras 22, 32.
[298] Ibid.

turf are key components of the product's overall quality and feel, customers may have been disappointed in the overall quality of the turf.[299]

18.30 Further, Respondent argues that many of the photographs in Claimant's claims depict turf with no obvious defects and Claimant also submitted duplicate claims.[300]

18.31 More importantly, Respondent points out that the record contains no complaints about Product No. 3 (i.e., the THD-Landscape turf or supermarket grass). No claims have been made to date by Claimant, and there is no basis to conclude that any claims are forthcoming as to this product.[301]

18.32 Further, Respondent notes that Claimant has received its own customer complaints for premature deterioration of turf that was not purchased from Respondent, suggesting that Claimant's own actions may have repeatedly damaged turf in its possession. One of the complaints against Claimant alleges a turf that was installed in May 2015, before any purchases from Respondent, had deteriorated prematurely and needed replacing by 2017. The complaint further alleges that the replacement provided by Claimant was made of the same product as was used initially and, two years later, needed replacing again.[302]

18.33 Last, Respondent contends that Claimant's generalized assertions about the quality of Respondent's turf are belied by their intentional destruction of key evidence. At the time Claimant submitted its SOC, it had $232,000 worth of Respondent's turf in storage.[303] In September 2020, Claimant admitted under oath that it had destroyed the evidence and this intentional spoliation cannot be ignored.[304]

18.34 In all, Respondent argues that there is no credibility to the claims submitted by Claimant, and there is no basis to extrapolate from the subset of customers. Claimant ordered and received more than 3.5 million square feet of turf from Respondent over a period of more than three years. After starting to pass along claims in July 2017, Claimant continued ordering turf for nearly a year, and this indicates Claimant did not believe it was exposing itself to any liability by continuing to resell products from Respondent.[305]

## B. Parties' Legal Arguments

18.35 Claimant's legal argument in relation to the Quality issues is that Respondent had provided turf of deficient quality and misrepresented the quality (and specifications) of its product to Claimant's detriment.[306] Claimant argues that Respondent has breached the contract between the parties, specifically that

---

[299] Rejoinder at pages 28-29; Ex R-31, R-39; Cheng Statement at para 26.
[300] Ex R-52; Rejoinder at page 29.
[301] Rejoinder at page 29.
[302] Rejoinder at page 29; Ex R-33.
[303] SOC at page 7.
[304] Ex R-59; Rejoinder page 30.
[305] Rejoinder page 30.
[306] SOC at para 22.

Respondent did not perform the contract terms because it was providing turf of compromised quality and specifications, and the turf was subject to early deterioration and overall quality complaints.[307] Thus, Respondent has failed to perform under the contract by not providing Claimant with the product it wanted.[308]

18.36    Respondent's legal argument as to Claimant's alleged claims for Quality issues is that those allegations are implausibly vague and unsupported by evidence, and therefore do not support arbitrable claims against Respondent.[309] Respondent's position is that there is no breach of contract on its part, as it always provided the turf that was ordered, and always provided a high-quality product that satisfied the contractual specifications of the particular purchase order.[310]

18.37    Further, Respondent argues that Claimant's allegations of breach by providing low-quality turf are conclusory and without merit, as Claimant cannot show that the turf was anything other than high-quality and compliant with the terms of each purchase order.[311] Respondent contends that Claimant has submitted scant evidence which is patently insufficient to demonstrate any quality problems with the product as delivered.[312] Therefore, Respondent has not breached any agreement, and Claimants' claims for breach of contract are without merit.[313]

18.38    In Respondent's Rejoinder, it argues that Claimant's claims of the turf being of a generalized defective quality must fail because the turf was rigorously tested, inspected by Claimant before shipment, and accepted by Claimant without objection.[314] The small number of customer complaints are not credible and do not reflect fault on Respondent's part, and Claimant had intentionally destroyed evidence at issue in this dispute.[315] The willful destruction of evidence requires an adverse inference against Claimant and rejection of their claim.[316]

18.39    Therefore, Respondent contends that Claimant's legal argument fails because Respondent fulfilled all terms of the parties' agreements and the turf sold by Respondent satisfied a high standard of quality.[317]

18.40    Claimant also has no claim for breach of contract based on the generalized allegations on quality because the evidence directly refutes the assertion of the Quality issues.[318] Claimant failed to show that Respondent knew its turf was defective and yet sold it anyway, which is not the case as Respondent's business reputation depends on it providing high-quality products that match its

---

[307] SOC at para 29.
[308] SOC at para 32.
[309] SOD at page 14.
[310] SOD at page 17.
[311] SOD at page 20.
[312] Ibid.
[313] SOD at page 21.
[314] Rejoinder at page 32.
[315] Ibid.
[316] Ibid.
[317] Ibid.
[318] Rejoinder at page 40.

customers specifications and expectations, not intentionally selling turf that will rapidly deteriorate. Moreover, the turf defect would have to be such that Claimant—an expert in artificial turf—would have been completely unaware.[319]

18.41 Respondent contends that all factors show that the turf from Respondent was high quality and satisfactory to Claimant. Respondent follows rigorous quality control processes, as described above. Before shipment, Claimant had an opportunity to inspect the turf at Respondent's factory. In fact, Tao Guo frequently conducted this in-person inspection before shipment of the turf. Once delivered to the United States, Claimant had an opportunity to inspect the goods before acceptance. Claimant never rejected a delivery based upon its own concerns about quality. Indeed, Claimant accepted each delivery and then resold the turf under its own name. Claimant is an expert in the field of artificial turf and is surely capable of assessing the quality of turf received in a shipment.[320]

18.42 The only evidence of "claims" based on turf quality are from third-party end customers. These complaints are relatively few in number given the volume of turf sold to Claimant, and they are not particularly credible. While Respondent usually required a physical sample of allegedly defective turf before offering a refund or discount to a customer, Respondent waived that requirement for Claimant as a gesture of goodwill. Thus, contrary to its usual protocol, Respondent gave Claimant a series of discounts based on photographs of unidentified turf. These discounts were not intended as acknowledgment of a product defect, but rather an effort to maintain goodwill with Claimant. After a time, however, Respondent noticed that the photographs were duplicative or failed to show any problems, and Respondent became suspicious. Those suspicions were confirmed when Claimant refused to provide additional support for the "claims" it submitted.[321]

**The parties' arguments in relation to the UCC**

18.43 The parties agree that the UCC applies.[322] The parties also do not dispute that Respondent would be considered a "merchant" for the purposes of the UCC.[323]

18.44 First, Claimant argues that Respondent's representations—that Claimant would receive a product with 90-ounce face weight per square yard, density of 16800, and DTEX of 14000—constituted an express warranty under UCC § 2-313.[324] There is no requirement that the seller have any specific intent to breach a warranty or that the buyer prove actual reliance.[325]

18.45 Claimant submits that the remaining elements of UCC § 2-313 have been proven, as it was the case "that the product did not perform as stated/promised OR that the it did not meet the quality of the description, sample, or model;

---

[319] Ibid.
[320] Rejoinder at page 41 (whole para).
[321] Ibid.
[322] SOC at para 45; SOD at page 23.
[323] SOD at page 25, Response at page 6-7.
[324] Id.
[325] SOC at para 48, citing UCC § 2-313, Official Comment no. 3.

(3) that plaintiff took reasonable steps to notify within a reasonable time that the product was not as represented, whether or not defendant received such notice; (4) that Defendant failed to remedy the product as required by the warranty; (5) harm to plaintiff, and (6) that the failure of the product to be as represented was a substantial factor in causing plaintiff's harm."[326]

18.46   Claimant states that the turf has been and continues to be subject to warranty claims and potential lawsuits from end-customers due to its faulty quality, early deterioration, and failure to meet the promised specifications. Claimant notified Respondent repeatedly as demonstrated by communications and temporary adjustments made to the DTEX and density specifications, and Respondent assured Claimant it was receiving what it had ordered.[327] Even if Respondent was calculating 90-ounces per square meter, its explanation of the problem in December 2018 still acknowledges it was shorting Claimant by having approximately 82.5-ounces per square meter when converting Tough Turtle's test results of 69-ounces per square yard.[328]

18.47   Second, Claimant cites Judicial Council of California Civil Jury Instructions, 2020 ed. ("CACI") § 1231 as instructive in proving implied warranty of merchantability under UCC § 2-314. The elements include (1) plaintiff's purchase of a product from a defendant; (2) defendant being in the business of selling these goods OR by seller holding itself out as having special knowledge or skill regarding these goods; (3) the product meeting the standards imposed by California Commercial Code § 2314(2) (equivalent to UCC § 2-314(2)); (4) plaintiff's reasonable steps to notify defendant within a reasonable time that the product did not have the expected quality; (5) harm to plaintiff; and (6) that the product did not have the expected quality.[329]

18.48   Claimant establishes that the turf would not meet the requirement of merchantability because it could not "pass without objection in the trade under the contract description."[330] Claimant asserts that parties verbally agreed at the inception of the EAA that the turf would contain 90-ounce face weight per square yard. After the complaints regarding deterioration, creases, leaking colorant, and defective blades, Claimant found that Respondent was providing turf of deficient quality and demonstrably low face weight.[331]

18.49   Claimant argues that the implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale.[332] In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery.[333]

---

[326] SOC at para 49, citing Judicial Council of California Civil Jury Instructions, 2020 ed. ("CACI") § 1230.
[327] SOC at para 50.
[328] SOC at para 51.
[329] SOC at para 53, Response at page 7-8.
[330] UCC § 2-314(2)(a).
[331] SOC at para 56.
[332] Response at page 8, citing *Mexia v. Rinker Boat Co., Inc.*, 174 Cal.App.4th 1297, 1304– 1305 (2009).
[333] Id.

18.50  Claimant further asserts that the turf products were not "fit for the ordinary purposes" used by their end-customers because it did not hold up to the standards promised by the Respondent and in turn by Claimant.[334] When the Tough Turtle results demonstrated that the face weight was lower than advertised, the product was not up to the "ordinary purpose".

18.51  The implied warranty that the goods be "fit for the ordinary purpose" may be breached when the product is defective to normal buyers making ordinary use of the product.[335] There must be a fundamental defect that renders the product unfit for its ordinary purpose,[336] not merely "cosmetic" defects.[337]

18.52  Third, Claimant argues that Respondent breached the UCC's implied warranty of fitness for a particular purpose[338] by providing turf short of the 90-ounce per square yard or meter metric.[339] The exclusions in UCC § 2-316 are not applicable because Respondent never disclaimed any warranties in writings and the defects were not immediately being discoverable due to the hollow blade design disguising the face weight of the turf.[340]

18.53  Claimant justifiably relied on Respondent's representations.[341] Respondent produced samples for Claimant and holds itself out as an expert turf manufacturer, and since it will argue that it did provide Claimant with quality turf, it is telling enough that Claimant was justified in trusting Respondent.[342] Due to the turf's premature deterioration and deficient face weight, it did not live up to the "particular purpose" expected by Claimant's end-customers.[343]

18.54  In its Response, Claimant argues that the UCC does not preclude its claims pursuant to UCC § 2-608(1), whereby a "buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it ... without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Here, Claimant is entitled to invoke its acceptance because its acceptance was reasonably induced by the difficulty of discovering the non-conformity of the turf that substantially impaired its value.[344] The turf had latent defects, including but not limited to, faulty quality, early deterioration, and failure to meet promised specifications that were not readily discoverable.[345]

---

[334] SOC at para 57, citing UCC § 2-314(2)(c).
[335] Response at page 8, citing *Brittalia Ventures v. Stuke Nursery Co., Inc.*, 153 Cal. App. 4th 17 (3d Dist. 2007).
[336] *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010) (quoting *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931 (N.D. Cal. 2009).
[337] *Carey v. Chaparral Boats, Inc.*, 514 F. Supp. 2d 1152, 1155–1156 (D. Minn. 2007).
[338] UCC § 2-315, CACI § 1232.
[339] SOC at para 64, Response at page 9.
[340] SOC at para 61.
[341] Response at page 10.
[342] SOC at para 63.
[343] Response at pages 9-10.
[344] Response at page 4-5.
[345] Response at page 6.

18.55 According to UCC § 2-608(2), the reasonable period commences from the point when the buyer discovers or should have discovered the non-conformity. Discovery requires actual knowledge of the defect or non-conformity, and a buyer is not required to revoke until he discovers the seriousness of the defect.[346]

18.56 Claimant submits that the elements of latency may be segmented due to a defect which unfolds gradually or simply a defect hidden from plain view.[347] Claimant did not discover the latent defects and resulting non-conformity of the turf until years after the transaction because the defects were dormant for a certain period of time.[348] To add, after Claimant confronted Respondent about the defective nature of its goods, Respondent merely denied the allegations, yet it offered refunds without presenting any defense.[349]

18.57 Claimant argues that there was no way to discover the non-conformity of the turf before it did, and hence it revoked its acceptance within a reasonable time after discovering the latent defects of the turf.[350] Thus it would have the same rights and duties with regards to the goods as if it had rejected them.[351] Claimant further refutes Respondent's argument that the pro-forma invoices are relevant, as there was no way for Claimant to discover the latent defects within 20 days.[352]

18.58 Respondent submits that Claimant accepted all goods without timely objection after a reasonable period for inspection. Each pro-forma invoice contained a condition that "in case of quality discrepancy, the buyer should file claim within 20 days after the arrival of the goods at port of destination."[353] This condition thus limited the remedies of Claimant in raising concerns regarding quality of the artificial turf, and therefore functioned as a disclaimer of implied warranties.[354]

18.59 Respondent asserts that Claimant failed to make any claims within this specified period. Instead, Claimant waited years to notify Respondent of the supposed non-conformance and only did so upon receiving purported complaints from their customer's customers.[355] This would not constitute a timely notification, and Claimant therefore accepted goods without reservation, even if they were non-conforming.[356]

18.60 Respondent contends that it did not violate any express or implied warranties under the UCC.[357] Respondent did not make any express warranties to Claimant regarding the 90-ounce per square yard face weight. The only express warranties

---

[346] Response at page 5, citing UCC § 2-608(2).
[347] Response at page 5, citing *Chaplin v. Bessire & Co.*, 361 S.W.2d 293, 294-95, 297 (Ky. Ct. App. 1962); *see also Birkner v. Purdon*, 27 Mich. App. 476, 481-82 (1970).
[348] Response at page 5.
[349] Response at page 5.
[350] Response at page 5.
[351] UCC § 2-608(3).
[352] Response at page 6.
[353] SOD at page 23; Claimant's Ex. C-7a.
[354] SOD at page 27.
[355] SOD at page 24.
[356] SOD at page 24.
[357] SOD at page 24.

as understood under UCC § 2-313 were the product specifications in the pro-forma invoices.[358] Claimant cannot prevail because Respondent satisfied all express provisions of the parties' agreements.

18.61 Respondent argues that it did not violate any implied warranties of merchantability,[359] where such a warranty requires merchants to sell products of reasonably good quality.[360] To make a claim for defective product for breach of implied warranty of merchantability, the plaintiff must show that the product was not reasonably fit for its intended purpose.[361] Furthermore, the implied warranty of merchantability does not impose a general requirement that goods precisely fulfill the expectation of the buyer, but it should provide for a minimum level of quality.[362] Respondent asserts that there is no evidence or plausible allegation that it sold goods that were not reasonably fit for their intended purpose. Respondent has rigorous protocols to ensure quality of its turf, and Respondent delivered numerous sample products to Claimant for review before making a single purchase.[363]

18.62 Respondent cites the exclusion of warranties under UCC § 2-316(3)(b), where there is no implied warranty with regards to defects when the buyer before entering into the contract has examined the goods as fully as he desired or has refused to examine the goods.[364] In the same vein, "a failure to notice defects which are obvious cannot excuse the buyer… A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe."[365] Since Claimant is experienced in the sale of artificial turf, Claimant cannot avoid the obligations of this expertise.[366] Claimant had the opportunity to inspect samples of every product, and any purported issues of face weight or product quality would have been apparent to Claimant in the pre-purchase inspection process.

18.63 Respondent did not breach the UCC's implied warranty of fitness for a particular purpose[367] because Claimant fails to identify any "particular use" for the turf that was not met by the turf provided by Respondent.[368] Claimant did not plausibly rely on Respondent's "skill or judgment to select or furnish suitable goods because Claimant is likewise experienced in the artificial turf sector.[369] Claimant placed the orders for the specifications of turf that it needed.[370]

18.64 Finally, Respondent contests that Claimant accepted the goods delivered by Respondent without complaint. UCC § 2-606 states that goods are accepted

---

[358] SOD at page 25.
[359] UCC § 2-314.
[360] SOD at page 25.
[361] SOD at page 25, citing *Wojcik v. Empire Forklift, Inc.*, 14 A.D.3d 63, 66 (3d Dept. 2004).
[362] SOD at page 25, citing *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1295-96 (1995).
[363] Rejoinder at page 35-36.
[364] SOD at page 26.
[365] SOD at page 26; UCC § 2-316, comment 8.
[366] SOD at page 26.
[367] UCC § 2-315.
[368] SOD at page 27.
[369] SOD at page 27.
[370] SOD at page 27.

when the buyer fails to reject the goods or takes any act that is inconsistent with the seller's ownership. Claimant had two opportunities for inspection—first, at the factory, and second, upon delivery to the United States.[371] Despite these opportunities for inspection, Claimant did not reject a single shipment of turf from Respondent, save for the complaint it made for the cracked packing crates for the initial shipment of THD-Landscape.[372]

18.65   Parties addressed the significance of Claimant's ability to inspect. It is not disputed by the parties that samples were given by Respondent to Claimant prior to Claimant's purchase of turf products.[373] Respondent's position is that Claimant has inspected all the turf it purchased multiple times through the samples provided, never rejected any turf, and even continued to order more turf from Claimant. Further, Claimant also inspected the products and approved them before delivery, where Mr. Tao Guo (on behalf of Claimant) would visit Respondent's manufacturing facility and randomly tested the product quality.[374]

18.66   This was briefed and argued by Respondent's counsel during the Hearing:

> "GST first inspected the turf when they received the sample. Before they placed any purchase orders, they received physical samples. When we're talking about the -- the samples, it was a physical product that they could touch, they could feel. If they wanted to measure the face weight, rip off the fibers, put it on the scale, you know the face weight.
>
> Again, they inspected the product after it was produced and before it was shipped; and
>
> A third time that they inspected the product was upon delivery.
>
> For each and every single one of the purchase orders, GST accepted the turf. GST never rejected a shipment from Mighty Grass. Not only did GST accept the turf, they then turned around and resold it to their own customers. They used different product names, they used their own set of specifications, but they resold all of the turf."[375]

18.67   Respondent's counsel further argued that Claimant knows the industry well as Claimant worked with other suppliers, and that Claimant conducted thorough due diligence before purchasing any turf from Respondent:

> "GST conducted thorough due diligence before purchasing turf from Mighty Grass (ordered more than half a dozen samples of turf in the year before 2015 before they placed their first order). These samples were sent for physical inspection by GST.[376]

---

[371] Rejoinder at page 37-38.
[372] Rejoinder at page 38; Respondent's Ex. R-19, at page 46-51.
[373] Day 1 Tr. 102:1-21 (Kramer) (Gao).
[374] SOD at page 5.
[375] Day 1 Tr. 23:14–24:3 (Kramer).
[376] Day 1 Tr. 27:17–29:25 (Kramer).

*Before any product left Mighty Grass' factory, GST had a chance to inspect the turf. Either by sending representative to physically look at it, or Mighty Grass would send pictures of the turf and only upon GST's approval can the turf leave the factory (Exhibit R-14)."*[377]

18.68   Mr. Gao's testimony, he explained that inspection of the products consists of "two parts". A first inspection is done at the factory in China where Claimant has a representative, and a second inspection is done once the products arrive in the United States. Mr. Gao maintained that these "are all visual inspections … from the aesthetic standpoint."[378]

18.69   Parties also made submissions on Respondent's supposed duty to inspect the defective turf. It was raised for the first time during the Hearing that Claimant invited Respondent's representatives to come to the United States to inspect the turf that was in dispute.[379] However, despite the requests, Respondent's representatives could not come to the United States for visa reasons, or to wait for the Respondent owner of the company to become available.[380] The Sole Arbitrator notes that Mr. Cheng did acknowledge Claimant's requests in a handwritten note, stating "after repeated communication, the customer said that we must go to the site to verify the actual situation for better cooperation in the future."[381]

18.70   Mr. Cheng further testified that "after GST told us about the defects of the products, we made the internal report applying for onsite inspection." When asked whether inspection at the customer's site happened, Mr. Cheng's response was that Respondent sent the application and was refused twice, so they did not go.[382]

18.71   Respondent refutes such requests as an unreasonable one, especially to have Mr. Han, the second in command to visit every single installation where the alleged turf was faulty.[383]

## C.   Sole Arbitrator's Analysis

18.72   Claimant has the burden of proving all its claims, including its claims in relation to the quality issues.

18.73   Claimant here argues that Respondent had provided turf of deficient quality and misrepresented the quality (and specifications) of its product to Claimant's detriment.[384] Claimant argues that Respondent has breached the contract between the parties, specifically that Respondent did not perform the contract terms because it was providing turf of compromised quality and specifications,

---

[377] Day 1 Tr. 34:9-25 (Kramer).
[378] Day 1 Tr. 69:13–70:23 (Figueiredo) (Gao).
[379] Day 2 Tr. 260 :8-14 (Arbitrator).
[380] Day 2 Tr. 203:6–204:18 (Kramer) (Gao); Day 2 Tr. 253:21–255:5 (Figueiredo) (Gao).
[381] Respondent's Ex. R-19 and R-19-a (translated), at page 15.
[382] Day 3 Tr. 391:6-20 (Figueiredo) (Cheng).
[383] Day 7 Tr. 745:10-18 (Kramer).
[384] SOC at para 22.

and the turf was subject to early deterioration and overall quality complaints.[385] In relation to these arguments, it does not appear that these are based on any express terms of the agreement. Insofar as Claimant argues that Respondent provided turf that is of compromised quality and specifications, following from my reasoning in relation to the Face Weight Specification issue above, it is unclear to me what precise quality or specification term refers to, and how such a term is somehow a term of the parties' agreement to which Respondent agreed to. If Claimant refers to the face weight requirement, I have found above that the parties' agreement does not contain such a requirement.

18.74 Claimant also accuses Respondent of breaching the implied warranties of merchantability and fitness for a particular purpose.

18.75 According to UCC § 2-314, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.[386] An implied warranty of merchantability may be excluded or modified by words or conduct subject to the provisions of UCC § 2-316.

18.76 Both Claimant and Respondent have made arguments based on the UCC provisions but are also in agreement that the United Nations Convention on Contracts for the International Sale of Goods (the "CISG") applies. For the sake of completeness, I will examine the warranties under both the UCC and the CISG. Under the UCC, goods carry the implied warranty of merchantability if sold by a merchant seller. Respondent does not deny that it is a merchant seller. This being the case, UCC § 2-314(2) says that merchantable goods are those that conform at least to the following six characteristics:

(1) Pass without objection in the trade under the contract description.
(2) In the case of fungible goods, are of fair average quality within the description.
(3) Are fit for the ordinary purposes for which such goods are used.
(4) Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved.

---

[385] SOC at para 29.
[386] § 2-314. Implied Warranty: Merchantability; Usage of Trade.
    (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
    (2) Goods to be merchantable must be at least such as
    (a) pass without objection in the trade under the contract description; and
    (b) in the case of fungible goods, are of fair average quality within the description; and
    (c) are fit for the ordinary purposes for which such goods are used; and
    (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and
    (e) are adequately contained, packaged, and labeled as the agreement may require; and
    (f) conform to the promise or affirmations of fact made on the container or label if any.
    (3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

(5) Are adequately contained, packaged, and labeled as the agreement may require.

(6) Conform to the promise or affirmations of fact made on the container or label if any.

18.77   In my view, the applicable parts of the warranty under the UCC are (2) and (3) above: that the goods must be of "fair average quality within the description" and "[a]re fit for the ordinary purposes for which such goods are used". For clarity, there is no need to invoke (4) on variations since I have found in the section above relating to contractual specifications that Claimant has not pleaded or shown how the turf supplied by Respondent does not comply with any contractual specifications agreed to by both parties.

18.78   The UCC also contains a separate implied warranty for fitness for a particular purpose:

§ 2-315. Implied Warranty: Fitness for Particular Purpose.

Where the <u>seller</u> at the time of contracting has reason to know any particular purpose for which the <u>goods</u> are required and that the <u>buyer</u> is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

In order to trigger this warranty, Claimant has to show that Respondent knew that the goods were required for a specific purpose and that Claimant was relying on Respondent's skill or judgment to select or furnish suitable goods.

18.79   In the same vein, Article 35 of the CISG provides that goods would not conform with the contract unless they are fit for the purposes that such goods of same description would ordinarily be used, or are fit for any particular purpose made known to the seller unless buyer did not rely or it would be unreasonable to rely on the skill of the seller:

**Article 35**

(1) The seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract.

(2) Except where the parties have agreed otherwise, the goods do not conform with the contract unless they:

(a) are fit for the purposes for which goods of the same description would ordinarily be used;

(b) are fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract, except where the circumstances show that the buyer did not rely, or

56

that it was unreasonable for him to rely, on the seller's skill and judgement;

(c) possess the qualities of goods which the seller has held out to the buyer as a sample or model;

(d) are contained or packaged in the manner usual for such goods or, where there is no such manner, in a manner adequate to preserve and protect the goods.

(3) The seller is not liable under subparagraphs (a) to (d) of the preceding paragraph for any lack of conformity of the goods if at the time of the conclusion of the contract the buyer knew or could not have been unaware of such lack of conformity.

18.80   These two obligations found in CISG Article 35(2)(a) and (b) are akin to the implied warranties of merchantability and fitness for a particular purpose found in the UCC.

18.81   First, in relation to the obligation to provide goods of merchantable quality, which finds expression in UCC and CISG, Claimant needs to show that the turf supplied by Respondent do not meet "fair average quality within the description" or are not "fit for the ordinary purposes for which such goods are used" (Section 2-314(2) of the UCC) or are not "fit for the purposes for which goods of the same description would ordinarily be used." On this point, Claimant has claimed 51 instances of turf that it claims are defective. Claimant has put forward claims of defects ranging from:

  (a)   Discoloration
  (b)   Fiber blades detaching from the backing and coming lose;
  (c)   Visible fold lines or creases when laid flat;
  (d)   Blue backing color seeping through and staining hands and clothing;
  (e)   The turf being of such different heights that it required a trim;
  (f)   Matted turf;
  (g)   Divots; and
  (h)   Twisted blades.[387]

18.82   The following is a summary of the complaints that Claimant has put forward in its submissions and during the Hearing, as I understand them:

**Claims by Tough Turtle**

| No. | Exhibit No. | Tough Turtle Job No. | Date | GST Invoice No. | Invoice Amount | Complaint |
|-----|-------------|----------------------|------|-----------------|----------------|-----------|
| 1 | C-53 | 26314 | 10/15/18 | 5891 | $990.93 | |

---

[387] Claimant's Ex. C-53 to C-110.

57

| | | | | 6344 | $953.11 | Visible fold lines and creases when laid flat (deduced from pictures) |
|---|---|---|---|---|---|---|
| 2 | C-54 | 26034 | 08/10/18 | 102432 | $783.40 | Visible fold lines and creases when laid flat (deduced from pictures) |
| | | | | 107070 | $707.11 | |
| 3 | C-55 | Not stated | 07/20/18 | 101137 | $4,579.56 | Matted turf, visible fold lines when laid flat (deduced from pictures and email) |
| 4 | C-56 | 26285 | 10/04/18 | 5889 | $3,196.49 | Divots, visible fold lines and creases when laid flat (deduced from pictures) |
| 5 | C-57 | Not stated | 05/20/18 | 093699 | $3,436.68 | Visible fold lines and creases when laid flat (deduced from pictures and email) |
| 6 | C-58 | 26242 | 09/24/18 | 5535 | $7,980.97 | Visible fold lines and creases when laid flat (deduced from pictures) |
| | | | | 5827 | $848.54 | |
| 7 | C-59 | Not stated | 06/16/18 | 097136 | $2,567.25 | Discoloration, patches, "burned" spots, visible fold lines and creases when laid flat (deduced from pictures and emails) |
| | | | | 104809 | $2,312.05 | |
| 8 | C-60 | Not stated | 07/12/18 | 101135 | $2,911.72 | Discoloration, fiber blades coming loose, visible fold lines and creases when laid flat (deduced from pictures) |
| 9 | C-61 | Not stated | 12/20/17 | 4755 | $2,044.25 | Blue backing color seeping through and staining hands and clothing (deduced from pictures and emails) |
| 10 | C-62 | 26123 | 08/25/18 | 8131 | $1,487.76 | Discoloration, visible fold lines and creases when laid flat (deduced from pictures and emails) |
| | | | | 6342 | $2,100.03 | |
| | | | | 5276 | $72.67 | |
| | | | | 4918 | $193.78 | |
| | | | | 107084 | $1,938.52 | |

| 11 | C-63 | Not stated | 09/27/16 | 046993 | $935.98 | Discoloration (deduced from pictures and emails) |
| | | | | 054501 | $75.43 | |
| 12 | C-64 | Not stated | 05/29/18 | 095446 | $1,506.01 | Discoloration, visible fold lines and creases when laid flat (deduced from pictures and emails) |
| 13 | C-65 | Not stated | 09/18/18 | 5827 | $848.54 | Visible fold lines and creases when laid flat (deduced from pictures and emails) |
| 14 | C-66 | 25312 | 03/31/18 | 089074 | $1,859.17 | Matted turf, fiber blades coming loose (deduced from pictures and emails) |
| | | | | 093574 | $1,859.17 | |
| 15 | C-67 | 26156 | 09/01/18 | 105195 | $4,303.43 | Divots (deduced from pictures and emails) |
| 16 | C-68 | Not stated | 06/16/18 | 103991 | $1,021.35 | No pictures, only emails (unable to deduce) |
| 17 | C-69 | 25584 | 05/23/18 | 095448 | $689.01 | Discoloration (deduced from pictures) |
| 18 | C-70 | Not stated | 14/12/16 | Not stated | $26,702 (approximation) | Discoloration, twisted blades, visible fold lines and creases when laid flat (deduced from pictures and emails) |
| 19 | C-71 | 25234 | 03/14/18 | 084545 | $1,879.06 | Visible fold lines and creases when laid flat (deduced from pictures and emails) |
| | | | | 084559 | $254.56 | |
| 20 | C-72 | 26054 | 08/09/18 | 8478 | $4,514.99 | Divots, visible fold lines and creases when laid flat (deduced from pictures and emails) |
| 21 | C-73 | Not stated | 08/24/18 | 4619 | $1,472.41 | No pictures, only emails (unable to deduce) |
| | | | | 5294 | $114.97 | |
| 22 | C-74 | 25708 | 06/13/18 | 095989 | $1,621.92 | Discoloration (sun damage) (deduced from pictures and emails) |
| | | | | 4743 | $226.28 | |
| 23 | C-75 | 25921 | 07/20/18 | 099315 | $5,464.05 | Matted turf (deduced from pictures and emails) |
| | | | | 101139 | $565.69 | |

| 24 | C-76 | 24536 | 09/05/17 | 066744 | $876.81 | Visible fold lines and creases when laid flat (deduced from pictures and emails) |

## Claims by other suppliers

| No. | Exhibit No. | Complainant Company Name | Date | GST Invoice or Order No. | Invoice Amount | Complaint |
|-----|-------------|--------------------------|------|--------------------------|----------------|-----------|
| 1 | C-83 | Gator Grass | 01/28/20 | Not provided | Not provided | Unable to deduce, no pictures |
| 2 | C-84 | Synthetic Grass Masters | 08/16/19 | Not provided | Not provided | Unable to deduce from picture provided |
| 3 | C-85 | Curb A Lawn | 01/22/20 | Not provided | $1417.50 | Unable to deduce, no pictures |
| 4 | C-86 | Curb A Lawn | 10/22/19 | Not provided | Not provided | Patches (deduced from email) |
| 5 | C-87 | L.A. Lawn | 02/13/19 | HW 233887 | $859.20 | Unable to deduce, no pictures |
| 6 | C-88 | Tucson Professional Landscaping Inc. | 10/22/18 | 240078 | $1,190.70 | Fiber blades coming loose, patches (deduced from emails) |
| 7 | C-89 | Tucson Professional Landscaping Inc. | 03/04/19 | HW 234211 | $652.08 | Deterioration, patches, fiber blades coming loose (deduced from emails and pictures) |
| 8 | C-90 | Jeff Noble | 07/19/19 | Not provided | Not provided | Patches, discoloration (deduced from pictures) |
| 9 | C-93 | Tucson Professional Landscaping Inc. | 10/29/18 | Not provided | Not provided | Patches, discoloration, twisted blades (deduced from pictures) |

## Warranty claims raised by Claimant to Respondent

| No. | Exhibit No. | Date | GST or Mighty Invoice or Order No. | Invoice Amount | Complaint |
|-----|-------------|------|-----------------------------------|----------------|-----------|
| | | | | | |

| 1 | C-91 | 08/23/18 | Not stated | $1,922.40 | Discoloration, fiber blades coming loose (deduced from emails and pictures) |
|---|------|----------|-----------|-----------|------------------------------------------------------------------------------|
| 2 | C-92 | Appears to be identical to C-91 | Appears to be identical to C-91 | $1,922.40 | Appears to be identical to C-91 |
| 3 | C-94 | 12/03/18 | PI: 0902-5-2016 | $4,478.18 | Disintegrating turf (deduced from emails and pictures) |
| 4 | C-95 | 02/13/19 | PI: 07038-2015 | $1,127.81 | Disintegrating turf (deduced from emails and pictures) |
| 5 | C-96 | 03/21/19 | PI: 07238 | $4,934.16 | Disintegrating turf (deduced from emails and pictures) |
| 6 | C-97 | 04/18/19 | PI: 0720-A&B | $5,669.99 | Disintegrating turf (deduced from emails and pictures) |
| 7 | C-98 | 11/21/19 | PI: 07038-2015 | $6,917.44 | Disintegrating turf (deduced from emails and pictures) |
| 8 | C-99 | 11/25/19 | PI: 07038-2015 | $7,371.34 | Disintegrating turf (deduced from emails and pictures) |
| 9 | C-100 | 12/09/19 | PI: 1202-15H-16 | $2,267.63 | Disintegrating turf (deduced from emails and pictures) |
| 10 | C-101 | 01/23/20 | PI: 0723A | $2,834.47 | Disintegrating turf (deduced from emails and pictures) |
| 11 | C-102 | 01/23/20 | PI: 0902-2016 | $3,854.15 | Disintegrating turf (deduced from emails and pictures) |
| 12 | C-103 | 02/04/20 | PI: 1115-10 | $2,165.29 | Disintegrating turf (deduced from emails and pictures) |
| 13 | C-104 | 02/14/20 | PI: 1013A-2015 | $1,814.53 | Disintegrating turf (deduced from emails and pictures) |
| 14 | C-105 | 02/18/20 | PI: 10138-2015 | $18,597.08 | Disintegrating turf (deduced from emails and pictures) |
| 15 | C-106 | 03/24/20 | PI: 0723A | $4,541.14 | Disintegrating turf (deduced from emails and pictures) |
| 16 | C-107 | 06/30/20 | PI: 38L-U-2018 | $878.15 | Disintegrating turf (deduced from emails and pictures) |
| 17 | C-108 | 06/30/20 | PI: 1118-11 | $5,642.77 | Disintegrating turf (deduced from emails and pictures) |
| 18 | C-109 | 06/30/20 | PI: 0616-21L-17 | $835.99 | Disintegrating turf (deduced from emails and pictures) |

**Replacements made by Claimant with regards to claims raised by other suppliers (Exhibit C-110)**

| Date | Customer Name | Notes | SF |
|------|---------------|-------|-----|
| 9/28/2015 | LA LAWN | Disintegrating, replaced | 6750 |
| 10/5/2015 | TURF GROUP USA | Streaky turf. Replaced | 2400 |
| 10/7/2015 | LA LAWN | Disintegrating, replaced | 2700 |
| 10/7/2015 | LA LAWN | Disintegrating, replaced | 15000 |
| 10/14/2015 | HIGH PERFORMANCE TURF | Disintegrating, replaced | 17100 |
| 10/19/2015 | TUCSON PROFESSIONAL | Disintegrating, replaced | 1350 |
| 10/23/2015 | LA LAWN | Disintegrating, replaced | 980 |
| 10/27/2015 | LA LAWN | Disintegrating, replaced | 1200 |
| 10/27/2015 | LA LAWN | Disintegrating, replaced | 5805 |
| 11/13/2015 | LA LAWN | Disintegrating, replaced | 4800 |
| 11/19/2015 | SYNTHETIC GRASS CO. | Disintegrating, replaced | 3900 |
| 11/20/2015 | TUCSON PROFESSIONAL | Disintegrating, replaced | 3000 |
| 12/17/2015 | LA LAWN | Disintegrating, replaced | 8700 |
| 12/17/2015 | LA LAWN | Disintegrating, replaced | 5010 |
| 1/14/2016 | TURF GROUP USA | Disintegrating, replaced | 3750 |
| 1/27/2016 | BARNUM MAINTENANCE | Disintegrating, replaced | 750 |
| 2/2/2016 | LA LAWN | Disintegrating, replaced | 945 |
| 3/9/2016 | LA LAWN | Disintegrating, replaced | 1620 |
| 4/11/2016 | LA LAWN | Disintegrating, replaced | 840 |
| 4/22/2016 | ACCENT GRASS N' GREENS | Disintegrating, replaced | 30000 |
| 6/16/2016 | TURF GROUP USA | Disintegrating, replaced | 1005 |
| 7/1/2016 | TURF GROUP USA | Disintegrating, replaced | 1500 |
| 7/7/2016 | FOREVER GREENS | Disintegrating, replaced | 5325 |
| 7/25/2016 | TURF GROUP USA | Disintegrating, replaced | 1800 |
| 8/4/2016 | FOREVER GREENS | Disintegrating, replaced | 4800 |
| 10/12/2016 | CURB A LAWN | Disintegrating, replaced | 7500 |
| 10/12/2016 | CURB A LAWN | Disintegrating, replaced | 2400 |
| 10/12/2016 | CURB A LAWN | Disintegrating, replaced | 3000 |
| 10/12/2016 | CURB A LAWN | Disintegrating, replaced | 1500 |
| 10/14/2016 | GATORGRASS SYNTHETIC LAW | Disintegrating, replaced | 9840 |
| 2/1/2017 | SYNTHETIC GRASS MASTERS | Disintegrating, replaced | 1305 |
| 11/9/2017 | TURF GROUP USA | Disintegrating, replaced | 3750 |
| 3/11/2018 | TRAN LANDSCAPING | Disintegrating, replaced | 3750 |
| 12/13/017 | TURF GROUP USA | Disintegrating, replaced | 6000 |

170075

18.83 Having reviewed the evidence above, as a general matter, there are several issues that detract from Claimant's ability to claim on the implied warranties or to otherwise successfully advance a claim based on quality issues or defects in the turf supplied by Respondent:

(1) There is no evidence in these alleged cases that prove that the turf at issue was that manufactured and supplied by Respondent. Traceability is an issue because Claimant is one of the largest North American distributors of turf, selling an estimated 25 to 30 million square feet of turf in the United

States.[388] Aside from Respondent, Claimant sources 15 different series of turf from two to three other suppliers.[389] They have 40 different SKUs of products, of which 29 or 30 are supplied by Claimant's own manufacturers.[390] I do not consider that Claimant has proved that the allegedly defective turf in each case above was manufactured and supplied by Respondent. In this regard, each of the pro-forma invoices contains a term where Claimant was to alert Respondent to a defect within a certain period of time. The pro-forma invoices stated the condition that "in case of quality discrepancy, the buyer should file claim within 20 days after the arrival of the goods at the port of destination."[391] Though this condition is subject to the parties' understanding in Clause 8 of the EAA, which I discuss below.

(2) Claimant also faces the challenge of proving that some of the alleged defects like creases and visible fold lines were due to manufacturing defects or shipping issues for which Respondent is responsible, and not due to improperly storage and handling, or installation by Claimant or its customer-purchasers, and by whoever else happened to handle the turf up to the point that it was installed. Given that the turf that was sold by Respondent was worth in excess of US$5m[392] and that Claimant was claiming over US$13m in damages[393] as a result of supposed defects, Claimant must prove that the cause of the claimed defects was Respondent and not Respondent itself or some other third party.

18.84  While I am sympathetic to the fact that some of the alleged defects might well be inherent and not easy to detect, other defects such as twisted blades or loose blades may well be issues that could have been detected upon contemporaneous inspection upon receiving the turf. Claimant already began encountering claims as early as July 2017, it was already supposedly on notice that there have been complaints from customers on turf supplied by Respondent.[394] Since they did not rigorously inspect the turf upon receipt, there is a significant risk that in selling, in much larger amounts, turf from several manufacturers and turf that Claimant itself manufactured, that it would soon become difficult or even impossible to tell or prove where the allegedly defective turf came from. Claimant should at least have implemented some system that would ensure traceability and to prove that claimed defective turf came from certain lots that were provided by Respondent, but there is no evidence of this from the information provided for the cases above.

18.85  The two causation issues above make it impossible for me to conclude that in relation to the complaints set out above, that Claimant's loss was caused by

---

[388] Day 1 Tr. 79:2-15 (Kramer) (Gao).
[389] Supplemental Interrogatories at page 3-4. Claimant states that Respondent is one of their three manufacturers between 2015 to 2017, and they were one of four manufacturers as of 2017 and 2018. Respondent produces three types of turf out of the 18 series of products from all its manufacturers. Between 2015 to 2018, Respondent supplied 1% and 3% of Claimant's total turf inventory.
[390] Day 1 Tr. 84:2-17 (Kramer) (Gao).
[391] *Id.* at page 23.
[392] Claimant's Ex. C-6, SOD at page 2.
[393] Day 7 Tr. 684:22–685:13 (Figueiredo).
[394] SOC at para 15, Respondent's Ex. R-19a.

defects in turf manufactured by Respondent, or indeed that the turf that was supposedly defective was supplied by Respondent.

18.86   Second, I address the obligation to provide goods that are fit for a particular purpose. The UCC requires the seller at the time of contracting to have reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. The CISG requires the turf to be fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract, except where the circumstances show that the buyer did not rely, or that it was unreasonable for him to rely, on the seller's skill and judgement. I accept that Respondent knew full well that the turf was being bought for the purpose of either installation in the United States or for resale in the United States.

18.87   At the same time, I do not accept that Claimant was relying on Respondent's skill or judgment to select or furnish suitable goods. In fact, Claimant is a sophisticated entity that is experienced in purchasing, selling, distributing, and even manufacturing turf.[395]

18.88   Being a major reseller and distributor of turf in the United States, Claimant is well placed both to understand the needs and purpose to which the turf it ordered would need to meet, and to communicate these specific needs to Respondent. As asserted by Respondent, Claimant worked with many other suppliers, and that Claimant conducted thorough due diligence before purchasing any turf from Respondent:

> *"GST conducted thorough due diligence before purchasing turf from Mighty Grass (ordered more than half a dozen samples of turf in the year before 2015 before they placed their first order). These samples were sent for physical inspection by GST.[396]*
>
> *Before any product left Mighty Grass' factory, GST had a chance to inspect the turf. Either by sending representative to physically look at it, or Mighty Grass would send pictures of the turf and only upon GST's approval can the turf leave the factory (Exhibit R-14)."[397]*

18.89   Mr. Gao's testimony details a rigorous ordering process, as Claimant has a representative in China working with Respondent to communicate their requirements, which Respondent will then provide different samples for Claimant to select. Once Claimant selects the sample, they would give Respondent the order. Claimant orders the turf in large quantities, leaving it to the Respondent to calculate how many rolls will fill a standard shipping container. Thereafter, Respondent generates a corresponding pro-forma invoice.[398] This demonstrates that there was extensive back and forth between parties, such that it was not the case that Claimant was relying on Respondent's

---

[395] Day 2 Tr. 210:11-13 (Kramer) (Gao); Day 2 Tr. 224:21-23 (Kramer) (Gao).
[396] Day 1 Tr. 27:17–29:25 (Kramer).
[397] Day 1 Tr. 34:9-25 (Kramer).
[398] Day 3 Tr. 293:6 – 297:11 (Arbitrator) (Gao).

skill or judgment to select or furnish suitable goods. Instead, the evidence is that Claimant communicated specific requirements and inspected samples before it placed orders with Respondent.

18.90  While Mr. Gao asserts that Claimant trusts Respondent to make the product as per their request,[399] and Respondent provides the specifications of DTEX, pile height, color and gauge in every pro-forma invoice,[400] it is still up to Claimant to determine whether the product and the technical specifications meet their requirements and needs of the market in the United States—this is not something that Claimant relied on Respondent for.

18.91  Claimant appears to have advanced an argument that the turf supplied do not comply with the samples supplied, but this point does not appear to have been seriously pursued, and I have not been given evidence sufficient for me to conclude that the turf supplied by Respondent did not comply with the samples that Respondent provided to Claimant.

18.92  Last, there may be a claim based on Section 10(3) of the EAA, which provides:

> If any technical or quality issues arise in Party B's products, resulting in economic losses for Party A in breach to its clients, Party B shall be liable for all economic losses and shall assume relevant legal responsibilities.

(Claimant's translation of EAA.)

18.93  In a sense, this may be read as an indemnity for any losses suffered as a result of any technical or quality issues that arise from Respondent's products. At the same time, for the reasons I describe above that Claimant has not carried its burden of proving in relation to the claims it advances that these stem from Respondent's products and further that the defect was due to a technical or quality issue, a contractual claim based on Section 10(3) must similarly be dismissed.

18.94  In relation to Claimant's claim that every piece of turf supplied by Respondent is defective,[401] I do not consider that Claimant has met its burden of showing that all of Respondent's turf is invariably and inevitably defective. First, as I explain above, existing claimed defects do not provide a sample population from which defects can be extrapolated to the entirety of all turf supplied by Respondent, since there is insufficient evidence to conclude that the claimed defects are found in turf manufactured by Respondent, nor that the defects were not the product of some other cause extraneous to Respondent. Second, I do not consider that it is possible, even if it is shown that the defects were attributable to Respondent, that there would likely be a 100% defect rate. Third, a 100% defect rate is especially unlikely where the claimed defects, as summarized in the tables above, are of varying types. This is not a case where the claimed

---

[399] Day 3 Tr. 299:11–300:17 (Arbitrator) (Gao).
[400] Claimant's Ex. C-7 to C-51.
[401] Day 2 Tr. 231:9-15 (Figueiredo) (Gao); Day 3 Tr. 327:22–328:22 (Arbitrator) (Gao).

defects are uniform and manifests in one or two types of consistent complaints, which if validated, may give rise to an inference that there is a defect in the design, manufacturing, or shipping process that yields turf that is consistently defective. There is also nothing in the record that would allow me to find that the defect rate would be a specific lower percentage, and I decline to do so.

18.95   For the reasons above, Claimant's contractual, UCC, and CISG claims on the Quality issue are dismissed.

## 19.   ISSUE 4: CAN CLAIMANT'S FRAUD CLAIMS BE MADE OUT (THE "FRAUD" ISSUE)?

21.1   Claimant has advanced an alternative claim for fraud based on intentional misrepresentation and concealment, particularly in relation to the 90-ounce face weight specification.

21.2   The parties agree that the elements of intentional misrepresentation include the requirements that (1) defendant's representation to plaintiff that a fact was true; (2) that defendant's representation was false; (3) that defendant knew the representation was false when it made it, or that it made the representation recklessly and without regard for its truth; (4) that defendant intended plaintiff rely on the representation; (5) that plaintiff reasonably relied on defendant's representation; (6) that plaintiff was harmed; and (7) that plaintiff's reliance on defendant's representation was a substantial factor in causing its harm.[402]

21.3   The parties also agree that concealment requires the following: (1) that defendant disclosed some facts to plaintiff but intentionally failed to disclose other facts, making the disclosure deceptive; (2) that plaintiff did not know of the concealed facts; (3) that defendant intended to deceive plaintiff by concealing the facts; (4) that had the omitted information been disclosed, plaintiff reasonably would have behaved differently; (5) harm to plaintiff; and (6) that defendant's concealment was a substantial factor in causing plaintiff's harm.[403]

### A.   Claimant's fraud claims

21.4   In addition to the elements of intentional misrepresentation and concealment, Claimant argues that the jury instructions are supported by the California Civil Code, outlining the provisions § 1709 and 1710 regarding willful deceit.[404] Furthermore, Claimant argues that the law contemplates liability for fraud when used to induce a party to enter into a contract,[405] and that fraud may also be constructive.[406]

---

[402] SOC at para 34, SOD at page 21, citing CACI § 1900.
[403] SOC at para 37, SOD at page 21, citing CACI § 1901.
[404] SOC at para 38.
[405] California Civil Code § 1572.
[406] California Civil Code § 1573.

21.5    Claimant argues that Respondent intentionally misrepresented to Claimant that would provide high quality, 90-ounce per square yard face weight product in order to induce Claimant to enter into the EAA.[407] Claimant clearly represented that it wanted and understood that it would receive 90-ounce face weight per square yard requirement. Respondent was caught providing turf that was short of such requirements, and it offered a solution to fix the problem. When the density was discovered to have dropped off again, Respondent denied the original communications about the 90-ounce face weight per square yard ever happened.

21.6    Claimant asserts it was expecting product that would not deteriorate early with 90-ounce face weight per square yard, but then Respondent falsely represented the quality of goods by providing Claimant with a product that did not meet that specification. Such misrepresentation includes not only words but also any other conduct that amounts to an assertion not in accordance with the truth.[408]

21.7    In addition, Claimant contends that Respondent concealed the fact that it was providing deficient turf. The law states that "the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact" is "deceit".[409] "wanted" fact that it was using a different system of measurement when it represented it was providing 90-ounce face weight per square yard, and had even previously agreed to fix the problem.[410]

21.8    Claimant asserts that Respondent know it was misrepresenting product specifications, especially after it agreed to fix the problem. Claimant relied on Respondent's representations when they marketed the turf having 90-ounce face weight per square yard.[411] Respondent's misrepresentation and concealment were the cause of Claimant's damages; had Claimant known the turf was deficient, it would not have ordered it in the first place.[412]

21.9    The Sole Arbitrator notes that Claimant does not make further submissions regarding fraud in its Response.

**B.    Respondent's defenses**

21.10   Respondent argues that Claimant's purported tort claims fail because they are duplicative of its claim for breach of contract, as there are no facts sufficient to state a tort claim apart from the parties' contractual relationship.[413] There is no evidence or allegation of a tortious breach by Respondent, as courts will "generally enforce the breach of a contractual promise through contract law,

---

[407] SOC at para 40.
[408] SOC at para 41, citing Rest.2d Torts § 525, comm. b—auto dealer who turns back odometer misrepresents car mileage; *Tenet Healthsystem Desert, Inc. v. Blue Cross of Calif.* (2016) 245 CA4th 821, 839, 199 CR3d 901, 916.
[409] California Civil Code § 1710.
[410] SOC at para 42.
[411] SOC at para 43.
[412] SOC at para 43.
[413] SOD at page 21.

except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies."[414]

21.11   Respondent contends that Claimant's fraud claim is barred by the economic loss rule, whereby a purchaser is required to recover in contract for purely economic loss due to disappointed expectations, unless the purchaser can demonstrate harm above and beyond a broken contractual promise.[415] Respondent did not owe Claimant any obligation outside of the contractual relationship and therefore any tort claims are without basis.[416]

21.12   Claimant's claims for fraud under theories of intentional misrepresentation or concealment fail for the same reason: Respondent did not withhold any material facts from Claimant.[417] Respondent never made a false statement to Claimant regarding the turf because each pro-forma invoice reflected the specifications of the ordered product.[418] Similar to the factual account by Respondent in the Quality and Face Weight Specifications issues, Respondent never represented to Claimant to provide turf with the 90-ounce per square yard specification. Likewise, there is no evidence that Respondent intentionally sold a low-quality product to Claimant.[419]

## C.   Sole Arbitrator's analysis on Claimant's fraud claim

21.13   The "economic loss rule" is a judicially created principle that prevents a party who suffers only economic loss from recovering damages under a tort theory. If the duty imposed by contract is identical to the duty imposed by common law, the contract prevails and the economic loss rule bars the tort claim. Generally, if the contract spells out the defendant's duty or the duty is a fundamental component of the terms in the contract, the economic loss rule will apply, and courts will prohibit a plaintiff from bringing a tort claim based upon the same facts.

21.14   Generally, most states (which we turn to since the parties have agreed that the "Applicable Law" is "the law of the United States of America" and there has been no argument that some other law should apply to subsequent orders and parties have proceeded on the assumption that the UCC applies) have adopted one of the following approaches to the economic loss rule:

(1)   there is no exception to the economic loss doctrine;

(2)   there is a general exception for all fraud in the inducement claims; or

(3)   a narrow exception exists where the fraud is not interwoven with the quality or character of the goods for which the parties contracted or otherwise involved performance of the contract.

---

[414] SOD at page 21-22, citing *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999).
[415] SOD at page 21, citing *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)
[416] SOD at page 21.
[417] SOD at page 22.
[418] SOD at page 22.
[419] SOD at page 22-23.

21.15    Here, and as recounted above, Claimant has based its fraud and misrepresentation claims on the following representations and acts of concealment:

(1)    Respondent intentionally misrepresented to Claimant that it would provide high quality, 90-ounce per square yard face weight product in order to induce Claimant to enter into the EAA;

(2)    Claimant asserts they were expecting product that would not deteriorate early with 90-ounce face weight per square yard, but then Respondent falsely represented the quality of goods by providing Claimant with a product that did not meet that specification;

(3)    Respondent concealed the fact that it was providing deficient turf; and

(4)    Respondent knew it was misrepresenting product specifications, especially after it agreed to fix the problem.

21.16    Each of these tortious claims of fraud and misrepresentation claims above are simply the same contractual specification and quality claims recast as tortious claims. These would be barred by economic loss rule.

21.17    An exception to the economic loss rule among some states in the United States is when the fraud or misrepresentation is an inducement to the contract itself, here the EAA or the individual pro-forma invoices. Claimant alleges that Respondent misrepresented that it would provide high quality, 90-ounce per square yard weigh product in order to induce Claimant into the EAA. Even assuming for the sake of argument that a misrepresentation that induces a contract is an exception to the economic loss rule, I do not consider that Claimant has established that the there was such a representation made by Respondent. If there were such a representation, it would be curious that the EAA itself does not contain a single term dealing with the "high quality" nature of the turf, nor anything to do with face weight. In fact, neither of these were addressed in any of the subsequently issued pro-forma invoices either.

21.18    For these reasons, Claimant's tortious claims based on fraud and misrepresentation must be dismissed.

## 20.    ISSUE 5: IF CLAIMANT IS SUCCESSFUL ON ITS FACE WEIGHT SPECIFICATION AND QUALITY ISSUES, OR FRAUD OR MISREPRESENTATION CLAIMS, WHAT DAMAGES IS CLAIMANT ENTITLED TO?

20.1    As I have denied Claimant's claims based on the Face Weight Specification issue, Quality issue, fraud and misrepresentation, there is no need to examine Claimant's damages theory, though I set out Claimant's damages case here and Respondent's arguments here for completeness.

A. **Claimant's damages theory**

20.2 Initially in its SOC, Claimant's damages case includes, but are not limited to, legal claims, compensation, and costs associated with re-installation, refunds and replacements for its end-customers.[420] The minimal estimate of Claimant's damages specifically includes, but are not limited to, the entire contracted purchase price amount of $5,536,607.52 for the deficient hollow-blade turf it ordered between 2015 to 2018.[421] Claimant argues that Respondent agreed to be "liable for all economic losses and shall assume relevant legal responsibilities."[422]

20.3 Pursuant to UCC § 2-714, Claimant argues that it is entitled to recovery of the entire contracted price of $5,536,607.52 as well as all consequential and incidental damages that can be reasonably expected.[423] Claimant further cites California Civil Code § 3300 and the Second Restatement of Contracts § 347 to substantiate that they have a right to "expectation interest as measured by (a) the loss in value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform".[424]

20.4 Additionally, Claimant argues that its claim of fraud will support a punitive damages award. Claimant is entitled to punitive damages as it applies to the fraud and concealment claims (addressed at Section **Error! Reference source not found.** above), pursuant to the California Civil Code provisions §§ 1709-1710; §§ 1572-1573; and §§ 3294 which was cited in *Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 335.[425] These damages are warranted in part to punish Respondent for its improper actions and to compensate Claimant for the ongoing uncertainty in costs related to the expenses and warranty issues.[426]

20.5 Claimant supports that it is entitled to interest, costs, and attorneys' fees by citing Section 31 and 34 of the Procedures for Large, Complex Commercial Disputes/International Dispute Resolution Procedures, where the Tribunal may award pre-award and post-award interest, and authority to allocate fees and expenses.[427]

20.6 Furthermore, California Civil Code provisions § 1032 allows for the prevailing party to recover costs in any proceeding and § 3287 provides that a person may recover prejudgment interest where the damages owing to him are certain. Damages are deemed certain where there is no dispute between the parties concerning the basis of computation of damages if any are recoverable, but

---

[420] SOC at para 66.
[421] Id.
[422] SOC at para 76; C-3 Section 10(3).
[423] SOC at para 68.
[424] SOC at para 68.
[425] SOC at para 71.
[426] SOC at para 72-73.
[427] SOC at para 74.

where their dispute centers on the issue of liability giving rise to the damage.[428] CACI § 3935 allows for prejudgment interest on each item of loss, as it relates to Claimant's economic losses resulting from the fraud cause of action.

20.7     In its Response, Claimant further elaborates that it is entitled to damages for the quantifiable, direct, and consequential economic damages as a result of Respondent's breaches of the EAA.[429] Claimant contracted for quality turf at agreed upon specifications, but received non-conforming, defective, and poor quality products.[430] Furthermore, there are ongoing reputational interests that have been severely impacted, loss of goodwill, diversion from business activities to deal with disputes, and general disruption to Claimant's business operations.[431]

20.8     During the Hearing, Claimant's damages theory shifted and instead now includes direct damages and other consequential damages such as expected remediation costs, lost profits from non-Tough Turtle Turf customers, lost profits from Tough Turtle Turf and NPV of lost profits from Tough Turtle Turf which amounts to $13,840,852.[432]

20.9     Claimant's expert witness, Mr. Malkiewicz summarized Claimant's damages claims in the following table:[433]

| Economic Damages Category | Line Item | Amount |
|---|---|---|
| Direct Damages | Direct Damages (07/2015-09/2018) | $2,060,365 |
| Consequential Damages | Expected Remediation Costs | $10,624,723 |
| | Lost Profits from Non-TTT Customers (10/2018-6/2020) | $472,690 |
| | Lost Profits from TTT (10/2018-6/2020) | $521,533 |
| | NPV of Lost Profits from TTT (7/2020 – 6/2023) | $161,541 |
| Total Damages | | $13,840,852 |

20.10     Mr. Malkiewicz elaborated that the starting point was to determine whether there is evidence of economic causation in relation to direct and inconsequential damages.[434] In terms of direct damages, Mr. Malkiewicz considered the evidence of pre-payments, partial payments, warranty claims and cancelled orders made by Claimant.[435] He found that the direct damages were roughly $2 million,[436] calculated as the difference between what Claimant ordered and had

---

[428] SOC at para 75, citing *National Farm Workers Service Center Inc. v. M. Caratan, Inc.* (1983) 146 Cal. App. 3d 796, 809.
[429] Response at page 10.
[430] Id.
[431] Id.
[432] Malkiewicz Demonstratives, slides 7 and 17.
[433] Malkiewicz Report, at para 13; Malkiewicz Demonstratives, slide 17.
[434] Day 5 Tr. 504:12-22 (Malkiewicz).
[435] Day 5 Tr. 505:6-22 (Malkiewicz).
[436] Malkiewicz Report, at para 50.

clients to make profits on, which was $3.7 million,[437] versus the profits that Claimant was actually able to achieve at $1.7 million.[438]

20.11  Mr. Malkiewicz accounted for the unpaid invoices which Claimant paid Respondent for but did not submit the remaining 70% payment on a particular invoice. This added a negative $130,000 as an offset to the direct damages calculation.[439]

20.12  Mr. Malkiewicz found consequential damages based on the lost profits and sales to Claimant's customers in the intervening period after September 2018 and when Claimant was able to launch its own version of hollow blade turf in June 2020.[440] Assuming 100 percent of the turf was defective,[441] remediation losses accounted for over $10 million out of the total $13 million he quantified.

20.13  Mr. Malkiewicz based the remediation percentages on his interview with Mr. Gao detailing Claimant's experience with handling warranty claims.[442] The company expects that of the customers who will require remediation, 90 percent will request replacement of turf and 10 percent will request a refund. Of the customers who require a refund, 25 percent will require replacement of purchased turf only and 75 percent will require replacement of purchased turf, additional materials, and installation.[443]

20.14  The Claimant's relationship with Tough Turtle is isolated as a separate line item in the consequential damages. Tough Turtle was effectively an exclusive customer for the Cool Blue Hollow product. Their special relationship with Claimant is accounted in a five-year lost profits period.[444] Hence, there are two types of lost profits; one from before Claimant is able to launch its own hollow blade turf and another projection for an additional three years, with a net present value of $161,000.[445]

20.15  Mr. Malkiewicz testified that he did not independently review any financial records of Claimant, and only reviewed documents only within the exhibits submitted in this arbitration. The exhibits were provided for by Mr. Gao, and not corroborated with anyone else from Claimant.[446] Mr. Malkiewicz concurred with Mr. Gao's estimate of the profit margin at generally 30% for wholesalers.[447]

---

[437] Malkiewicz Report, at para 55.
[438] Malkiewicz Report, at para 50; Day 5 Tr. 506:15-23 (Malkiewicz); Day 5 Tr. 509:4–510:3 (Malkiewicz).
[439] Day 5 Tr. 508:10-21 (Malkiewicz).
[440] Day 5 Tr. 505:23–506:11 (Malkiewicz).
[441] Malkiewicz Report, at para 43.
[442] Malkiewicz Report, at para 57; Day 5 Tr. 546:8-548:2 (Kramer) (Malkiewicz).
[443] Id.
[444] Day 5 Tr. 513:6-23 (Malkiewicz).
[445] Day 5 Tr. 514:12-19 (Malkiewicz).
[446] Malkiewicz Report, at para 10; Day 5 Tr. 518:14–519:22 (Kramer) (Malkiewicz).
[447] Day 5 Tr. 522:19–523:12 (Kramer) (Malkiewicz).

## B.    Respondent's contentions

20.16    First, Respondent argues that Claimant erroneously seeks rescission damages despite not claiming that the parties' contracts should be rescinded. Respondent cites that "an action for rescission and an action for breach of contract are alternative remedies. The election of one bars the recovery under the other.[448] By asserting a claim for breach of contract, Claimant has implicitly affirmed the existence of the parties' contracts, thus precluding it from seeking rescission damages.[449]

20.17    Second, Respondent refutes that Claimant is entitled to damages equal to the amount it paid Respondent for all the purchase orders, calculated at $5,536,607.52. Respondent made several refunds or credits to Claimant based on Respondent's good faith desire to maintain a good client relationship with Claimant.[450] The figure fails to account for several purchase orders that Claimant placed, paid deposits for and put on hold.[451] Claimant also includes the 39L-U invoice in the damage calculations, despite receiving the products and not paying the balance.[452] Therefore, Claimant failed to account for these refunds and profits from its reselling of turf to Tough Turtle in its damage calculations.[453]

20.18    Third, Respondent asserts there is no colorable basis for punitive damages. Respondent provided turf to Claimant for more than three years pursuant to an on-going series of purchase orders from Claimant, and never took any action to defraud or conceal important information about the turf.[454] Punitive damages are reserved for highly culpable behavior, which is not demonstrated in this instance.[455] Further, the Sole Arbitrator should not permit tort recovery in a contract case.[456]

20.19    In the Rejoinder, Respondent preliminarily addresses Claimant's overhaul of its damages theory, asserting that speculative damages should not be awarded.[457] Respondent cites the California Civil Code § 3301, 3358-3359, and *Allen v. Gardner* 126 Cal. App. 2d 335, 340 (1954), where it was held that the uncertainty as to the fact of damage, as to the nature, existence, or cause of the damage is fatal.[458] Respondent argues that Claimant's new damages theory is grossly excessive, and should be rejected.[459]

20.20    As to Claimant's new damages theory that was articulated during the Hearing, Respondent's counsel in its Closing said that the usual analysis for projections

---

[448] SOD at page 27, citing *Akin v. Certain Underwriters at Lloyd's London*, 140 Cal. App. 4th 291, 296 (2006).
[449] SOD at page 28, citing *Sharabianlou v. Karp*, 181 Cal. App. 4th 1133, 1144-45 (2010).
[450] SOD at page 28.
[451] Respondent's Ex. R-27 at page 5. These were purchase orders placed on 14 June 2018 for "THD Landscape".
[452] Respondent's
[453] SOD at page 28.
[454] SOD at page 28.
[455] SOD at page 29, citing *Lee v. Health Force, Inc.*, 268 A.D.2d 564, 564 (2d Dept. 2000).
[456] SOD at page 29, citing *Erlich v. Menezes*, 21 Cal. 4th 543, 553 (1999).
[457] Rejoinder at page 43.
[458] Id.
[459] Id.

of loss, "the fact of the harm must be certain" and "the proof of damages must be reasonably well proven … [with] a sound basis for it."[460] Further, "there needs to be efforts at mitigation and no double recovery, and of course no windfall".[461] Respondent's counsel contends that Claimant is seeking a windfall for expenses that they have not incurred, and will not incur in the future.

20.21   With regards to the loss of profits for future sales to Tough Turtle, Respondent's counsel argued that these numbers merely reflect "hypothetical sales" in the future, and there is no certainty as to what Tough Turtle would have done, or if Tough Turtle would still be in business.[462]

20.22   Respondent's position is that the Malkiewicz Report was all based on projections, and there is no evidence of harm. The damages theory Claimant has put forward is about "projected losses, theoretical losses, and they're seeking a windfall … money for harm that they did not suffer."[463]

## C.   Sole Arbitrator's analysis

20.23   As I explain above, as Claimant does not succeed on its contract or tort claims, parties' arguments on damages are restated here for completeness only and nothing in the damages case put forward by Claimant nor anything in the Mr. Malkiewicz Report changes my decision on the substantive merits of Claimant's claims.

## 21.   ISSUE 6: RESPONDENT'S COUNTERCLAIMS

21.1   As explained at paragraph 14.23 above, Respondent brought counterclaims against Claimant for breach of contract, including failure to pay amounts owed to Respondent, and intentional representation including the Respondent's reimbursement to Claimant based upon fraudulent claims of defect. The total amount claimed include damages of at least $633,103.47, plus interest and attorney's fees.[464]

## A.   Respondent's counterclaims for breach of contract and intentional misrepresentation

21.2   With regards to Respondent's counterclaims for breach of contract, it is in relation to two order cancellations, two instances of unpaid balances, and losses from unshipped inventory. The breakdown of expenses is detailed as follows:[465]

(1)   On or about 26 September 2017, the parties entered into a supply contract.[466] At Claimant's request, Respondent purchased inventory in order to meet Claimant's requirements pursuant to the contract. These

---

[460] Day 7 Tr. 723:17-25 (Kramer).
[461] Day 7 Tr. 724:3-11 (Kramer).
[462] Day 7 Tr. 727:16-21 (Kramer).
[463] Day 7 Tr. 729:5-14 (Kramer).
[464] SOD at page 29.
[465] SOD at page 28-30, Cheng 1 at para 50-54.
[466] Respondent's Ex. R-27 at page 4; Claimant's Ex. C-35.

losses are not readily mitigated because they are product costs tailored to the North American market and could thus not be reused for other orders.[467] Claimant cancelled its orders without good reason, causing Respondent to incur $260,088.43 in losses:[468]

1. $100,577.98 was lost in unused pallets and tray paper tubes.

2. $159,510.45 was lost in other unused raw materials and accessories, such as blue cloth tape, stretch film, black glue and glue curing agent.[469]

(2) Due to an order cancellation, Respondent lost the value of its unused blue glue inventory and curing agent,[470] totaling 14,078 kilograms with a value of $31,267.25.[471] Mr. Cheng testified on cross-examination that the glue was specifically ordered for Claimant.[472] In response to the question whether the glue could be used for other products and customers, Mr. Cheng answered that "the glue can be used if it's requested by the customer, but if not we cannot use the glue for other customers."[473] Furthermore, the factory informed Mr. Cheng that the glue was stored for too long and went beyond the warranty period,[474] but he did not know how long Respondent held the unused glue.[475]

(3) On or about 9 August 2018, the parties entered into a supply contract for $186,840.[476] Claimant made a pre-payment of $56,052 and Respondent delivered the goods that they ordered. However, Claimant failed to pay the remaining balance of $130,788. Claimant has retained the benefit of the parties' agreement without fulfilling its obligations.[477]

(4) On or about 22 August 2018, the parties entered into a supply contract with a total amount of $186,840.[478] Respondent requested Claimant to send shipping instructions, but Claimant willfully refused to do so and failed to pay the remaining balance of $130,788. Respondent argues it was owed the amount due by terms of the obligation, with interest thereon.[479]

(5) Between October 2016 and July 2018, Respondent accumulated "unshipped supply inventory" related to orders placed by Claimant, totaling to approximately $20,850.36. There was a total of 1,901.02

---

[467] Rejoinder at page 45.
[468] Cheng 1 at para 50.
[469] Day 7 Tr. 800:7-13 (Kramer), Respondent's Ex. R-21-a and R-23-a.
[470] Day 7 Tr. 800:23–801:3 (Kramer), referring to Respondent's Ex. R-24-a and R-26-a at page 6.
[471] Cheng 1 at para 51.
[472] Day 3 Tr. 381:23–382:5 (Figueiredo) (Cheng).
[473] Day 3. Tr. 382:6-15 (Figueiredo) (Cheng).
[474] Day 3 Tr. 383:15–384:4 (Figueiredo) (Cheng).
[475] Day 3. Tr. 382:19-21 (Figueiredo) (Cheng).
[476] Respondent's Ex. R-27 at page 5; Claimant's Ex. C-49, also referred to as the 39LU invoice during hearings.
[477] Rejoinder at page 44, citing New York Pattern Jury Instructions – Civil, § 4.1.
[478] Respondent's Ex. R-27 at page 5; Claimant's Ex. C-51, also referred to as the 40LU invoice during hearings.
[479] Rejoinder at page 45, citing California Civil Code § 3302.

square meters of unshipped turf leftover from six invoices shown in Exhibits C-15 to C-19, and C-47.[480]

21.3  Respondent counterclaims against Claimant for intentional misrepresentation of the defective turf.[481] Respondent did not believe that any defects alleged by Claimant existed, but provided certain discounts to Respondent to maintain the business relationship.[482] However, Respondent has now discovered that Claimant's demands for discounts were fraudulent because the defects were fabricated.[483] Claimant knew that the discount claims were false and intended for Respondent to rely on the misrepresentation to its detriment.[484] Therefore, Respondent is entitled to recover all the amounts it paid to Claimant totaling $59,321.44, from the invoices in Exhibits C-29 to C-31.[485] Using the summarized table that Respondent submitted on 8 December 2020, there are 18 counterclaims for Claimant's fraudulent warranty claims with a different claimed amount of $54,121.44.[486]

## B.  Claimant's defenses to counterclaims

21.4  Claimant contests the factual allegations in relation to each of the Respondent's counterclaims as follows:

(1)  With regards to the 26 September 2017 order outlined in paragraph 22.2(1) above, Claimant submits that there was extensive back and forth regarding this invoice,[487] with discussions of partial refunds for warranty claims due to the defect that turf blades were falling out from the backing.[488]

(2)  Addressing the glue inventory loss claimed by Respondent in paragraph 22.2(2) above, Claimant argues that Respondent presented no evidence as to when or how the loss was sustained, or to which "cancelled order" the claim relates to.[489]

(3)  With respect to Respondent's claims in paragraphs 22.2(3) and (4) above, Claimant acknowledges that it made two orders from Respondent on 9 and 22 August 2018, both for $186,840 of turf products. Claimant paid a deposit of $56,052 for each order. The product was delivered for the 9 August order, but Claimant cancelled the 22 August order before it was delivered due to continued quality complaints. Claimant processed the product for return to Respondent, but it failed, and Respondent refused to take it. [490]

---

[480] Cheng 1 at para 54(g), Respondent's Ex. R-27 at pages 2 and 5.
[481] SOD at page 31, Rejoinder at page 45.
[482] SOD at page 31, Cheng 1 at para 55.
[483] Cheng 1 at para 55.
[484] SOD at page 31.
[485] Cheng 1 at para 55.
[486] Respondent's Evidence of damages re Mighty Grass counterclaims, at page 3-5.
[487] SODC at para 4, C-35; Respondent's Ex. R-16, R-19.
[488] Id.
[489] SODC at para 5.
[490] SODC at para 6.

(4)     As for Respondent's alleged "accumulated unshipped supply" in paragraph 22.2(5) above, Claimant made full payment as detailed by the pro-forma invoices from Exhibits C-15 to C-19, C-47, and the wire transfers in Exhibit C-80.[491] Mr. Cheng asserted that Respondent was not informed of any reason why Claimant refused to pay or send shipping instructions for this invoice but did not think it was because of the quality problem.[492] Mr. Cheng further stated that Respondent did not sell the turf product to its customers in Australia or Spain,[493] and the turf is still stored in Respondent's warehouse.[494] The Sole Arbitrator raised the question as to whether the claim for the balance price is warranted in a situation when Respondent is not delivering, and Claimant is not taking delivery of the product.[495] Respondent submits that they should be entitled to the full contract amount because there is no salvage value to the turf because there is no market for it.[496] Respondent agrees there is a duty to mitigate, but because the backing used for the North American market is more expensive, there is no ready market for the turf anywhere else.[497] Respondent has been ready and willing to ship the turf to Claimant for a while, and does not seek double recovery.[498] When asked by the Sole Arbitrator about whether Respondent has any evidence on the record of expense on mitigation of ancillary materials, Respondent argues that the testimony has been clear that there is no other use or market for the unused products.[499]

(5)     With respect to Respondent's counterclaims for the "demands for discounts" in paragraph 22.3 above, Claimant argues that the products were actually defective.[500] In any case, Respondent admits that the discounts were provided without it believing in any falsity and for the purposes of maintaining the business relationship.[501]

21.5     Claimant makes several arguments to refute Respondent's counterclaims.

21.6     First, Claimant argues that Respondent does not attempt to explain why or how such unused inventory and unshipped supply materials were lost. No reference was made to supporting documents to demonstrate how Claimant is responsible.[502] As a procedural matter, Respondent may be relying on a large portion of evidence that is in Chinese, and that is inappropriate because it needed to be translated into English.[503] There is no evidence that Respondent

---

[491] SODC at para 7.
[492] Day 3 Tr. 387:7-13 (Figueiredo) (Cheng).
[493] Day 3 Tr. 388:21–389:11 (Figueiredo) (Cheng).
[494] Day 3 389:8-18 (Figueiredo) (Cheng).
[495] Day 7 Tr. 804:19–811:15 (Arbitrator) (Kramer).
[496] Day 7 Tr. 807:9-12 (Kramer).
[497] Day 7 Tr. 809:8-17 (Kramer).
[498] Day 7 Tr. 809:23–810:12 (Arbitrator) (Kramer).
[499] Day 7 Tr. 810:15–711 :14 (Arbitrator) (Kramer).
[500] SODC at para 8.
[501] Id.
[502] SODC at para 12.
[503] SODC at para 10, citing Procedural Order No. 2 at para 28.

suffered any damages for "unused materials" or "unshipped supply materials".[504] Furthermore, Respondent does not state the legal basis on which Claimant would be liable, noting that there is no language in the EAA or any invoices that Claimant cannot cancel an order before or after a product is delivered.[505]

21.7    Second, Claimant submits that Respondent has not successfully proven its case for intentional misrepresentation of the "fraudulent and fabricated requests for discounts". Respondent did not reasonably rely upon Claimant's alleged misrepresentations as to complaints regarding defects in its own products because it admitted that it did not believe that any such defects existed.[506] If Respondent knew that the request for refund was untrue and honored the request for sake of the business relationship, there was no fraud.[507]

21.8    Third, Respondent does not explain in its calculations how the discounts were calculated or supporting evidence as to why the discounts were given in the first place. The failure to present the arguments and evidence in support of Respondent's argument overly prejudices Claimant's ability to mount a Defense.[508] Respondent also does not cite any legal bases for recovery of interest and attorney's fees and should thus be foreclosed from making such arguments at the arbitration.[509]

21.9    Fourth, Claimant contends that Respondent's claims for lost or unsold supplies are negated due to its failure to mitigate. Respondent failed to explain why it could not seek to otherwise resell or reuse any unused product. Respondent must take reasonable steps to mitigate damages from a breach.[510] Any losses suffered by Respondent could have been avoided by using the supplies towards future orders with Claimant or other customers or seek to resell the product. Respondent did not provide any evidence of its attempts to reuse or resell supplies.[511]

21.10   Finally, Claimant contends that Respondent waived any tort or contract claims it had against Claimant for its own invoices that Claimant paid in full.[512] Claimant substantiates its defense by citing the following principles: (1) a waiver is the intentional relinquishment of a known right after knowledge of the facts;[513] (2) Courts will find for waiver when the party intentionally relinquishes the right or when the party's acts are "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished;[514] and (3) when the injured party with knowledge of the

---

[504] SODC at para 13.
[505] Id.
[506] SODC at para 14, citing Cheng 1 at para 55.
[507] Id.
[508] SODC at para 15.
[509] SODC at para 16.
[510] SODC at para 17, citing *Shaffer v. Debbas* (1993) 17 Cal. App. 4th 33, 41.
[511] SODC at para 17.
[512] SODC at para 18.
[513] SODC at para 18, citing *Roesch v. De Mota* (1944) 24 Cal.2d 563, 572.
[514] SODC at para 18, citing *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal. App. 5th 56, 78.

breach continues to accept performance from the guilty party, such conduct may constitute a waiver of breach.[515] On this basis, Respondent's issuance of a revised invoice, it would have known the facts regarding any potential financial loss. Thus, Respondent knowingly waived its rights to future payment.[516]

## C. Sole Arbitrator's analysis on counterclaims by Respondent

21.11   Respondent has brought two broad categories of counterclaims against Claimant: (1) contract breach for cancelling orders and failure to pay for certain orders, and (2) fraud or intentional misrepresentation in relation to claims for defects and seeking of refunds.

21.12   With regards to the first set of counterclaims for contractual breaches:

(1)   On or about 26 September 2017, parties entered into a supply contract.[517] At Claimant's request, Respondent purchased inventory in order to meet Claimant's requirements pursuant to the contract. These losses are not readily mitigated because they are product costs tailored to the North American market and could thus not be reused for other orders.[518] Claimant cancelled its orders without good reason, causing Respondent to incur $260,088.43 in losses:[519]

(a)   $100,577.98 was lost in unused pallets and tray paper tubes.

(b)   $159,510.45 was lost in other unused raw materials and accessories, such as blue cloth tape, stretch film, black glue and glue curing agent.

**Sole Arbitrator's ruling**: On the balance of the evidence, I do not consider that Respondent has demonstrated that the unused materials were somehow unique and incapable of being used as part of the manufacturing process for other products or turf for other customers. Materials such as pallets are commonly used for shipping and are not materials that are unique to the North American market. As for the other raw materials and accessories stated in 1(b), these similarly appear to be materials and accessories that are used in the manufacture of turf and there does not appear to be any satisfactory explanation as to why these cannot be used in the manufacture of other turf products. As Respondent has not demonstrated the extent to which loss could have been mitigated, had it taken reasonable steps to mitigate, Respondent's counterclaim for the cost of these items is dismissed for failure to mitigate damages, as Respondent has not proven that Claimant's breach caused the loss and not Respondent's own failure to mitigate.

---

[515] SODC at para 18, citing *Kern Sunset Oil Co. v. Good Roads Oil Co.* (1931) 214 Cal. 435, 440-441.
[516] SODC at para 19.
[517] Respondent's Ex. R-27 at page 4; Claimant's Ex. C-35.
[518] Rejoinder at page 45.
[519] Cheng 1 at para 50.

    (2)    Due to an order cancellation, Respondent lost the value of its unused blue glue inventory and curing agent, totaling 14,078 kilograms with a value of $31,267.25.[520]

**Sole Arbitrator's ruling**: Similarly, there has been no satisfactory explanation for why glue and curing agent used as part of manufacturing turf cannot be used in the manufacture of other turf. While I accept that the glue and curing agent may have been ordered specifically for Claimant's orders, I do not accept that blue glue and curing agent were not capable of being used in the manufacture of any other turf, especially if coupled with a reduction in price to attract customers who were indifferent to the color of the glue being used. As Respondent has not demonstrated the extent to which loss could have been mitigated, had it taken reasonable steps to mitigate, Respondent's counterclaim for the cost of blue glue and curing agent is also dismissed for failure to mitigate damages, as Respondent has not proven that Claimant's breach caused the loss and not Respondent's own failure to mitigate.

    (3)    On or about 9 August 2018, parties entered into a supply contract for $186,840.[521] Claimant made a pre-payment of $56,052 and Respondent delivered the goods that it ordered. However, Claimant failed to pay the remaining balance of $130,788.

**Sole Arbitrator's ruling**: As Respondent has performed its obligation to deliver the contractually agreed goods under the contract, Claimant is liable to pay for the remainder of the agreed price. I would therefore award the remaining balance of $130,788 to Respondent.

    (4)    On or about 22 August 2018, parties entered into a supply contract with a total amount of $186,840.[522] Respondent requested Claimant to send shipping instructions, but Claimant willfully refused to do so and failed to pay the remaining balance of $130,788. Respondent argues they were owed the amount due by terms of the obligation, with interest thereon.[523]

**Sole Arbitrator's ruling**: This counterclaim differs from the one above in that the goods under the agreement have not been delivered, and therefore a claim for the agreed price is not appropriate. As the amount that had been paid was presumably a "deposit" that was accepted by Respondent as security for performance, the "deposit" amount could be retained by Respondent for Claimant's failure to go through with the contract, but Respondent may not seek further sums in excess of the deposit it agreed to accept. Respondent's counterclaim for the remaining price is therefore dismissed.

    (5)    Between October 2016 and July 2018, Respondent accumulated unshipped supply inventory related to orders placed by Claimant,

---

[520] Cheng 1 at para 51.
[521] Respondent's Ex. R-27 at page 5; Claimant's Ex. C-49, also referred to as the 39LU invoice during hearings.
[522] Respondent's Ex. R-27 at page 5; Claimant's Ex. C-51, also referred to as the 40LU invoice during hearings.
[523] Rejoinder at page 45, citing California Civil Code § 3302.

totaling to approximately $20,850.36. There was a total of 1,901.02 square meters of unshipped turf leftover from six invoices shown in Exhibits C-15 to C-19, and C-47.[524]

**Sole Arbitrator's ruling:** At the Hearing, Respondent's counsel elaborated that there was extra turf from these pro-forma invoices was "unsaleable" or "cancelled orders". This was because Claimant did not request shipment of the full amount that it had ordered. Respondent "went to the effort of getting it manufactured and [Claimant] just simply hasn't ordered it for shipment."[525]

Respondent does not explain how the amount of leftover turf is calculated. Respondent does not provide further evidence of differing shipping instructions or order cancellations sent by Claimant.

In contrast, Claimant submitted evidence of wire transfer payments made to Respondent to demonstrate that these counterclaims were paid in full.[526] Therefore, there is insufficient evidence to demonstrate that Claimant had failed to accept or pay for the amount of turf that it had ordered, and Respondent's counterclaim based on this allegation is dismissed.

22.13  With regards the second set of counterclaims based on intentional misrepresentation and fraud, key to any misrepresentation and fraud claim is reliance by Respondent on Claimant's representation. The parties do not dispute that reliance is a crucial element that must be satisfied.[527] As Respondent itself has admitted that it did not believe that any defects alleged by Claimant existed but provided certain discounts to Respondent to maintain the business relationship,[528] it is clear that there was no reliance by Respondent on Claimant's representations and Respondent's counterclaims for misrepresentation and fraud must be dismissed. I also agree that when Respondent stated that the discounts were offered to maintain the business relationship, that Respondent got exactly what it intended out of the discounts that it offered Claimant, and there is no basis for seeking repayment of discounts offered on these circumstances. Respondent's counterclaim for misrepresentation and fraud is dismissed.

## 22.  ADVERSE INFERENCES

Respondent sought an adverse inference to be drawn against Claimant for intentionally destroying $232,000 worth of turf it had in storage during the pendency of the arbitration,[529] without consulting Respondent or the Sole Arbitrator.[530] As I have found in Respondent's favor on Claimant's claims, I consider Claimant's request for adverse inferences moot.

---

[524] Cheng 1 at para 54, Respondent's Ex. R-27 at pages 2 and 5.
[525] Day 7 Tr. 801:8-22 (Kramer).
[526] Claimant's Ex. C-80 to C-81vv.
[527] SOC at para 34, SOD at page 21, citing CACI § 1900.
[528] SOD at page 31, Cheng 1 at para 55.
[529] Supplemental Interrogatories at page 9.
[530] Rejoinder at page 6, Day 7 Tr. 789:2–13 (Kramer).

## 23.    COSTS

24.1    Claimant seeks a total of **$377,575.18** for costs incurred in this arbitration, comprising legal costs and procedural costs, the breakdown of which is as follows:

    (1)    $58,602.50 for fees paid to the AAA/ICDR.

    (2)    $37,688.50 for costs of the expert witness, Mr. Michael Malkiewicz.

    (3)    $281,284.18 for legal fees, expenses, and incidentals incurred.

24.2    Respondent seeks a total of **$624,093.42** for costs incurred in this arbitration, comprising legal costs and procedural costs, the breakdown of which is as follows:

    (1)    $52,075.00 for fees paid to the AAA/ICDR.

    (2)    RMB 95,760 or $14,835.24 (at an exchange rate of 1 RMB = 0.15 USD) for legal fees incurred by Chinese attorneys and translation fees.

    (3)    $549,486.00 for legal fees incurred.

    (4)    $7,697.18 for legal expenses and incidentals incurred.

24.3    The general rule in awarding costs of the arbitration is that costs are to be awarded to the prevailing party. The parties themselves gave expression to this rule when they agreed in Section 11 of the EAA that: "The results of the arbitration shall be final and binding upon both parties, and the costs of the arbitration proceeding shall be borne by the unsuccessful party, unless otherwise stipulated by the arbitrators' judgment."[531]

24.4    The Sole Arbitrator has examined the Parties' respective costs submissions. I find that the costs are reasonable. Based on the Sole Arbitrator's rulings above, Respondent is the prevailing party vis-à-vis Claimant's claims, and Claimant is largely the prevailing party vis-à-vis Respondent's counterclaims. At the same time, Claimant's claims make up most of the submissions and evidence in this arbitration and significantly more time than Respondent's counterclaims. I would order that Claimant as the overall unsuccessful party, taking into account the manner in which the various issues have been decided and weight of these issues on costs, bear 50% of Respondent's claimed costs of the arbitration and legal fees, i.e., **US$312,046.71**. Claimant's claim for costs is dismissed.

24.5    The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$32,515.00 and the compensation and expenses of the arbitrator totaling US$87,100.00 shall be borne in the manner indicated in the previous paragraph—i.e. Claimant shall reimburse and pay 50% of

---

[531] Section 11, EAA.

Respondent's costs. Therefore, in addition to the AAA/ICDR fees of $52,075.00 claimed and awarded in the prior paragraph, Claimant shall reimburse Respondent the additional sum of **US$28,378.75**, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant, upon demonstration by Respondent that these incurred costs have been paid.

24. **AWARD**

25.1 For the reasons explained above, the Sole Arbitrator makes the following Award:

25.2 The Sole Arbitrator has jurisdiction over the parties' dispute and all of Claimant's claims and Respondent's counterclaims.

25.3 Claimant's claim based on Respondent's failure to supply turf that complies with a specific face weight requirement (i.e., the Face Weight Specifications issue) is dismissed.

25.4 Claimant's contractual, UCC, and CISG claims based on the Quality issue are dismissed.

25.5 Claimant's tortious claims based on fraud and misrepresentation are dismissed.

25.6 Respondent's counterclaims are dismissed, save for the counterclaim for the remaining balance owed by Claimant under a supply contract entered into on or about 9 August 2018. Claimant is ordered to pay **$130,788** to Respondent.

25.7 Claimant is to pay Respondent its costs of the arbitration and legal fees in the amount of **US$312,046.71**.

25.8 Claimant shall reimburse Respondent the sum of **US$28,378.75**, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant, upon demonstration by Respondent that these incurred costs have been paid.

25.9 Interest is to accrue at the New York statutory rate of 9% per annum on all monetary sums awarded above (except for the reimbursement of US$28,378.75 above, in respect of which interest will run 30 days from the date of payment by Respondent), from 30 days from the date of this Award until payment is made in full.

25.10 This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

I, the undersigned Arbitrator, do hereby affirm upon my oath as Arbitrator that I am the individual who made up the Arbitral Tribunal in this arbitration, and who has executed this instrument, which is my Final Award.

Dated: May 17, 2021

 

 

_____

Dan Tan

**EXHIBIT D**

INTERNATIONAL CENTER FOR DISPUTE RESOLUTION
International Arbitration Tribunal

**GLOBAL SYN-TURF, INC.**

CLAIMANT

-AND-

**HEBEI MIGHTY SYNTHETIC RUBBER AND PLASTIC CO, LTD.**

RESPONDENT

**ICDR Arbitration No. 01-19-0000-5581**

_____

**DISPOSITION OF REQUEST FOR CLARIFICATION
AND MODIFICATION OF FINAL AWARD**

_____

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties dated April 15, 2015, and having been duly sworn and having duly heard the proofs and allegations of the parties, and having previously rendered a Final Award dated May 17, 2021, and Global Syn-Turf having made a Request for Clarification and Modification of Final Award pursuant to Article 33 of the International Dispute Resolution Procedures, and, on behalf of Mighty Grass by email dated June 18, 2021 and letter of June 28, 2021, having raised objections thereto, and having read and fully considered the contentions of the parties, do hereby determine, as follows:

Save for one clarification, the Request for Clarification and Modification of Final Award is hereby denied.

I would clarify that nothing in Final Award should be taken as barring ongoing and future warranty claims by Claimant where such claims have not actually been presented in these proceedings (as opposed to mere future projections of such claims being presented). While the Final Award has dismissed a claim based on future warranty claims based on projections, the Award does not purport to adjudicate on any ongoing and future warranty claims themselves since these actual claims were not presented in these proceedings.

The remaining requests seek to reargue the merits and are dismissed.

In all other respects, said Award dated May 17, 2021 is hereby reaffirmed. No order as to costs is made.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Disposition of Request for Interpretation or Correction of Award was made in New York, New York, USA.

July 27, 2021

_____

Date

_____

Dan Tan

<div style="border: 1px solid red; text-align: center;">

# EXHIBIT E

</div>

INTERNATIONAL CENTER FOR DISPUTE RESOLUTION
International Arbitration Tribunal

**GLOBAL SYN-TURF, INC.**

CLAIMANT

-AND-

**HEBEI MIGHTY SYNTHETIC RUBBER AND PLASTIC CO, LTD.**

RESPONDENT

**ICDR Arbitration No. 01-19-0000-5581**

---

**DISPOSITION OF REQUEST FOR CLARIFICATION
OF DISPOSTION OF REQUEST FOR MODIFICATION**

---

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties dated April 15, 2015, and having been duly sworn and having duly heard the proofs and allegations of the parties, and having previously rendered a Final Award dated May 17, 2021, and previously rendered a Disposition on Global Syn-Turf's Request for Clarification and Modification of Final Award pursuant to Article 33 of the International Dispute Resolution Procedures ("ICDR Rules") on July 27, 2021, and, on reviewing Global Syn-Turf's Request for Clarification of Disposition of Request for Modification of August 27, 2021, and Hebei Mighty Synthetic Rubber and Plastic Co Ltd.'s response of September 2, 2021, do hereby determine, as follows:

Global Syn-Turf's Request for Clarification of Disposition of Request for Modification seeks "clarification from this tribunal as to the handling of warranty claims going forward with respect to (a) that that had already been affected during the pendency of this arbitration; and (b) whether and to what extent the changes to the procedure during this arbitration extend going forward or not." (Request at p.5.)

First, Article 33 of the ICDR Rules does not appear to permit a further request to clarify the Disposition of a prior request under Article 33. Second, the latest Request does not seek an interpretation or clarification of the award or any issue on a claim advanced in the arbitration, but rather clarification on the handling of ongoing and "going forward" warranty claims that I had made clear in my prior Disposition of July 24, 2021 were not dealt with in the Award as the actual claims themselves were not presented in the proceedings. These issues fall outside the scope of these proceedings.

In all other respects, said Award dated May 17, 2021 is hereby reaffirmed. No order as to costs is made.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Disposition of Request for Interpretation or Correction of Award was made in New York, New York, USA.

October 11, 2021

_____
Date

_____
Dan Tan